Timothy J. Conway, OSB No. 851752
  Email:  tim.conway@tonkon.com
  Direct:  503.802.2027
Eric M. Levine, OSB No. 224393
   Email:  Eric.Levine@tonkon.com
  Direct:  503.802.2072
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Main:  503.221.1440
Facsimile:  503.274.8779
  *Attorneys for Ankor Holdings, LLC*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 26-31412-7 |
| Moyata Alaka Anotta, dba Anotta Holdings, | **ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING** |
| Debtor. | **(EXPEDITED HEARING REQUESTED)** |

Ankor Holdings, LLC ("**Ankor Holdings**") moves for entry of an order, substantially

similar to the proposed form of order attached hereto as **Exhibit A**, granting emergency relief

("**Motion**") to secure and protect the real property commonly known as 8140 N. Commercial

Avenue in Portland, Multnomah County, Oregon 97217 ("**Premises**").  Specifically, Ankor

Holdings seeks permission to: (1) secure access to the Premises at its sole cost and expense,

including, without limitation, the installation, repair, and maintenance of perimeter fencing and

to undertake such additional measures as may be reasonably necessary or appropriate to protect

and secure the Premises; (2) restrict Debtor Moyata Alaka Anotta ("**Anotta**") and any other party

not authorized by Mr. Ken Eiler, the Chapter 7 trustee ("**Chapter 7 Trustee**") from entering or

**Page 1 of 7** – ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

**TONKON TORP LLP**
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

conducting business on the Premises; (3) take any other security measures the Chapter 7 Trustee may authorize; and (4) allow Ankor Holdings' environmental experts and relevant authorities from the Oregon Department of Environmental Quality ("**DEQ**") to enter the Premises and evaluate the myriad environmental hazards that Anotta has accrued on the Premises.  Ankor Holdings has conferred with the Chapter 7 Trustee who consents to this relief.

This matter is urgent and requires an expedited hearing (and a shortening of the response period) because Anotta is causing ongoing environmental harm at the Premises and incurring corresponding administrative civil fines, interest, and penalties from DEQ, some of which Ankor Holdings (as owner of the Premises and Anotta's landlord) may be liable for.  The fines accrue daily. ***Moreover, Governor Tina Kotek and the Oregon Department of Justice have decried the serious consequences of Anotta's pollution***.[1]  Granting the Motion will allow Ankor Holdings to work with the Chapter 7 Trustee to gain access to, secure, and ultimately begin the cleanup process of the Premises.

In support hereof, Ankor Holdings represents as follows:

**I.      JURISDICTION**

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157.  Venue is proper in this Court under 28 U.S.C. § 1409.  This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(G).

**II.     PRELIMINARY STATEMENT**

Ankor Holdings needs Anotta's mess cleaned up.  Anotta rented commercial real estate from Ankor Holdings beginning in the fall of 2024.  Attached as **Exhibit B** is a true and correct copy of the commercial lease dated October 24, 2024 ("**Lease**").  Anotta represented that he

---

[1]   *See* Oregon Department of Justice, AG Rayfield Asks Court to Schedule Hearing to Hold Portland Scrapyard Owner in Contempt for Repeated Environmental Violations, available at https://www.doj.state.or.us/media-home/news-media-releases/ag-rayfield-asks-court-to-act-on-portland-scrapyards-repeated-violations/ (last visited Apr. 24, 2026).

**Page 2 of 7** –   ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

would run a scrap metal business at the Premises. Instead, Anotta ran an illegal car shredding business in violation of the Lease and Oregon environmental laws.[2] Anotta's pollution includes unpermitted wastewater discharge, hazardous waste storage, air contamination, and more—thereby damaging the Premises and posing serious dangers to surrounding properties and neighbors.

Ankor Holdings tried to stop this. It began eviction proceedings against Anotta in March 2026, which were stayed the morning of the eviction trial when Anotta filed its Chapter 7 petition. Ankor Holdings wishes to work cooperatively with the Chapter 7 Trustee to gain access to, secure, and begin addressing the environmental issues at the Premises. Ankor Holdings will fund such actions at no cost to the Estate, pending the Court's approval of this Motion.

**III.     FACTUAL BACKGROUND**

Anotta leased the Premises from Ankor Holdings beginning in the fall of 2024. Anotta signed the Lease as President of "Anotta Holdings," an assumed business name, with the stated tenant as Anotta Moyata, trade name NW Metals, Inc. Under the Lease, Anotta agreed to pay $18,000 per month in Base Rent, plus calculated Additional Rent. Also under the Lease, Anotta was required to maintain the Premises according to certain standards, conduct his operations in compliance with Oregon law, and was prohibited from using the Premises for certain uses.

Anotta is in arrears for unpaid rent under the Lease for nearly $250,000 and is in violation of myriad provisions of the Lease for repeated failure to comply with Oregon environmental laws, destruction of the Premises, failure to notice Ankor Holdings of hazardous waste releases, and more. Based on these Lease violations, Ankor Holdings issued a Notice of Default and opportunity to cure on December 22, 2025. A true and correct copy of the Notice of

---

[2] DEQ has also issued a Notice of Civil Penalty Assessment and Order because Anotta operated the business without proper permitting. The Oregon Department of Justice has also initiated contempt proceedings in *State of Oregon v. NW Metals, Inc. and Moyata Anotta*, Case No. 19CV49704, in the Circuit Court of the State of Oregon for the County of Multnomah, which is pending at the time of filing.

**Page 3 of 7** –   ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

Default is attached hereto as **Exhibit C** and incorporated herein.  The defaults were not cured, and, on February 4, 2026, Ankor Holdings issued a Notice of Lease Termination, accordingly, noticing Anotta that the Lease would terminate on February 28, 2026.  A true and correct copy of the Notice of Lease Termination is attached hereto as **Exhibit D** and incorporated herein.  On February 24, 2026, Ankor Holdings sent Anotta a Supplemental Notice for failure to pay rent and reiterated that the Lease would terminate on February 28, 2026.  A true and correct copy of the Supplemental Notice is attached hereto as **Exhibit E** and incorporated herein.  Pursuant to Ankor Holdings' Notice of Default, Notice of Lease Termination, and Supplemental Notice, the Lease terminated on February 28, 2026, at 11:59 p.m.

Despite the termination of the Lease, Anotta remained in possession of the Premises and unlawfully held the Premises with force.  Accordingly, Ankor Holdings initiated the eviction action captioned as *Ankor Holdings, LLC. vs Moyata Anotta, Doing Business as NW Metals, Inc.* in the Circuit Court of the State of Oregon for the County of Multnomah ("**State Court**"), Case No. 26LT05695 ("**Eviction Case**") in March 2026.  A true and correct copy of the Complaint and Summons filed in the Eviction Case is attached hereto as **Exhibit F** and incorporated herein.

Meanwhile, NW Metals, Inc., an Oregon corporation owned and operated by Anotta and listed as a tenant by and through Anotta in the Lease, is the subject of an investigation and enforcement action brought by DEQ for multiple violations of Oregon law, including improper disposal of solid waste without a permit, operating a commercial establishment that would cause an increase of discharge of waste into waters, and operating a shredder at the Premises without obtaining an air containment discharge permit.  A true and correct copy of the Notice of Civil Penalty Assessment and Order issued by DEQ dated November 4, 2025, is attached hereto as **Exhibit G** and incorporated herein.

On April 6, 2026, Governor Tina Kotek described Anotta and NW Metals as "repeatedly violat[ing] our environmental safety and air quality standards" and thereby "put[ting] Oregon communities at risk[.]"  Similarly, Attorney General Dan Rayfield described the business

**Page 4 of 7** – ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

practices of Anotta and NW Metals as "send[ing] toxic smoke over a residential neighborhood" during a 2018 incident that caused 145 people to evacuate their homes.  And, at the Premises in particular, the Attorney General also alleged that Anotta and NW Metals continue to illegally dispose of solid waste, among other environmental violations.

The State Court scheduled a trial in the Eviction Case on Thursday, April 23, 2026, at 1:30 p.m.  Anotta filed the above-captioned bankruptcy case on April 23, 2026 ("**Petition Date**").  Notice of the bankruptcy filing was provided to Ankor Holdings at 12:27 p.m. on April 23, 2026, just one hour before the eviction trial, causing it to be automatically stayed.  As of the Petition Date, any of Anotta's possessory rights to the Premises have vested in the Bankruptcy Estate and are controlled by the Chapter 7 Trustee.  *See* 11 U.S.C. §§ 323, 541(a), 542(a), 363(b)(1), and 704(a).

Ankor Holdings, through counsel, reached out to the Chapter 7 Trustee regarding the environmental issues at the Premises.  The Chapter 7 Trustee subsequently informed Anotta that Anotta is not authorized to conduct any business on the Premises, nor remove any equipment or vehicles from it.  With respect to the Premises, Anotta responded that "my possessory and operational interests, as well as related disputes with the landlord, are subject to ongoing legal proceedings.  Any restriction on access or control over the premises should be addressed through appropriate court authorization."  A true and correct copy of the email correspondence between the Chapter 7 Trustee and Anotta is attached hereto as **Exhibit H**.  This Court is the proper forum to seek direction regarding protection of the Premises and property of the Bankruptcy Estate.

IV.    **ARGUMENT**

A.    **Ankor Holdings Seeks an Order Permitting it to Help Secure and Protect the Premises.**

Ordinarily, the Chapter 7 Trustee would incur the expenses necessary to protect the Premises and potential assets of the estate.  However, in this instance, it is uncertain whether any

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

assets will be available to satisfy such expenses, and the Premises require immediate protection and action. Accordingly, and because the Premises are owned by Ankor Holdings, Ankor Holdings is willing to pay the expenses associated with securing and protecting the Premises. Anotta is currently damaging the Premises through his illegal, unfettered pollution. He is causing hazardous chemicals to seep into the ground and contaminate water streams, particulates to contaminate the air from his car shredder, and piling incredible amounts of vehicular waste across the Premises. Both the Governor and the Attorney General have publicly called out Anotta, by name, and demanded that he stop his harmful conduct at the Premises. Ankor Holdings has also tried to stop Anotta by evicting him from the Premises, but such efforts were stayed by the filing of this Chapter 7 petition.

Not only is it in the public's interest to stop Anotta's illegal activities at the Premises, Ankor Holdings—as the owner and landlord of the Premises—also has an interest in stopping the continuous damage to the Premises. Moreover, Anotta's continued illegal activity potentially exposes Ankor Holdings to DEQ fines because it owns the Premises.

Accordingly, Ankor Holdings is willing to pay the costs to secure the Premises—instead of such costs being borne by the Estate. That includes the costs to install and maintain fencing around the perimeter of the Premises and whatever other actions are deemed necessary or appropriate to protect the Premises, and the costs of having environmental experts evaluate the Premises and determine a process to remediate Anotta's illegal conduct. Allowing Ankor Holdings to pay the costs of securing and protecting the Premises is in the best interest of the public and the Estate.

**B.      The Order Should Prohibit Unauthorized Access to the Premises.**

The bankruptcy estate is currently in possession of the Premises. The Chapter 7 Trustee is the person with authority over property of the estate and the right to control access to the Premises. *See* 11 U.S.C. §§ 323, 541(a), 542(a), 363(b)(1), and 704(a). The Chapter 7 Trustee has notified Anotta of the Chapter 7 Trustee's authority over property of the estate. However,

**Page 6 of 7** –   ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

Anotta has responded that his access to the Premises "should be addressed through appropriate court authorization." *See* **Exhibit H**. Based on Anotta's response, an order of this Court is needed that expressly states that the Chapter 7 Trustee has possession and control over all property of the estate and all access to the Premises shall be limited only to such persons and entities as authorized by the Chapter 7 Trustee pending further order of this Court.

**V.      CONCLUSION**

For the foregoing reasons, Ankor Holdings hereby respectfully requests that this Court enter an order, substantially similar to the proposed form of order attached hereto as **Exhibit A**, permitting Ankor Holdings to secure and protect the property, shortening the time for a response to the Motion, expediting a hearing on the Motion, and such other relief as the Court deems fit.

DATED:  April 27, 2026.

TONKON TORP LLP


By:    */s/ Eric M. Levine*
Timothy J. Conway, OSB No. 851752
Eric M. Levine, OSB No. 224393
*Attorneys for Ankor Holdings, LLC*

**Page 7 of 7** –   ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| In re | Case No. 26-31412-7 |
|---|---|
| Moyata Alaka Anotta, dba Anotta Holdings, Debtor. | **ORDER GRANTING ANKOR HOLDINGS, LLC'S EMERGENCY MOTION TO SECURE AND PROTECT PROPERTY** |

THIS MATTER having come before the Court on Ankor Holding, LLC's ("**Ankor Holdings**") Emergency Motion to Secure and Protect Property ("**Motion**")[1] [ECF No. _____] and the Court being duly advised in the premises and finding good cause; now, therefore;

1.    The Motion is GRANTED.

2.    Any objections to the Motion that have not otherwise been withdrawn or resolved are overruled.

3.    Ankor Holdings may secure access to the Premises at its sole cost and expense, including, without limitation, the installation, repair, and maintenance of perimeter fencing, and to undertake such additional measures as may be reasonably necessary or appropriate to protect and secure the Premises.

---

[1] Capitalized terms not defined herein have the same meaning as set forth in the Motion.

**Page 1 of 3** – ORDER GRANTING ANKOR HOLDINGS, LLC'S EMERGENCY MOTION TO SECURE AND PROTECT PROPERTY

EXHIBIT A
Page 1 of 3

4.      Debtor Anotta and any other party not authorized by the Chapter 7 Trustee are restricted from entering the Premises and are restricted from conducting business on the Premises.

5.      Ankor Holdings may take any other security measures the Chapter 7 Trustee authorizes.

6.      Ankor Holdings' environmental experts and relevant authorities from DEQ may access the Premises and evaluate the environmental hazards at the Premises.

7.      Ankor Holdings provided adequate notice of the Motion to Debtor Anotta under the circumstances of the case.

8.      Notwithstanding anything in the Bankruptcy Code or Bankruptcy Rules to the contrary, this Order shall be effective upon entry.

9.      Ankor Holdings, the Chapter 7 Trustee, and all other parties are authorized to take all actions necessary to effectuate the relief granted in this Order.

10.     This Court shall retain exclusive jurisdiction and power over all affected parties with respect to any matters, claims, or rights arising from or related to the implementation and interpretation of this Order.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Page 2 of 3** – ORDER GRANTING ANKOR HOLDINGS, LLC'S EMERGENCY MOTION TO SECURE AND PROTECT PROPERTY

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT A
Page 2 of 3

### 

I certify that I have complied with the requirements of LBR 9021-1(a).

Presented by:

TONKON TORP LLP

By: _____
     Timothy J. Conway, OSB No. 851752
     Eric M. Levine, OSB No. 224393
     1300 SW Fifth Avenue, Suite 2400
     Portland, OR 97201
     Telephone:  (503) 221-1440
     Facsimile:  (503) 274-8779
     Email:     tim.conway@tonkon.com
               eric.levine@tonkon.com
     *Attorneys for Ankor Holdings, LLC*

044805\00003\19531755v1

**Page 3 of 3** – ORDER GRANTING ANKOR HOLDINGS, LLC'S EMERGENCY MOTION TO
      SECURE AND PROTECT PROPERTY

EXHIBIT A
Page 3 of 3

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of Industrial Lease (Net Lease)*
**© 2018 BOMA OREGON**

## 8140 N COMMERCIAL AVE LEASE
### (Net Lease)

**Between:**

**ANCHOR HOLDINGS, LLC**

**("Landlord")**

**And**

**Anotta Holdings**

**("Tenant")**

**Dated** _____ **10/24/2024** _____

## TABLE OF CONTENTS

**Page**

1.1   Basic Lease Terms ................................................................................................................1

1.2   Lease of Premises. ...............................................................................................................2

1.3   Delivery of Possession and Commencement. ......................................................................2

2.1   Rent Payment. .....................................................................................................................3

2.2   Prepaid Rent. .......................................................................................................................3

3.1   Security Deposit. .................................................................................................................3

4.1   Use. .....................................................................................................................................4

4.2   Equipment. ..........................................................................................................................4

4.3   Signs and Other Installations ..............................................................................................4

4.4   Parking ................................................................................................................................4

5.1   Utilities and Services...........................................................................................................4

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*



* Users of this lease form are encouraged to show changes using a redlining or blacklining function. Users who receive this form completed by others are encouraged to compare the form received to the form published by BOMA Oregon to ensure the acceptability of any changes or variations from the published form.
**Error! Unknown document property name.**

EXHIBIT B
Page 1 of 24

Standard Form of Industrial Lease (Net Lease)*
**© 2018 BOMA OREGON**

5.2    Extra Usage. ................................................................................................................5

5.3    Security ......................................................................................................................5

6.1    Maintenance and Repair. ............................................................................................5

6.2    Alterations ..................................................................................................................6

7.1    Indemnity ...................................................................................................................6

7.2    Insurance ....................................................................................................................6

8.1    Fire or Casualty ..........................................................................................................7

8.2    Waiver of Subrogation ...............................................................................................7

9.1    Eminent Domain .........................................................................................................7

10.1   Assignment and Subletting.........................................................................................7

11.1   Default. ......................................................................................................................8

11.2   Remedies for Default. ................................................................................................8

11.3   Right to Cure. .............................................................................................................9

12.1   Surrender; Holdover ...................................................................................................9

13.1   Regulations. ...............................................................................................................9

14.1   Access ........................................................................................................................9

14.2   Furniture and Bulky Articles ...................................................................................10

15.1   Notices. ....................................................................................................................10

16.1   Subordination and Attornment .................................................................................10

16.2   Transfer of Building .................................................................................................10

16.3   Estoppels. .................................................................................................................10

17.1   Attorney Fees ...........................................................................................................10

18.1   Quiet Enjoyment. .....................................................................................................11

18.2   Limitation on Liability .............................................................................................11

19.1   Additional Rent:  Tax Adjustment............................................................................11

19.2   Additional Rent: Cost-of-Living Adjustment. ..........................................................11

19.3   Additional Rent:  Operating Expense Adjustment.....................................................12

19.4   Operating Expense Disputes......................................................................................12

20.1   Hazardous Materials..................................................................................................12

20.2   Mold. ........................................................................................................................13

21.1   Complete Agreement; No Implied Covenants ...........................................................13

21.2   Space Leased AS IS. .................................................................................................13

21.3   Captions ....................................................................................................................13

21.4   Nonwaiver. ...............................................................................................................13

21.5   Consent. ....................................................................................................................13



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*

\* Users of this lease form are encouraged to show changes using a redlining or blacklining function. Users who receive this form completed by others are encouraged to compare the form received to the form published by BOMA Oregon to ensure the acceptability of any changes or variations from the published form.
**Error! Unknown document property name.**

Standard Form of Industrial Lease (Net Lease)*
**© 2018 BOMA OREGON**

| | | |
|---|---|---|
| 21.6 | Force Majeure. | 13 |
| 21.7 | Commissions | 13 |
| 21.8 | Successors | 14 |
| 21.9 | Financial Reports | 14 |
| 21.10 | Waiver of Jury Trial. | 14 |
| 21.11 | OFAC Compliance | 14 |
| 21.12 | Representation; Preparation | 14 |
| 21.13 | Exhibits | 15 |



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*

\* Users of this lease form are encouraged to show changes using a redlining or blacklining function. Users who receive this form completed by others are encouraged to compare the form received to the form published by BOMA Oregon to ensure the acceptability of any changes or variations from the published form.

**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**1.1    Basic Lease Terms.**

A.  **REFERENCE DATE OF LEASE**          10/24/2024

B.  **TENANT:**                                         **MOYATA ANOTTA**
    Trade Name:                                   NW Metals, INC.
    Address (Leased Premises):       8140 N Commercial Ave, Portland, OR 97227

    Address (For Notices):               3744 NW Devoto Ln
                                  Portland, OR 97229

        E-mail address:                       anottam@gmail.com

        Primary Tenant Contact:        Moyata Anotta
        Telephone:                             503-367-6955
        E-mail address:

C.  **LANDLORD:**                                  Ankor Holdings, LLC
    Address (For Notices):               3877 NE Bryant st

        E-mail address:

                                 Jesce Horton
    Landlord Primary Contact:        5037896654
    Telephone:
    E-mail address:                        Jescejh@gmail.com
    Address for Rent Payments:      3877 NE Bryant St

D.  **PREMISES**: 8140 N Commercial Street___ in ____Portland____, Oregon, as generally shown on Exhibit A hereto. The land upon which the Building is located, including all parking areas, walkways, landscape areas, together with the Building, is referred to in this Lease as the "Property."

E.  **PREMISES AREA:** Approximately __23,980__Rentable Square Feet (See Exhibit "A"). The parties acknowledge that the calculation of square footage of the Premises is an approximation.  No recalculation of square footage of the Premises shall affect the obligations of Tenant under this Lease, including, without limitation, the amount of Base Rent payable by Tenant.

F.  **BUILDING AREA:** Approximately _____23,980_____Rentable Square Feet on 3.03 acres.

G.  **TENANT'S PROPORTIONATE SHARE:** __100___%. The percentage is obtained by dividing the rentable square feet of the Premises by the total number of rentable square feet of the Building.  Landlord may modify Tenant's Proportionate Share if the Building size is increased or decreased, as the case may be.

H.  **TENANT'S PERMITTED USE OF PREMISES:**

    Scrap metal

    ____ .

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 1
**Error! Unknown document property name.**



Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

I.  **TERM OF LEASE:** Commencement Date:  November 1, 2024_____

Expiration Date:  Month to Month term. Landlord or Tenant may terminate this lease with 30-day written notice.

Number of Full Calendar Months:  _____

J.  **INITIAL MONTHLY BASE RENT:**  $18,000_____

K.  **BASE RENT ADJUSTMENT: N/A**

| Effective Date of Rent Increase | New Monthly Base Rent |
|---|---|
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |
| _____, 20_____ | $_____ |

L.  **PARKING:**  ___NA_____Spaces [Insert "NA" if not applicable]

M.  **PREPAID RENT:**  Upon execution of this Lease, Tenant shall deposit with Landlord __$0___ (the "Prepaid Rent"), which shall be Base Rent due for the first month of the Lease Term for which Base Rent is payable.

N.  **SECURITY DEPOSIT:**  Upon execution of this Lease, Tenant shall deposit with Landlord ____$18,000 (the "Security Deposit"). Due on December 1st, 2024

O.  **BROKER(S):**  ____Steve Bowers of Kidder Mathews_____

P.  **GUARANTORS:**  __N/A_____

If Guarantor(s) is/are listed, Tenant shall cause Guarantor(s) to return to Landlord an executed Guaranty of this Lease in the form attached as Exhibit E at the same time as Lease execution.

For valuable consideration, Landlord and Tenant covenant and agree as follows:

**1.2    Lease of Premises.**
Landlord leases to Tenant the premises described in the Basic Lease Terms and shown on Exhibit A (the "Premises"), located in the Building, subject to the terms and conditions of this Lease.

**1.3    Delivery of Possession and Commencement.**
The "Lease Term" or "Term" shall be the number of full calendar months stated in the Basic Lease Terms plus the remaining portion of the calendar month in which the Commencement Date occurs if the Commencement Date does not occur on the first day of a calendar month.  Should Landlord be unable to deliver possession of the Premises on the Commencement Date stated in the Basic Lease Terms, and no delay is caused by a "Tenant Delay" as defined in Exhibit B of this Lease, the Commencement Date will be deferred



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 2
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

and Tenant shall owe no rent until notice from Landlord tendering possession to Tenant. If possession is not so tendered within ninety (90) days following the Commencement Date set forth in the Basic Lease Terms, and no delay is caused by a Tenant Delay, then Tenant may elect to terminate this Lease by notice to Landlord within ten (10) days following expiration of the ninety (90)-day period. Landlord shall have no liability to Tenant for delay in delivering possession. The expiration date of this Lease shall be the date stated in the Basic Lease Terms or, if later, the last day of the calendar month that is the number of full calendar months stated in the Basic Lease Terms from the month in which the Commencement Date occurs. The Premises shall be improved in accordance with Exhibit B. The existence of any "punch list"-type items shall not postpone the Commencement Date of this Lease. Tenant's occupancy of the Premises shall constitute conclusive acceptance of the amount of square footage stated herein, and of the condition of the Premises. Upon determination of the Commencement Date, Landlord and Tenant will complete the Commencement Date Lease Certificate in the form attached as Exhibit C.

**2.1    Rent Payment.**
Tenant shall pay to Landlord the Base Rent for the Premises and any "Additional Rent" provided herein, without deduction or offset. "Additional Rent" means amounts determined under Section 19 of this Lease and any other sums payable by Tenant to Landlord under this Lease. For the purposes of this Lease, Base Rent and Additional Rent are herein referred to collectively as "Rent." Rent is payable in advance on the first day of each month commencing on the Commencement Date of this Lease. Rent for any partial month during the Lease Term shall be prorated to reflect the number of days during the month that the Lease Term is in effect and shall be due on the first day of any such partial month in which the Lease Term is in effect. Rent not paid when due shall bear interest at the rate of one and one-half percent (1 ½%) per month, or if less, the maximum applicable rate of interest permitted by law, until paid. For Rent payments made more than ten (10) days late, Landlord may at its option impose a late charge of the greater of five percent (5%) of the Rent past due or One Hundred dollars ($100) in lieu of interest for the first month of delinquency. Tenant acknowledges that late payment by Tenant to Landlord of any Rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impracticable to ascertain, and that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of any such late payment and is not a penalty. Neither imposition nor collection nor failure to impose or collect such late charge shall be considered a waiver of any other remedies available for default. In addition to such late charge, an additional charge of Seventy-five dollars ($75) shall be recoverable by Landlord for any returned checks.

**2.2    Prepaid Rent.**
Upon the execution of this Lease, Tenant shall pay to Landlord the Prepaid Rent set forth in the Basic Lease Terms. Landlord's obligations with respect to the Prepaid Rent are those of a debtor and not of a trustee, and Landlord shall be entitled to commingle the Prepaid Rent with Landlord's general funds. Landlord shall not be required to pay Tenant interest on the Prepaid Rent. Landlord shall be entitled to immediately endorse and cash Tenant's Prepaid Rent; however, such endorsement and cashing shall not constitute Landlord's acceptance of this Lease. In the event Landlord does not accept this Lease, Landlord shall promptly return the Prepaid Rent to Tenant.

**3.1    Security Deposit.**
At the same time as execution of the Lease by Tenant, Tenant shall pay to Landlord the amount stated in the Basic Lease Terms as a Security Deposit. Landlord may apply the Security Deposit to pay the cost of



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 3
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

performing any obligation Tenant fails to perform within the time required by this Lease, but such application by Landlord shall not waive Landlord's other remedies nor be the exclusive remedy for Tenant's default. If the Security Deposit is applied by Landlord, Tenant shall on demand pay the sum necessary to replenish the Security Deposit to its original amount. In no event will Tenant have the right to apply any part of the Security Deposit to any Rent or other sums due under this Lease. If Tenant is not in default at the expiration or termination of this Lease, Landlord shall return the entire Security Deposit to Tenant, except for any portion retained by Landlord pursuant to the provisions of this Section 3.1, Section 12.1, or any other provision of this Lease. Landlord's obligations with respect to the Security Deposit are those of a debtor and not of a trustee, and Landlord shall be entitled to commingle the Security Deposit with Landlord's general funds. Landlord shall not be required to pay Tenant interest on the Security Deposit. Landlord shall be entitled to immediately endorse and cash Tenant's Security Deposit; however, such endorsement and cashing shall not constitute Landlord's acceptance of this Lease. In the event Landlord does not accept this Lease, Landlord shall return said Security Deposit. If Landlord sells its interest in the Premises during the term hereof and deposits with or credits to the purchaser the unapplied portion of the Security Deposit, thereupon Landlord shall be discharged from any further liability or responsibility with respect to the Security Deposit.

4.1 **Use.**
Tenant shall use the Premises as a business for the Tenant's Permitted Use stated in the Basic Lease Terms and for no other purpose without Landlord's written consent. In connection with its use, Tenant shall at its expense promptly comply and cause the Premises to comply with all applicable laws, ordinances, rules and regulations of any public authority ("Laws") and shall not annoy, obstruct, or interfere with the rights of other tenants of the Building. Tenant shall create no nuisance or allow any objectionable fumes, noise, light, vibration, radiation, or electromagnetic waves to be emitted from the Premises. If any sound or vibration produced by Tenant's activities is detectable outside the Premises, Tenant shall provide such insulation as is required to muffle such sound or vibration and render it undetectable at Tenant's cost. Tenant shall not conduct any activities that will increase Landlord's insurance rates for any portion of the Building or that will in any manner degrade or damage the reputation of the Building. Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operations as well as upon all trade fixtures, leasehold improvements, merchandise, and other personal property in or about the Premises.

4.2 **Equipment.**
Tenant shall install in the Premises only such equipment as is customary for Tenant's Permitted Use and shall not overload the floors or electrical circuits of the Premises or Building or alter the plumbing or wiring of the Premises or Building. Landlord must approve in advance the location of and manner of installing any wiring or electrical, heat generating, climate sensitive or communication equipment or exceptionally heavy articles. All telecommunications equipment, conduit, cables and wiring, additional dedicated circuits and any additional air conditioning required because of heat generating equipment or special lighting installed by Tenant shall be installed and operated at Tenant's expense and, at Landlord's written request, shall be removed by Tenant at Tenant's sole cost and expense. Landlord shall have no obligation to permit the installation of equipment by any telecommunications provider whose equipment is not then servicing the Building. Tenant shall have no right to install any equipment on or through the roof of the Building, or use or install or store any equipment or other items outside the interior boundary of the Premises.

 {00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 4
**Error! Unknown document property name.**

EXHIBIT B
Page 7 of 24

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**4.3     Signs and Other Installations.**

No signs, awnings, or other apparatus shall be painted on or attached to the Building or anything placed on any glass or woodwork of the Premises or positioned so as to be visible from outside the Premises, including any window covering (shades, blinds, curtains, drapes, screens, or tinting materials) without Landlord's written consent, and Landlord's approval as to design, size, location, and color. All signs installed by Tenant shall comply with Landlord's standards for signs and all applicable codes and all signs and sign hardware shall be removed upon termination of this Lease with the sign location restored to its former state unless Landlord elects to retain all or any portion thereof. Tenant may not install any alarm boxes, foil protection tape or other security equipment on the Premises without Landlord's prior written consent. Any material violating this provision may be removed and disposed of by Landlord without compensation to Tenant, and Tenant shall reimburse Landlord for the cost of the same upon request.

**4.4     Parking.**

If a number of parking spaces is designated in the Basic Lease Terms, then during the term of this Lease, Landlord shall make available to Tenant's employees such number of parking space(s) at the parking lot servicing the Building, on a non-exclusive first come, first served basis. Landlord's obligation pursuant to this Section shall be limited to making such spaces available in whatever manner Landlord deems appropriate (attended, unattended, marked stalls, or other means), so long as the number of spaces referred to are made available to Tenant. Tenant shall be required to pay as rental for the spaces made available to, and used by, Tenant the established parking rates for the Building or lot (as the case may be), as adjusted from time to time, and such sum shall be Additional Rent payable under this Lease.

**5.1     Utilities and Services.**

Landlord will arrange with the applicable utility providers to furnish water and electricity to the Building at all times. Tenant shall comply with all government laws or regulations regarding the use or reduction of use of utilities on the Premises. Interruption of services or utilities shall not be deemed an eviction or disturbance of Tenant's use and possession of the Premises, render Landlord liable to Tenant for damages, or relieve Tenant from performance of Tenant's obligations under this Lease. Landlord shall take all reasonable steps to correct any interruptions in service caused by defects in utility systems within Landlord's reasonable control. Tenant shall provide its own surge protection for power furnished to the Premises. Landlord shall have the exclusive right to choose the utility service providers to the Premises and may change providers at its discretion. Tenant shall cooperate with Landlord and the utility service providers at all times as reasonably necessary, and shall allow Landlord and utility service providers reasonable access to the pipes, lines, feeders, risers, wiring, and any other machinery within the Premises.

**5.2     Extra Usage.**

If Tenant uses excessive amounts of utilities or services of any kind because of operation outside of normal Building hours, high demands from office machinery and equipment, nonstandard lighting, or any other cause, Landlord may impose a reasonable charge for supplying such extra utilities or services, which charge shall be payable monthly by Tenant in conjunction with monthly Base Rent payments or, at Landlord's option, within ten (10) days of Landlord's billing therefor. In case of dispute over any extra charge under this Section, Landlord shall designate a qualified independent engineer whose decision shall be conclusive on both parties. Landlord and Tenant shall each pay one-half (1/2) of the cost of such determination. Landlord reserves the right to install separate meters for any such utility and to charge Tenant for the cost of such installation.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 5
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**5.3**    **Security.**
Landlord may but shall have no obligation to provide security service or to adopt security measures regarding the Premises, and Tenant shall cooperate with all reasonable security measures adopted by Landlord. Tenant may install a security system within the Premises with Landlord's written consent, which consent will not be unreasonably withheld. Landlord will be provided with an access code to any security system and shall not have any liability for accidentally setting off Tenant's security system. Landlord may modify the type or amount of security measures or services provided to the Building or the Premises at any time without notice.

**6.1**    **Maintenance and Repair.**
6.1.1    Tenant shall maintain and repair the Premises in clean and good condition, including, without limitation, maintaining and repairing all walls, floors, and ceilings, all interior doors, partitions and windows, and all Premises systems, fixtures, and equipment that are not the maintenance responsibility of Landlord, as well as damage caused by Tenant, its agents, employees, contractors or invitees.

6.1.2    Landlord shall have no liability for failure to perform required maintenance and repair unless written notice of such maintenance or repair is given by Tenant and Landlord fails to commence efforts to remedy the problem in a reasonable time and manner. Landlord shall have the right to erect scaffolding and other apparatus necessary for the purpose of making repairs or alterations to the Building, and Landlord shall have no liability for interference with Tenant's use because of such work. Work may be done during normal business hours. Tenant shall have no claim against Landlord for any interruption or reduction of services or interference with Tenant's occupancy caused by Landlord's maintenance and repair, and no such interruption or reduction shall be construed as a constructive or other eviction of Tenant.

6.1.3    Landlord's cost of repair and maintenance shall be considered "operating expenses" for purposes of Section 19.3, except that repair of damage caused by negligent or intentional acts or breach of this Lease by Tenant, its agents, employees, contractors, or invitees shall be at Tenant's expense.

**6.2**    **Alterations.**
6.2.1    Tenant shall not make any alterations, additions, or improvements to the Premises, change the color of the interior, or install any wall or floor covering without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Should Landlord consent in writing to Tenant's alteration of the Premises, Tenant shall contract with a contractor approved by Landlord for the construction of such alterations, shall secure all appropriate governmental approvals and permits, and shall complete such alterations with due diligence in compliance with the plans and specifications approved by Landlord. All such construction shall be performed in a manner that will not interfere with the quiet enjoyment of other tenants of the Building. Any such improvements, alterations, wiring, cables, or conduit installed by Tenant shall at once become part of the Premises and belong to Landlord, except for removable machinery and unattached movable trade fixtures. Landlord may at its option require that Tenant remove any improvements, alterations, wiring, cables, or conduit installed by or for Tenant and restore the Premises to the original condition upon termination of this Lease. Landlord shall have the right to approve the contractor used by Tenant for any work in the Premises, and to post notices of nonresponsibility in connection with work being performed by Tenant in the Premises. Work by Tenant shall comply with all laws then applicable to the Premises. Tenant shall not allow any liens to attach to the Building or Tenant's interest in the Premises as a result of its activities or any alterations.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 6
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

6.2.2     Landlord may require Tenant's general contractor performing any work at the Premises to post a payment and performance bond equal to one hundred twenty-five percent (125%) of the estimated cost of the contractor's work, including work performed by any subcontractor thereunder.  Tenant shall provide, or shall cause Tenant's general contractor to provide, evidence of the following insurance coverages prior to commencing work and upon demand during the course of the work: a) worker's compensation for statutory limits in compliance with applicable state and federal laws; b) commercial general liability with limits of not less than Five Million Dollars ($5,000,000) combined single limit per occurrence for bodily injury and property damage, naming Landlord and its building manager as additional insureds; and c) builder's risk coverage in the coverage amount not less than the projected cost of the improvements contemplated.  Each certificate of insurance must contain a provision confirming that no cancellation or material change in policies will be effective except upon thirty (30) days written notice to Landlord, if available.

6.2.3     Landlord may perform alterations to or change the configuration of the Building, the parking area, and other areas on the Property, in Landlord's sole discretion.

**7.1     Indemnity.**
Tenant shall indemnify, defend, and hold harmless Landlord and its managing agents, and employees from any claim, liability, damage, or loss occurring on the Premises, or any cost or expense in connection therewith (including attorney fees), arising out of (a) any damage to any person or property occurring in, on or about the Premises, (b) use by Tenant or its agents, invitees, or contractors of the Premises and/or the Building, and/or (c) Tenant's breach or violation of any term of this Lease.

**7.2     Insurance.**
Tenant shall carry (a) liability insurance with general aggregate limits of not less than One Million Dollars ($1,000,000) with no less than One Million Dollars ($1,000,000) per occurrence for bodily injury and no less than One Million Dollars ($1,000,000) per occurrence for property damage**,** and (b) Business Auto Liability insurance covering owned, non-owned, and hired vehicles with a limit of not less than One Million Dollars ($1,000,000) per occurrence, which insurance shall have an endorsement naming Landlord**,** Landlord's lender, if any, and Landlord's managing agent, if any, as an additional insured, cover the liability insured under Section 7.1 of this Lease and be in a form and with companies reasonably acceptable to Landlord. Prior to occupancy, Tenant shall furnish a certificate evidencing such insurance that, if reasonably available, shall state that the coverage shall not be canceled or materially changed without thirty (30) days' advance written notice to Landlord, Landlord's lender, if any, and Landlord's managing agent, if any.  In any event, Tenant shall notify Landlord promptly upon learning of any proposed or pending change in any coverage required under this Lease; Tenant shall furnish to Landlord a renewal certificate at least thirty (30) days prior to expiration of any policy.  All insurance required to be procured by Tenant under this Lease shall be issued by a carrier reasonably acceptable to Landlord and authorized to issue policies in the state in which the Property is located. All insurance providers shall have an AM Best rating of AV or better and shall be licensed to issue insurance in the State of Oregon.

**8.1     Fire or Casualty.**
"Major Damage" means damage by fire or other casualty to the Building or the Premises that causes the Premises or any substantial portion of the Building to be unusable, or that will cost more than twenty-five percent (25%) of the pre-damage value of the Building to repair, or that is not covered by insurance.  In case of Major Damage, Landlord may elect to terminate this Lease by notice in writing to the Tenant within



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 7
**Error! Unknown document property name.**

EXHIBIT B
Page 10 of 24

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

thirty (30) days after such date. If this Lease is not terminated following Major Damage, or if damage occurs that is not Major Damage, Landlord shall promptly restore the Premises to the condition existing just prior to the damage. Tenant shall promptly restore all damage to tenant improvements or alterations installed or paid for by Tenant or pay the cost of such restoration to Landlord if Landlord elects to do the restoration of such improvements. Unless the casualty was caused by Tenant, Rent shall be reduced from the date of damage until the date restoration work being performed by Landlord is substantially complete, with the reduction to be in proportion to the area of the Premises not usable by Tenant.

**8.2     Waiver of Subrogation.**
Tenant shall be responsible for insuring its personal property and trade fixtures located on the Premises and any alterations or tenant improvements it has made to the Premises. Neither Landlord, its managing agent, nor Tenant shall be liable to the other for any loss or damage caused by water damage, sprinkler leakage, or any of the risks that are covered by property insurance or could be covered by a customary broad form of property insurance policy, or for any business interruption, and there shall be no subrogated claim by one party's insurance carrier against the other party arising out of any such loss.

**9.1     Eminent Domain.**
If a condemning authority takes title by eminent domain or by agreement in lieu thereof to the entire Building or a portion sufficient to render the Premises unsuitable for Tenant's use, then either party may elect to terminate this Lease effective on the date that possession is taken by the condemning authority. If this Lease is not terminated, then Base Rent shall be reduced for the remainder of the term in an amount proportionate to the reduction in area of the Premises caused by the taking. All condemnation proceeds shall belong to Landlord, and Tenant shall have no claim against Landlord or the condemnation award because of the taking.

**10.1     Assignment and Subletting.**
Tenant shall not assign or encumber its interest under this Lease or sublet all or any portion of the Premises without first obtaining Landlord's consent in writing. This provision shall apply to all transfers by operation of law, and to all mergers and changes in control of Tenant, all of which shall be deemed assignments for the purposes of this Section. No assignment shall relieve Tenant of its obligation to pay Rent or perform other obligations required by this Lease, and no consent to one assignment or subletting shall be a consent to any further assignment or subletting. If Tenant proposes a subletting or assignment for which Landlord's consent is required, Landlord shall have the option of terminating this Lease and dealing directly with the proposed subtenant or assignee, or any third party. If Landlord does not terminate this Lease, Landlord shall not unreasonably withhold its consent to any assignment or subletting provided the effective rental paid by the subtenant or assignee is not less than the current scheduled rental rate of the Building for comparable space and the proposed Tenant is compatible with Landlord's normal standards for the Building. If an assignment or subletting is permitted, fifty percent (50%) of any net profit, or the net value of any other consideration received by Tenant as a result of such transaction, shall be paid to Landlord promptly following its receipt by Tenant. Tenant shall pay a nonrefundable fee in the amount of Seven Hundred Fifty Dollars ($750) to Landlord at the time of any request for assignment or subletting, regardless of whether Landlord's consent is granted, and shall also pay reasonable attorneys', accountants' and other professional fees incurred in connection with any such request, regardless of whether Landlord's consent is granted. It shall not be unreasonable for Landlord to withhold consent to a proposed sublease or an assignment (a) if the character, reputation, experience, credit, financial strength or business of the proposed sublessee or assignee is unacceptable to Landlord, or (b) if the proposed use of the Premises by the proposed sublessee or assignee is



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 8
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

not a permitted use of the Premises authorized by this Lease, or (c) if in the Landlord's business judgment, the Premises will be adversely impacted by the proposed sublessee or assignee, or (d) if the proposed sublessee or assignee is a former tenant of the Property within the last twelve (12) months prior to the request, or (e) if the proposed sublessee or assignee does not expressly assume and agree in writing to be bound by all of Tenant's obligations under this Lease and, in the event of an assignment, be directly responsible for all of Tenant's obligations under this Lease, or (f) if Tenant is in breach or default under this Lease, or has been within breach or default within the past six (6) months prior to the request of any of terms, covenants, or conditions of this Lease.

**11.1    Default.**
Any of the following shall constitute an Event of Default by Tenant under this Lease (time of performance being of the essence of this Lease):

11.1.1    Tenant's failure to pay Rent or any other charge under this Lease within ten (10) days after it is due.

11.1.2    Tenant's failure to comply with any other term or condition within twenty (20) days following written notice from Landlord specifying the noncompliance.  If such noncompliance cannot be cured within the twenty (20)-day period, this provision shall be satisfied if Tenant commences correction within such period and thereafter proceeds in good faith and with reasonable diligence to complete correction as soon as possible but not later than ninety (90) days after the date of Landlord's notice.

11.1.3    Failure of Tenant to execute the documents described in Section 16.1 or 16.3 within the time required under such Sections; failure of Tenant to provide or maintain the insurance required of Tenant pursuant hereto; or failure of Tenant to comply with any Laws as required pursuant hereto within twenty-four (24) hours after written demand by Landlord.

11.1.4    Tenant's insolvency, business failure or assignment for the benefit of its creditors.  Tenant's commencement of proceedings under any provision of any bankruptcy or insolvency law or failure to obtain dismissal of any petition filed against it under such laws within the time required to answer; or the appointment of a receiver for all or any portion of Tenant's properties or financial records.

11.1.5    Assignment or subletting by Tenant in violation of Section 10.1.

11.1.6    Vacation or abandonment of the Premises without the written consent of Landlord or failure to occupy the Premises within twenty (20) days after notice from Landlord tendering possession.

**11.2    Remedies for Default.**
Upon occurrence of an Event of Default as described in Section 11.1, Landlord shall have the right to the following remedies, which are intended to be cumulative and in addition to any other remedies provided under applicable law or under this Lease:

11.2.1    Landlord may at its option terminate this Lease, without prejudice to its right to damages for Tenant's breach.  With or without termination, Landlord may retake possession of the Premises (with or without use of legal process) and may use or relet the Premises without accepting a surrender or waiving the right to damages.  Following such retaking of possession, efforts by Landlord to relet the Premises shall be sufficient



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 9
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

if Landlord follows its usual procedures for finding tenants for the space at rates not less than the current rates for other comparable space in the Building. If Landlord has other vacant space in the Building, prospective tenants may be placed in such other space without prejudice to Landlord's claim to damages or loss of rentals from Tenant.

11.2.2    Landlord may recover all damages caused by Tenant's default that shall include an amount equal to (a) all Rent lost through the date that, with commercially reasonable efforts, Landlord should be able to relet the Premises to one or more suitable replacement tenants and such replacement tenants shall begin paying Rent, including monthly Base Rent, plus (b) the difference between the Rent provided under this Lease for the remainder of the Term less the amount that can reasonably be expected to be earned in Rent from replacement tenants, discounted at the federal discount rate published by the Federal Bank, San Francisco office, at the time of the Event of Default. In addition, Landlord shall be entitled to recover all costs of reletting including, but not limited to, the cost of removing any tenant improvements, personal property, rubbish and debris left on the Premises by Tenant, the cost of preparing the space for reletting, and the cost of all leasing commissions, tenant improvements, free rent periods, and all other tenant concessions reasonably incurred by Landlord in reletting the Premises to one or more replacement tenants. Landlord may sue periodically to recover damages as they occur throughout the Lease term, and no action for accrued damages shall bar a later action for damages subsequently accruing, or Landlord may elect in any one action to recover accrued damages, plus damages attributable to the remaining term of the Lease.

**11.3**    **Right to Cure.**
Landlord may, but shall not be obligated to, make any payment or perform any obligation that Tenant has failed to perform when required under this Lease. All of Landlord's expenditures incurred to correct the failure to perform shall be reimbursed by Tenant upon demand with interest from the date of expenditure at the rate of one and one-half percent (1 ½%) per month. Landlord's right to correct Tenant's failure to perform is for the sole protection of Landlord and the existence of this right shall not release Tenant from the obligation to perform all the covenants herein required to be performed by Tenant, or deprive Landlord of any other right Landlord may have by reason of default of this Lease by Tenant, whether or not Landlord exercises its right under this Section.

**12.1**    **Surrender; Holdover.**
On expiration or early termination of this Lease, Tenant shall deliver all keys to Landlord and surrender the Premises vacuumed, swept, and free of debris and in the same condition as at the commencement of the term subject only to reasonable wear from ordinary use. Tenant shall remove all its furnishings and trade fixtures that remain its property and any alterations, cables or conduits if required by Section 6.2, and shall repair all damage resulting from such removal. Failure to remove shall be an abandonment of the property, and, following ten (10) days' written notice, Landlord may remove or dispose of it in any manner without liability, and recover the cost of removal and other damages from Tenant. If Tenant fails to vacate the Premises when required, including failure to remove all its personal property, Landlord may elect either: (i) to treat Tenant as a tenant from month to month, subject to the provisions of this Lease except that Rent shall be two (2) times the total Rent being charged when the Lease term expired, and any option or other rights regarding extension of the term or expansion of the Premises shall no longer apply; or (ii) to eject Tenant from the Premises (using self-help or otherwise) and recover damages caused by wrongful holdover.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 10
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**13.1     Regulations.**

Landlord shall have the right but shall not be obligated to make, revise, and enforce rules and regulations or policies consistent with this Lease for the purpose of promoting safety, health, order, economy, cleanliness, and good service to all tenants of the Building, including, but not limited to, moving, use of common areas, and prohibition of smoking. All such regulations and policies including those, if any, attached to this Lease as Exhibit D, shall be complied with as if part of this Lease and failure to comply shall be a default.

**14.1     Access.**

During times other than normal Building hours, Tenant's officers and employees or those having business with Tenant may be required to identify themselves or show passes in order to gain access to the Building. Landlord shall have no liability for permitting or refusing to permit access by anyone. Landlord may regulate access to any Building elevators outside of normal Building hours. Landlord shall have the right to enter upon the Premises at any time by passkey or otherwise to determine Tenant's compliance with this Lease, to perform necessary services, maintenance, and repairs or alterations to the Building or the Premises, to post notices of nonresponsibility, or to show the Premises to any prospective tenant or purchaser. Except in case of emergency, such entry shall be at such times and in such manner as to minimize interference with the reasonable business use of the Premises by Tenant.

**14.2     Furniture and Bulky Articles.**

Tenant shall move furniture and bulky articles in and out of the Building or make independent use of any elevators only at times approved by Landlord following at least 24 hours' written notice to Landlord of the intended move.

**15.1     Notices.**

Notices between the parties relating to this Lease shall be in writing, effective when delivered during business hours by facsimile transmission, email, hand delivery, private courier, nationally-recognized overnight courier or regular or certified U.S. mail. Notices shall be delivered postage prepaid, to the address, email address, or facsimile number for the party stated in the Basic Lease Terms or to such other address as either party may specify by notice to the other. Notice to Tenant may always be delivered to the Premises. Rent shall be payable to Landlord at the same address stated in the Basic Lease Terms (or at such other address as Landlord may specify by notice to Tenant) and in the same manner, but shall be considered paid only when received. Notwithstanding the foregoing, notice by email or facsimile shall be effective on the date transmitted only with proof of transmission, and only if a copy of such notice is also sent on the same business day by one of the other notice methods permitted under this Section 15.1.

**16.1     Subordination and Attornment.**

This Lease shall be subject to and subordinate to any mortgage, deed of trust, ground lease, master lease or land sale contract (hereafter collectively referred to as encumbrances) now existing against the Building. At Landlord's option, this Lease shall be subject and subordinate to any future encumbrance, ground lease or master lease hereafter placed against the Building (including the underlying land) or any modifications of existing encumbrances, and Tenant shall execute such documents as may reasonably be requested by Landlord or the holder of the encumbrance to evidence this subordination. If any encumbrance is foreclosed, then if the purchaser at foreclosure sale gives to Tenant a written agreement to recognize Tenant's Lease, Tenant shall attorn to such purchaser and this Lease shall continue.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 11
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**16.2 Transfer of Building.**
If the Building is sold or otherwise transferred by Landlord or any successor, Tenant shall attorn to the purchaser or transferee and recognize it as the landlord under this Lease, and, provided the purchaser or transferee assumes all obligations under this Lease thereafter accruing, the transferor shall have no further liability hereunder.

**16.3 Estoppels.**
Either party will within ten (10) days after notice from the other execute, acknowledge, and deliver to the other party a certificate certifying whether or not this Lease has been modified and is in full force and effect; whether there are any modifications or alleged breaches by the other party; the dates to which Rent has been paid in advance, and the amount of any security deposit or prepaid Rent; and any other facts that may reasonably be requested. Failure to deliver the certificate within the specified time shall be conclusive upon the party of whom the certificate was requested that the Lease is in full force and effect and has not been modified except as may be represented by the party requesting the certificate. If requested by the holder of any encumbrance, or any underlying lessor, Tenant will agree to give such holder or lessor notice of and an opportunity to cure any default by Landlord under this Lease.

**17.1 Attorney Fees.**
In any litigation, arbitration, or other proceeding arising out of this Lease, including any bankruptcy proceeding, the prevailing party shall be entitled to recover attorney fees at trial, in arbitration, and on any appeal or petition for review for any such proceedings. If Landlord incurs attorney fees because of a breach or default by Tenant, Tenant shall pay all such legal fees and expenses of Landlord whether or not litigation is filed. If Landlord employs a collection agency to recover delinquent charges, Tenant agrees to pay all collection agency and other fees charged to Landlord in addition to Rent, late charges, interest, and other sums payable under this Lease.

**18.1 Quiet Enjoyment.**
Landlord warrants that as long as Tenant complies with all terms of this Lease it shall be entitled to possession of the Premises free from any eviction or disturbance by Landlord or parties claiming through Landlord.

**18.2 Limitation on Liability.**
Notwithstanding any provision in this Lease to the contrary, neither Landlord nor its managing agent or employees shall have any liability to Tenant for loss or damage to Tenant's property from any cause, nor shall Landlord or its managing agent have any liability arising out of the acts, including criminal acts, of other tenants of the Building or third parties, nor any liability for consequential or punitive damages, nor liability for any reason that exceeds the value of its interest in the Property.

**19.1 Additional Rent: Property Taxes.**
Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of real property taxes for the Property. Prior to the Commencement Date, Landlord shall estimate the amount of real property taxes for the then-current calendar year and Tenant shall pay on or before the first day of each calendar month during such calendar year Tenant's Proportionate Share of such real property taxes divided by the number of months remaining in such calendar year. Thereafter, on or before January 1 of each calendar year during the remainder of the Term, Landlord shall estimate the amount of real property taxes for the ensuing calendar year, and Tenant shall pay on or before the first day of each calendar month during such calendar year one-twelfth (1/12) of Landlord's estimate of Tenant's Proportionate Share of the real property taxes for the year,

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 12
**Error! Unknown document property name.**

EXHIBIT B
Page 15 of 24

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

provided that Landlord may revise its estimate during any year with reasonable cause and the additional estimate shall be payable as equal additions to Rent for the remainder of the calendar year. Tenant's Proportionate Share of property taxes shall be prorated like Base Rent for any partial month of the Term. Following the end of each calendar year, or when actual tax year information becomes available, Landlord shall compute the actual real property taxes and bill Tenant for any deficiency or credit Tenant with any excess collected. Tenant shall pay any such deficiency within thirty (30) days after Landlord's billing, whether or not this Lease shall have expired or terminated at the time of such billing. "Real property taxes" as used herein means all taxes and assessments of any public authority against the Property, the cost of contesting any tax, and any form of fee or charge imposed on Landlord as a direct consequence of owning or leasing the Property, including but not limited to Rent taxes, gross receipt taxes, leasing taxes, or any fee or charge wholly or partially in lieu of or in substitution for or to supplement ad valorem real property taxes or assessments, whether now existing or hereafter enacted. If, during the term of this Lease, the voters of the state in which the Premises are located or the state legislature enacts a real property tax limitation, then any substitute taxes, in any name or form, that may be adopted to replace or supplement real property taxes shall be added to taxes for purposes of this Section 19.1. If any portion of the Building is occupied by a tax-exempt tenant (other than Tenant) that receives a property tax exemption for its premises, so that the Building has a partial tax exemption under ORS 307.112 or a similar statute, then real property taxes shall mean taxes computed as if such partial exemption did not exist. If Tenant is a nonprofit or tax-exempt organization and wishes to apply for a real property tax exemption as a tax-exempt organization under ORS 307.130, as further described in ORS 307.112, as may be amended from time to time, then Landlord and Tenant shall reasonably cooperate to so apply at no out-of-pocket cost to Landlord. Any exemption granted as a result of any such application shall accrue for the sole benefit of Tenant. If a separate assessment or identifiable tax increase arises because of improvements to the Premises, then Tenant shall pay 100 percent (100%) of such increase.

19.2    **Additional Rent: Cost-of-Living Adjustment.**
Effective on each anniversary following the Commencement Date of this Lease, Landlord shall be entitled to recover Additional Rent which shall be a percentage of Base Rent equal to the percentage increase, if any, in the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics. The percentage increase shall be computed by comparing the schedule entitled "West Urban Region, All Items, 1982 - 84 = 100" for the latest available month three (3) months preceding the month in which the Lease term commenced with the same figure for the same month in the years for which the adjustment is computed. All comparisons shall be made using index figures derived from the same base period and in no event shall this provision operate to decrease the monthly Rent for the Premises below the monthly Base Rent, plus property tax adjustments and operating expense adjustments as provided in this Lease. If the index cited above is revised or discontinued during the term of this Lease, then the index that is designated by BOMA Oregon to replace it shall be used.

19.3    **Additional Rent:  Operating Expense Adjustment.**
Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of operating expenses for the Property.  Prior to the Commencement Date, Landlord shall estimate the amount of operating expenses for the then-calendar year and Tenant shall pay on or before the first day of each calendar month during such calendar year Tenant's Proportionate Share of such operating expenses divided by the total number of months remaining in such calendar year.  Thereafter, on or before January 1 of each subsequent year of the remainder of the Term, Landlord shall estimate the amount of operating expenses for the ensuing calendar year, and Tenant shall pay to Landlord, on or before the final day of each calendar month during such calendar year,

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 13
**Error! Unknown document property name.**

EXHIBIT B
Page 16 of 24

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

one-twelfth (1/12) of Tenant's share of the estimated operating expenses, provided that Landlord may revise its estimate during any year with reasonable cause and the additional estimate shall be payable as equal additions to Rent for the remainder of the calendar year. Tenant's Proportionate Share of operating expenses shall be prorated like Base Rent for any partial month of the term. Following the end of each calendar year, Landlord shall compute the actual operating expenses and bill Tenant for any deficiency or credit Tenant with any excess collected. Tenant shall pay any such deficiency within thirty (30) days after Landlord's billing, whether or not this Lease shall have expired or terminated at the time of such billing. Landlord shall also inform Tenant as to any change in Tenant's monthly payment of Tenant's Proportionate Share of operating expenses. As used herein "operating expenses" shall mean all costs of operating, maintaining, and repairing the Property as determined by standard real estate accounting practice, including, but not limited to: all water and sewer charges; the cost of natural gas and electricity provided to the Building; janitorial and cleaning supplies and services; administration costs and management fees; superintendent fees; security services, if any; insurance premiums; licenses; and permits for the operation and maintenance of the Building and all its component elements and mechanical systems; ordinary and emergency repairs and maintenance, and the annual amortized capital improvement cost (amortized over such a period as Landlord may select but not shorter than the period allowed under the Internal Revenue Code and at a current market interest rate) for any capital improvements to the Property required by any governmental authority or those that have a reasonable probability of improving the efficiency of the Building. "Operating expenses" shall also include all assessments under recorded covenants or master plans and/or by owners' associations.

**19.4    Operating Expense Disputes.**
If Tenant disputes any computation of Additional Rent or Rent adjustment under Sections 19.1 through 19.3 of this Lease, Tenant shall give notice to Landlord not later than thirty (30) days after the notice from Landlord describing the computation in question, but in any event not later than (thirty) 30 days after expiration or earlier termination of this Lease. If Tenant fails to give such a notice, the computation by Landlord shall be binding and conclusive between the parties for the period in question. If Tenant gives a timely notice, the dispute shall be resolved by an independent certified public accountant selected by Landlord whose decision shall be conclusive between the parties. Each party shall pay one-half (1/2) of the fee for making such determination, except that if the adjustment in favor of Tenant does not exceed ten percent (10%) of the escalation amounts for the year in question, Tenant shall pay (i) the entire cost of any such third-party determination; and (ii) Landlord's out-of-pocket costs and reasonable expenses for personnel time in responding to the audit. Nothing herein shall reduce Tenant's obligations to make all payments as required by this Lease. In no event shall Landlord have any liability to Tenant based on its calculation of Additional Rent or Rent adjustments, except and only the obligation to cause any correction to be made pursuant to this Section 19.4. Tenant shall maintain as strictly confidential the existence and resolution of any dispute regarding Rent charges hereunder. In no event shall Tenant be entitled to employ or retain any auditor, consultant, or other professional in connection with exercising any right under this Section 19.4 whose fee is based on the results of the dispute.

**20.1    Hazardous Materials.**
Neither Tenant nor Tenant's agents or employees shall cause or permit any Hazardous Material, as hereinafter defined, to be brought upon, stored, used, generated, released into the environment, or disposed of on, in, under, or about the Premises, except reasonable quantities of cleaning supplies and office supplies necessary to or required as part of Tenant's business that are generated, used, kept, stored, or disposed of in a manner that complies with all laws regulating any such Hazardous Materials and with good business practices.

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 14
**Error! Unknown document property name.**

EXHIBIT B
Page 17 of 24

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

Tenant covenants to remove from the Premises (or the Building, if applicable), upon the expiration or sooner termination of this Lease and at Tenant's sole cost and expense, any and all Hazardous Materials brought upon, stored, used, generated, or released into the environment during the term of this Lease. To the fullest extent permitted by law, Tenant hereby agrees to indemnify, defend, protect, and hold harmless Landlord, Landlord's managing agent, and their respective agents and employees, and their respective successors and assigns, from any and all claims, judgments, damages, penalties, fines, costs, liabilities, and losses that arise during or after the term directly or indirectly from the use, storage, disposal, release or presence of Hazardous Materials on, in, or about the Premises that occurs during the term of this Lease. Tenant shall promptly notify Landlord of any release of Hazardous Materials in, on, or about the Premises that Tenant or Tenant's agents or employees become aware of during the Term of this Lease, whether caused by Tenant, Tenant's agents or employees, or any other persons or entities. As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material, or waste that is or becomes regulated by any local governmental authority, the state of Oregon, or the United States government. The term "Hazardous Material" includes, without limitation, any material or substance that is (i) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," "hazardous material," or "waste" under any federal, state, or local law, (ii) petroleum, and (iii) asbestos. The provisions of this Section 20, including, without limitation, the indemnification provisions set forth herein, shall survive any termination of this Lease.

**20.2    Mold.**
Tenant shall not allow or permit any conduct or omission at the Premises, or anywhere on Landlord's property, that will promote or allow the production or growth of mold, spores, fungus, or any other similar organism, and shall indemnify and hold Landlord harmless from any claim, demand, cost and expense (including attorney fees) arising from or caused by Tenant's failure to strictly comply with its obligations under this provision.

**21.1    Complete Agreement; No Implied Covenants.**
This Lease and the attached Exhibits and Schedules, if any, constitute the entire agreement of the parties and supersede all prior written and oral agreements and representations and there are no implied covenants or other agreements between the parties, except as expressly set forth in this Lease. Neither Landlord nor Tenant is relying on any representations other than those expressly set forth herein.

**21.2    Space Leased AS IS.**
Unless otherwise stated in this Lease, the Premises are leased AS IS in the condition now existing with no alterations or other work to be performed by Landlord.

**21.3    Captions.**
The titles to the Sections of this Lease are descriptive only and are not intended to change or influence the meaning of any Section or to be part of this Lease.

**21.4    Nonwaiver.**
Failure by Landlord to promptly enforce any regulation, remedy, or right of any kind under this Lease shall not constitute a waiver of the same and such right or remedy may be asserted at any time after Landlord becomes entitled to the benefit thereof, notwithstanding delay in enforcement.


{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 15
**Error! Unknown document property name.**

EXHIBIT B
Page 18 of 24

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**21.5 Consent.**
Except where otherwise provided in this Lease, either party may withhold its consent for any reason or for no reason whenever that party's consent is required under this Lease.

**21.6 Force Majeure.**
If performance by Landlord of any portion of this Lease is made impossible or impracticable by any prevention, delay, or stoppage caused by governmental approvals, war, acts of terrorism, strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes for those items, governmental actions, civil commotions, fire or other casualty, or other causes beyond the reasonable control of Landlord, performance by Landlord for a period equal to the period of that prevention, delay, or stoppage is excused.

**21.7 Commissions.**
Each party represents that it has not had dealings with any real estate broker, finder or other person with respect to this Lease in any manner, except for the broker(s) identified in the Basic Lease Terms. Landlord shall pay a leasing commission of one (1) months rent that shall be paid over the first three months of the lease term. If the property was to close on a sale before February 1st, 2025, the Broker shall credit the Landlord for the full amount of the lease commission. The credit shall be applied through escrow.

**21.8 Successors.**
This Lease shall bind and inure to the benefit of the parties, their respective heirs, successors, and permitted assigns.

**21.9 Financial Reports**
Within fifteen (15) days after Landlord's request, Tenant will furnish Tenant's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's internally prepared financial statements. Tenant will discuss its financial statements with Landlord and will give Landlord access to Tenant's books and records in order to enable Landlord to verify the financial statements. Landlord will not disclose any aspect of Tenant's financial statements except (a) to Landlord's property manager and internal personnel, and (b) to Landlord's lenders or prospective purchasers of the Building, and (c) in litigation between Landlord and Tenant, and (d) if required by law or court order.

**21.10 Waiver of Jury Trial.**
To the maximum extent permitted by law, Landlord and Tenant each waive right to trial by jury in any litigation arising out of or with respect to this Lease.

**21.11 OFAC Compliance.**
Tenant represents and warrants that Tenant is in compliance with all laws, statutes, rules and regulations or any federal, state or local governmental authority in the United States of America applicable to Tenant and all beneficial owners of Tenant, including, without limitation, the requirements of Executive Order No. 133224, 66 Fed Reg. 49079 (September 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control of the Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders"). Tenant agrees to make its policies, procedures and practices regarding compliance with the Orders available to Landlord for its review and

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 16
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

inspection during normal business hours and upon reasonable prior notice. Tenant further represents and warrants that neither Tenant nor any beneficial owner of Tenant: (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists"); (b) has been determined by competent authority to be subject to the prohibitions contained in the Orders; (c) is owned or controlled by, nor acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or (d) shall transfer or permit the transfer of any interest in Tenant or any beneficial owner in Tenant to any person who is or whose beneficial owners are listed on the Lists.

**21.12    Representation; Preparation.**

**THIS LEASE, ATTACHMENTS AND AMENDMENTS WERE PREPARED AT THE DIRECTION OF LANDLORD AND TENANT AND BOTH HAVE BEEN ADVISED AND HAD AN OPPORTUNITY TO SEEK INDEPENDENT COUNSEL TO REVIEW THIS LEASE, ATTACHMENTS, AND AMENDMENTS. THE RULE OF CONSTRUCTION THAT A WRITTEN AGREEMENT IS CONSTRUED AGAINST THE PARTY PREPARING OR DRAFTING SUCH AGREEMENT SHALL SPECIFICALLY NOT BE APPLICABLE TO THE INTERPRETATION OR ENFORCEMENT OF THIS LEASE, ATTACHMENTS, AND AMENDMENTS. NO REPRESENTATION OR RECOMMENDATION IS MADE BY BOMA PORTLAND OR THE REAL ESTATE BROKERS INVOLVED IN THIS TRANSACTION CONCERNING THE LEGAL SUFFICIENCY OR TAX OR LEGAL CONSEQUENCES ARISING FROM THIS LEASE.**

**21.13    Exhibits.**

The following Exhibits are attached hereto and incorporated as a part of this Lease:

| | |
|---|---|
| Exhibit A | Premises |
| Exhibit B | Optional Rider Work Agreement |
| Exhibit C | Commencement Date Lease Certificate |
| Exhibit D | Rules and Regulations |
| Exhibit E | Guaranty |



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 17
**Error! Unknown document property name.**

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Lease as of the day and year first written above.

LANDLORD:                          Ankor

                                   By: _Jesce Horton_

                                   Printed Name: Jesce Horton

                                   Title: Partner


TENANT:                            Anotta Holdings

                                   By: _Moyata_

                                   Printed Name: Moyata Anotta

                                   Title: President

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 18
**Error! Unknown document property name.**

EXHIBIT B
Page 21 of 24

Docusign Envelope ID: D54742C2-A152-42D5-8946-534788B77FC1

Standard Form of OFFICE LEASE (Net Lease)
**© 2018 BOMA OREGON**
**Exhibit A**



{00631069;1}
*Standard Form of OFFICE LEASE (NET)*
Exhibit B
**Error! Unknown document property name.**

EXHIBIT B
Page 22 of 24

Standard Form of OFFICE LEASE (Net Lease)
**© 2018 BOMA OREGON**

{00631069;1}
*Standard Form of OFFICE LEASE (NET)*
Exhibit B
**Error! Unknown document property name.**

EXHIBIT B
Page 23 of 24

Standard Form of OFFICE LEASE (Net Lease)
**© 2018 BOMA OREGON**

{00631069;1}
*Standard Form of OFFICE LEASE (NET)*
Exhibit C
**Error! Unknown document property name.**

EXHIBIT B
Page 24 of 24

December 22, 2025

**VIA OVERNIGHT COURIER**

Moyata Anotta
3744 NW Devoto Lane
Portland, OR 97229

      RE:    Lease of Property located at 8140 N. Commercial Ave, Portland, OR
              NOTICE OF DEFAULT

Dear Mr. Anotta,

This notice is given pursuant to the Lease Agreement dated October 24, 2024 ("Lease") between Ankor Holdings, LLC as landlord ("Landlord"), and Moyata Anotta, DBA NW Metals, Inc. as tenant ("Tenant"), for the premises at 8140 N Commercial Ave in Portland Oregon, as more particularly described on Exhibit A to the Lease ("Premises").  Tenant is in default of the Lease as follows:

Landlord recently became aware that Tenant is the subject of an investigation and enforcement action brought by the Oregon Department of Environmental Quality ("DEQ") for multiple violations of Oregon law, including:

- Disposing of solid waste at the Premises, a location not permitted by DEQ to receive solid waste.
- Establishing, operating, or maintaining a solid waste disposal site at the Premises without a solid waste disposal permit.
- Operating a commercial establishment or activity which would cause an increase in the discharge of wastes into waters of the state, or which would otherwise alter the physical, chemical, or biological properties of any waters of the state without a permit issued by DEQ.
- Establishing, installing, and operating a shredder at the Premises without first obtaining an air contaminant discharge permit ("ACDP") from DEQ.

Tenant was issued a Pre-Enforcement Notice by DEQ in July 2025, which Tenant failed to comply with.  As such, Tenant was then issued a Notice of Civil Penalty Assessment and Order (Attached as Exhibit A), requiring the Tenant to pay a penalty to DEQ in the amount of $357,461 and to:

- Immediately cease operating Shredder 3 without an ACDP;
- Submit a written notification to DEQ that Shredder 3 is no longer operating, along with a current dated photograph of the Shredder 3 hour meter;
- Properly dispose of the solid waste and waste tires at the Premises or submit a complete application for a solid waste permit; and
- Work with the Landlord to properly dispose of the solid waste and waste tires at the site.

Tenant is in violation of Section H of the Basic Lease Terms. Tenant's Permitted Use of Premises is defined only as "scrap metal."  This does not permit Tenant to operate a shredder, dispose of, or store solid waste at the Premises.

EXHIBIT C
Page 1 of 3

Moyata Anotta
December __, 2025
Page 2

Tenant is in violation of Section 4.1 of the Lease which requires tenant to "promptly comply and cause the Premises to comply with all applicable laws, ordinances, rules and regulations of any public authority. Tenant is also in violation of the portion of Section 4.1 of the Lease which prohibits Tenant from conducting "any activities that will increase Landlord's insurance rates for any portion of the Building or that will in any manner degrade or damage the reputation of the Building."

Tenant is in violation of Section 6.1 of the Lease which requires Tenant to "maintain and repair the Premises in clean and good condition." The photographs taken by DEQ demonstrate that the Premises is not being maintained in clean and good condition.

Tenant is in violation of Section 6.2.1 of the Lease which prohibits Tenant from making any alterations, additions, or improvements to the Premises without Landlord's prior written consent. Operating a shredder at the Premises constitutes an alteration or addition, for which Landlord's consent was not obtained.

Tenant is in violation of Section 20.1 of the Lease, which prohibits Tenant and Tenant's agents from causing or permitting any Hazardous Material to be brought upon, stored, used, generated, released into the environment, or disposed of on, in, under or about the Premises. Hazardous Material is defined to include the "waste" that is the subject of DEQ's enforcement action. The only permitted use of Hazardous Materials is that which "complies with all laws regulating any such Hazardous Materials and with good business practices."

Tenant is also in violation of Section 20.1 of the Lease for failing to notify Landlord of releases of hazardous materials when it became aware of such after DEQ's issuance of the pre-enforcement notice.

This letter constitutes Landlord's notice to Tenant under Section 11.1.3 of the Lease, which provides that "failure of Tenant to comply with any Laws as required pursuant hereto **within twenty-four (24) hours** after written demand of Landlord" shall constitute an Event of Default.

This letter also constitutes Landlord's notice to Tenant under Section 11.1.2 of the Lease, which provides that Tenant's failure to comply with any other term or condition **within twenty (20) days** following written notice from Landlord specifying the noncompliance constitutes an Event of Default. If Tenant has not cured the breaches stated in this letter within 20 days after the date of this letter, then Tenant shall be in default of the Lease and Landlord will seek its available remedies, which includes lease termination, retaking possession of the Premises, and an action for damages and/or recovery under Landlord's indemnification rights in Sections 7.1, 11.2.2 and 20.1.

Landlord also hereby notifies the Tenant that it may exercise its right to perform any obligation that Tenant has failed to perform when required under Lease, including, but not limited to, all actions required by DEQ, and that pursuant to Section 11.3, all of Landlord's expenditures incurred to correct the failure to perform shall be reimbursed by Tenant upon demand with interest from the rate of expenditure at the rate of 1.5% per month.

Finally, Tenant's actions have caused DEQ to bring an enforcement action against the Landlord, including the assessment of a penalty in the amount of $78,798.  Landlord hereby notifies Tenant of its intent to bring an action for damages and recovery under the applicable Lease provisions, which includes attorney fees pursuant to Section 17.1 of the Lease.

EXHIBIT C
Page 2 of 3

Moyata Anotta
December 23, 2025
Page 3

If Landlord wishes to discuss this issue further, please have your legal counsel contact our attorney, Maureen Bayer of Tonkon Torp LLP, at maureen.bayer@tonkon.com or (503) 802-2115.

Thank you for your prompt attention to this matter.

Very truly yours,

*Jesce Horton*

Jesce Horton, Partner
Anchor Holdings, LLC

007459\00077\19044996v2
044805\00002\19085447v1

EXHIBIT C
Page 3 of 3



TONKON TORP

Maureen S. Bayer
maureen.bayer@tonkon.com

503.802.2115   direct
503.221.1440   main

February 4, 2026

**VIA EMAIL (anottam@gmail.com)**
**AND CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Moyata Anotta DBA NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

Re:    NOTICE OF LEASE TERMINATION
       8140 N. Commercial Avenue, Portland Oregon

Dear Mr. Anotta:

Tonkon Torp LLP represents Anchor Holdings LLC, an Oregon limited liability company ("Landlord") in connection with that certain Lease Agreement dated October 24, 2024, between Landlord and Moyata Anotta / NW Metals, Inc. ("Tenant") (the "Lease").

Pursuant to Section 11.2.1 of the Lease, this letter constitutes Landlord's written notice that Landlord elects to terminate the Lease. Landlord issued Tenant a Notice of Default pursuant to Section 11.1.2 of the Lease on or about December 12, 2025. Tenant acknowledged receipt of the Notice of Default effective December 22, 2025 and therefore Tenant had until no later than January 11, 2026 to cure the noncompliance identified in the Notice of Default. Tenant's response dated December 23, 2025 identified that NW Metals was "evaluating" the steps evaluated in DEQ's enforcement correspondence and "assessing operational adjustments." As Tenant has not cured its noncompliance, **Landlord hereby declares Tenant in default and terminates the Lease, effective at 11:59 p.m. on February 28, 2026**.

As required by Section 12.1 of the Lease, Tenant must deliver all keys to Landlord and surrender the Premises vacuumed, swept, and free of debris and in the same condition as at commencement of the Lease, save for reasonable wear from ordinary use. Tenant must remove all furnishings, trade fixtures, alterations, cables and conduits, and repair all damage resulting from such removal.

Landlord expressly reserves all rights and remedies under the Lease and Oregon law.

Sincerely,

Maureen S. Bayer

MSB/cp
044805\00003\19164906v2

EXHIBIT D
Page 1 of 4



**Certified Mail® Receipt**

Domestic Mail Only
No Insurance Coverage Provided

| | |
|---|---|
| Postage | $ |
| Certified Mail Fee | $ |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2980 5619

Sent To:

Moyata Anotta DBA NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

EXHIBIT D
Page 2 of 4

PS Form 3800, April 2015

SEE REVERSE FOR INSTRUCTIONS

MSB 44805-3



**TONKON TORP**

1300 SW 5th Ave.
Suite 2400
Portland OR 97201

MSB 044805-00003

CERTIFIED MAIL®

PORTLAND OR PDC 972

9414 7266 9904 2980 5819 94

**RETURN RECEIPT REQUESTED**

quadient

FIRST-CLASS MAIL
IMI
$010.44
02/04/2026 ZIP 97204
043M31249312

US POSTAGE

LN
2·6

UNC
2/22

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Moyata Anotta DBA NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

NIXIE        971     DE 1           0002/24/26

RETURN TO SENDER
UNCLAIMED
UNABLE TO FORWARD

UNC    BC: 97201561000      *0449-03499-04-44

EXHIBIT D
Page 3 of 4

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF RETURN ADDRESS, FOLD AT DOTTED LINE

Return Receipt Article Number

9590 9266 9904 2980 5819 97

2. Certified Mail® Article Number

9414 7266 9904 2980 5819 94

3. Service Type: **CERTIFIED MAIL**

4. Restricted Delivery? *(Extra Fee)*  ☐ Yes

1. Article Addressed to:

LINE 1▸

Morales-Anotts DBA NW Metals, Inc.
3744 A" Devota Lane
Portland, OR 97239

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X   ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

Thank you for using Return Receipt Service

FOLD AND TEAR HERE

a T."

EXHIBIT D
Page 4 of 4

PS Form 3811, Facsimile, July 2015    Domestic Return Receipt

 **TONKON TORP**

Maureen S. Bayer
maureen.bayer@tonkon.com

503.802.2115   direct
503.221.1440   main

February 24, 2026

**VIA EMAIL**
**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

Moyata Anotta
DBA NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

Re:    SUPPLEMENTAL NOTICE OF LEASE TERMINATION
       8140 N. Commercial Avenue, Portland, Oregon

Dear Mr. Anotta:

Pursuant to Section 11.2.1 of the Lease, this letter constitutes Landlord's supplemental written notice that Landlord elects to terminate the Lease. Landlord issued Tenant a Notice of Default pursuant to Section 11.1.2 of the Lease on or about December 12, 2025. Tenant acknowledged receipt of the Notice of Default effective December 22, 2025 and therefore Tenant had until no later than January 11, 2026 to cure the noncompliance identified in the Notice of Default. Tenant's response dated December 23, 2025 identified that NW Metals was "evaluating" the steps evaluated in DEQ's enforcement correspondence and "assessing operational adjustments." This does not cure Tenant's noncompliance.

In addition, pursuant to Section 11.1.1, Tenant is also in default for failure to pay rent under the Lease within ten days after it was due. Specifically, Tenant has not paid amounts due and owing for the months October 2025, November 2025, December 2025, January 2026, and February 2026. The rent payment made in December 2025 in the amount of $12,000 was applied to rent due for the month of September 2025. The amount of rent currently outstanding is $90,000.

As Tenant has not cured its noncompliance, and as Tenant's nonpayment of rent within ten days of the due date constitutes an Event of Default under the Lease, **Landlord hereby declares Tenant in supplemental default and terminates the Lease on that additional basis, effective at 11:59 p.m. on February 28, 2026.** Tenant must vacate and surrender the Premises by that date, as required by Section 12.1 of the Lease and detailed in Landlord's prior termination notice.

EXHIBIT E
Page 1 of 5

Moyata Anotta
February 24, 2026
Page 2


In response to your undated letter received on February 14, 2026, the grounds upon which Ankor Holdings ("Landlord") is pursuing eviction are based on independent violations of the Lease, as set forth in the Notice of Default and this letter. While certain violations of the Lease are also the subject of Oregon Department of Environmental Quality ("DEQ") enforcement action against you, the outcome of the enforcement action does not bear on the Lease violations. For example, Section 4.1 of the Lease requires Tenant to "promptly comply and cause the Premises to comply with all applicable laws, ordinances, rules and regulations of any public authority." You allege that "the lease does not permit termination based solely on disputed allegations that remain under administrative review." First, termination is not based solely on disputed allegations, but includes violations that constitute events of default which are unrelated to Tenant's compliance with law, including:

- Nonpayment of rent – violation of Section 2.1;
- Use of the Premises for activities outside of the allowed use – violation of Basic Lease Term H;
- Conducting activities that will increase Landlord's insurance rates for any portion of the Building or that will in any manner degrade or damage the reputation of the Building – violation of Section 4.1;
- Failure to maintain and repair the Premises in clean and good condition – violation of Section 6.1.1;
- Making alterations, additions, or improvements to the Premises without Landlord's prior written consent – violation of Section 6.1.2;
- Failing to notify Landlord of releases of hazardous materials – violation of Section 20.1; and
- Causing or permitting any Hazardous Material to be brought upon, stored, used, generated, released into the environment, or disposed of on, in, under or about the Premises - violation of Section 20.1.

Second, there is nothing in the Lease or in law that prohibits Landlord from terminating the Lease for violations where Tenant has challenged the basis of regulatory enforcement. As such, the Lease remains terminated, **effective at 11:59 p.m. on February 28, 2026**.

Sincerely,

Maureen S. Bayer

MSB/cp

044805\00003\19289527v1

## Certified Mail® Receipt

*Domestic Mail Only*
*No Insurance*
*Coverage Provided*

CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2980 5820

| | | |
|---|---|---|
| Postage | $ | |
| Certified Mail Fee | $ | |
| Return Receipt Fee (Endorsement Required) | $ | |
| Restricted Delivery Fee (Endorsement Required) | $ | |
| **Total Postage & Fees** | $ 10.44 | |

Postmark Here

FEB 24 2026

USPS WATERFRONT STA.
PORTLAND OR 97204

Sent To:

Moyata Anotta
DBA NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

EXHIBIT E
Page 3 of 5

PS Form 3800, April 2015

**SEE REVERSE FOR INSTRUCTIONS**

MSB 44805-3

| Return Receipt Article Number | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

9590 9266 9904 2980 5820 24

2. Certified Mail® Article Number

9414 7266 9904 2980 5820 21

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type: **CERTIFIED MAIL**

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

1. Article Addressed to:

Moyika Anotts
Dba NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

EXHIBIT E
Page 4 of 5

PS Form 3811, Facsimile, July 2015          Domestic Return Receipt



First-Class Mail
Postage & Fees Paid
USPS®
Permit No. G-10

9590 9266 9904 2980 5820 24

United States
Postal Service®    • Sender: Please print your name, address and ZIP+4® below •

TONKON TORP LLP
1300 SW 5TH AVENUE
SUITE 2400
PORTLAND, OR  97201

EXHIBIT E
Page 5 of 5

MSB 44805-3

AMENDED
26LT05695

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH
LANDLORD TENANT DEPARTMENT       **Case No.** 26LT05695
**EVICTION SUMMONS**

| **PLAINTIFF (LANDLORD OR AGENT):** | **Vs.** | **DEFENDANT (TENANTS/OCCUPANTS)** |
|---|---|---|

ANKOR HOLDINGS LLC, an Oregon limited

liability company

MOYATA ANOTTA d.b.a. NW METALS, INC., an Oregon
domestic business corporation, and All Other Occupants of 8140
N. Commercial Ave in Portland, Oregon

**TO:**   8140 N. Commercial Ave,Portland, Multnomah County, Oregon 97217
Street address and city of property occupied by defendant

_____
(Mailing address if different)

**NOTICE TO TENANTS: READ THESE PAPERS CAREFULLY! YOUR LANDLORD WANTS TO EVICT YOU**

ON _____ 3/26/2026 _____ AT _____ 8:45 _____ A.M./▮▮▮, you must come to court at the location below or appear by video
as instructed on your hearing notice. You do not have to pay any fees to the court for this first hearing.

**1200 SW First Ave, Crane Room, Portland OR 97204.**

- If you *do not* appear in court or via video and your landlord does, your landlord will win automatically and can have the sheriff
physically remove you from the property.

- If you *do* appear in court or via video and your landlord does not, the court will dismiss this case.

- If both of you appear in court or via video:
  - ➢ The judge may ask you to try to reach an agreement with your landlord, but this is voluntary. Trained mediators may be
  available for free to help you resolve disputes.
  - ➢ If you and your landlord do not reach an agreement, the court will schedule a trial.

**IF YOU WANT A TRIAL, YOU MUST:**
- ➢ Be in court or appear via video at the time scheduled above. Allow time to get through security if you will be appearing in
person, or get connected to the hearing via your computer or smart phone if you will be appearing via video;
- ➢ On the same day, file an *Answer* with the court giving a *legal* reason why you should not be evicted. The court can give
you a form;
- ➢ Give a copy of the *Answer* to your landlord (or your landlord's agent or lawyer); **and**
- ➢ Pay a filing fee. The judge may defer payment if you are low-income. Go to *www.courts.oregon.gov* to see what the filing
fee will be.

**GO TO THIS LOCATION:**
MULTNOMAH County Circuit Court Crane Room
1200 SW First Avenue, Portland, Oregon 97204
971-274-0545 or MUL.Evictions.Hearings@ojd.state.or.us
http://courts.oregon.gov/multnomah

**IF YOU HAVE QUESTIONS, YOU SHOULD SEE A LAWYER IMMEDIATELY.** If you need help finding a lawyer, call the
Oregon State Bar's Lawyer Referral Service at 503.684.3763 or toll-free in Oregon at 800.452.7636 or go to
*www.oregonstatebar.org*.

_____       March 13, 2026
Signature of Plaintiff (landlord or agent)                Dated

Maureen S. Bayer. OSB No. 214905
Name of Plaintiff (printed)**Attorney for Plaintiff Ankor Holdings LLC**

Tonkon Torp LLP, 1300 SW 5th Ave, Suite 2400, Portland, OR 97201          503.802.2115
Address of Plaintiff                                                      Phone Number

EXHIBIT F
Page 1 of 64

05-25B   (01/26)               Distribution:  Original/Court          (Three Service Copies)

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| ANKOR HOLDINGS LLC, an Oregon limited liability company,<br><br>       Plaintiff,<br><br>       v.<br><br>MOYATA ANOTTA d.b.a. NW METALS, INC., an Oregon domestic business corporation, and All Other Occupants of 8140 N. Commercial Ave in Portland, Oregon<br><br>       Defendant. | Case No. 26LT05695<br><br>**AMENDED COMPLAINT (FORCIBLE ENTRY AND UNLAWFUL DETAINER - COMMERCIAL PROPERTY)**<br><br>**(TENANCY NOT COVERED BY ORS CHAPTER 90)**<br><br>**FEE AUTHORITY ORS 21.135(1)**<br><br>**NOT SUBJECT TO MANDATORY ARBITRATION** |

Plaintiff Ankor Holdings LLC ("Landlord") alleges as follows:

1.

Landlord is an Oregon limited liability company with its principal place of business in Multnomah County, Oregon.

2.

Moyata Anotta d.b.a. NW Metals, Inc. ("Tenant") is an Oregon domestic business corporation with its principal place of business in Multnomah County, Oregon.  The lease was signed by Moyata Anotta as President of Anotta Holdings.

3.

Landlord, as lessor, and Tenant, as lessee, are parties to a commercial lease agreement entered into and effective October 24, 2024 (the "Lease"), for certain real property commonly known as 8140 N. Commercial Ave in Portland, Multnomah County, Oregon 97217, consisting

PAGE 1 –   AMENDED COMMERCIAL FED COMPLAINT

**TONKON TORP LLP**
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT F
Page 2 of 64

of a 23,980 square foot warehouse and paved area on 3.03 acres (the "Premises").  A true and correct copy of the Lease is attached hereto as Exhibit 1 and incorporated herein.

4.

Tenant is the subject of an investigation and enforcement action brought by the Oregon Department of Environmental Quality ("DEQ") for multiple violations of Oregon law, including:

a.   Disposing of solid waste at the Premises, a location not permitted by DEQ to receive solid waste;

b.   Establishing, operating, or maintaining a solid waste disposal site at the Premises without a solid waste disposal permit;

c.   Operating a commercial establishment or activity which would cause an increase in the discharge of waste into waters of the state, or which would otherwise alter the physical, chemical, or biological properties of any waters of the state without a permit issued by DEQ; and

d.   Establishing, installing, and operating a shredder at the Premises without first obtaining an air contaminant discharge permit from DEQ.

A true and correct copy of the Notice of Civil Penalty Assessment and Order issued by DEQ to Tenant dated November 4, 2025, is attached hereto as Exhibit 2 and incorporated herein.

5.

On information and belief, since at least February 2025, Tenant has operated a vehicle shredding operation in violation of Section 1.1, Item H and Section 4.1 of the Lease.  Tenant's permitted use of the Premises is defined only as a business for "scrap metal."

6.

Pursuant to Section 1.1, Item J, Section 2.1, and Section 19 of the Lease, Tenant must pay Landlord $18,000 in Base Rent, plus calculated Additional Rent (collectively, "Rent") per month in advance of the first day of each month.

PAGE 2 –    AMENDED COMMERCIAL FED COMPLAINT

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT F
Page 3 of 64

7.

Pursuant to Section 2.1 of the Lease, Tenant is subject to late payment interest at the rate of 1.5% per month.  Section 2.1 similarly subjects Tenant to a 5% fee of amounts past-due by more than 10 days, at Landlord's option.

8.

Tenant is in violation of Section 1.1, Item J and Section 2.1 of the Lease for recurring failure to pay Rent, either in full or at all, plus interest and late fees, beginning November 2024.

9.

Tenant is currently in arrears for unpaid Rent in the amount of $229,700.

10.

Tenant is currently subject to late payment interest on the total unpaid Rent arrears at the rate of 1.5% per month, which continues to compound.

11.

Additionally, Tenant is currently subject to late payment fees in the amount of $10,585.

12.

Tenant is in violation of Section 4.1 of the Lease which requires Tenant to "promptly comply and cause the Premises to comply with all applicable laws, ordinances, rules and regulations of any public authority."

13.

Tenant is in violation of Section 4.1 of the Lease, which prohibits Tenant from conducting "any activities that will increase Landlord's insurance rates for any portion of the Building or that will in any manner degrade or damage the reputation of the Building."

14.

Tenant is in violation of Section 4.2 of the Lease which only permits equipment customary for Tenant's permitted use—i.e., scrap metal—at the Premises.

PAGE 3 –   AMENDED COMMERCIAL FED COMPLAINT

**TONKON TORP LLP**
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT F
Page 4 of 64

15.

Tenant is in violation of Section 6.1.1 of the Lease which requires Tenant to "maintain and repair the Premises in clean and good condition."

16.

Tenant is in violation of Section 6.2.1 of the Lease which prohibits Tenant from making "any alterations, additions, or improvements to the Premises . . . without Landlord's prior written consent."

17.

Tenant is in violation of Section 20.1 of the Lease for causing or permitting hazardous materials to "be brought upon, stored, used, generated, released into the environment, or disposed of" at the Premises without notice to Landlord and not in compliance with applicable hazardous materials laws and regulations.

18.

Tenant is in default under Section 11.1.1 of the Lease for failure to pay Rent and other charges within ten (10) days after it was due.

19.

Pursuant to Section 11.1.2 and Section 15.1 of the Lease, Landlord issued a Notice of Default and opportunity to cure to Tenant on December 22, 2025, specifying Tenant's noncompliance with various Lease terms and conditions as described herein.  A true and correct copy of the Notice of Default is attached hereto as Exhibit 3 and incorporated herein.

20.

Tenant failed to timely cure its violations.  Accordingly, Tenant is also in default under Section 11.1.2 of the Lease.

21.

Pursuant to Section 11.2 of the Lease, Landlord, by and through its legal counsel, issued a Notice of Lease Termination to Tenant on February 4, 2026, describing Tenant's default under

PAGE 4 –   AMENDED COMMERCIAL FED COMPLAINT

**TONKON TORP LLP**
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT F
Page 5 of 64

Section 11.1.2 of the Lease for failure to cure noticed Lease violations.  Pursuant to the Notice of Lease Termination, Landlord informed Tenant that the Lease is terminated, effective February 28, 2026, at 11:59 PM.  A true and correct copy of the Notice of Lease Termination is attached hereto as Exhibit 4 and incorporated herein.

22.

Pursuant to Section 11.2 of the Lease, Landlord, by and through its legal counsel, sent Tenant a Supplemental Notice of Default and Lease Termination ("Supplemental Notice") on February 24, 2026, for Tenant's additional default under Section 11.1.1 for failure to pay Rent.  Landlord's Supplemental Notice reaffirmed that the Lease was terminated, effective February 28, 2026, at 11:59 PM.  A true and correct copy of the Supplemental Notice is attached hereto as Exhibit 5 and incorporated herein.

23.

On February 24, 2026, Tenant claimed to Landlord that Landlord was in default under Section 5.1 of the Lease for alleged failure to provide electricity to the Premises.

24.

There is electrical service present at the Premises.

25.

Unbeknownst to Landlord, the Premises initially lacked power at the beginning of the Lease term.  Landlord reconnected the Premises to power in or about February 2025.  A true and correct copy of a power restoration invoice from Capitol Electric, Co., Inc. to Landlord for the Premises, dated February 12, 2025, is attached hereto as Exhibit 6 and incorporated herein.

26.

Tenant seeks additional power for its vehicle shredding operation, which is not suited for the current electric capabilities at the Premises.

27.

As discussed above, Tenant's vehicle shredding operation violates the Lease.

PAGE 5 –    AMENDED COMMERCIAL FED COMPLAINT

**TONKON TORP LLP**
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT F
Page 6 of 64

28.

Under Section 5.1 of the Lease, Landlord is under no obligation to provide any particular voltage of power to the Premises.  Instead, Section 5.1 of the Lease provides that interruption of services or utilities does not constitute a disturbance of Tenant's use and possession of the Premises, nor does it relieve Tenant from performance of its Lease obligations.

29.

Section 21.2 of the Lease provides that Tenant agreed to lease the Premises "AS-IS . . . with no alterations or other work to be performed by Landlord."

30.

Landlord is not in default under the Lease.

31.

Pursuant to Landlord's Notice of Default, Notice of Lease Termination, and Supplemental Notice, the Lease terminated on February 28, 2026, at 11:59 PM.

32.

Despite the Lease's termination, Tenant remains in possession of the Premises. As a result, Tenant unlawfully holds the Premises with force.  Landlord is entitled to possession of the Premises.

33.

Pursuant to Section 17.1 of the Lease, Landlord is entitled to its attorney fees incurred herein, including on any appeal.

WHEREFORE, Landlord prays for the following relief:

A.    An order and judgment evicting Tenant from the Premises and returning possession of the Premises to Landlord;

/ / /

/ / /

/ / /

PAGE 6 –    AMENDED COMMERCIAL FED COMPLAINT

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT F
Page 7 of 64

B.      Landlord's costs, disbursements, and reasonable attorney fees incurred herein; and

C.      Such further relief as the Court deems just and proper.

DATED:  March 6, 2026.

TONKON TORP LLP


By:    s/ Maureen S. Bayer
  Will Gent, OSB No. 165254
   Direct:  503.802.5767
   Email:  will.gent@tonkon.com
  Maureen S. Bayer, OSB No. 214905
   Direct:  503.802.2115
   Email:  maureen.bayer@tonkon.com
  Carlisle S. Pearson, OSB No. 204221
   Direct:  503.802.2125
   Email:  carlisle.pearson@tonkon.com
  1300 SW Fifth Ave., Suite 2400
  Portland, OR 97201
  Facsimile: 503.274.8779
Attorneys for Plaintiff

Trial Attorney: Maureen S. Bayer, OSB No. 214905

044805\00003\19162825v8

PAGE 7 –    AMENDED COMMERCIAL FED COMPLAINT

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

EXHIBIT F
Page 8 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of Industrial Lease (Net Lease)*
**© 2018 BOMA OREGON**

**8140 N COMMERCIAL AVE LEASE**
**(Net Lease)**

**Between:**

**ANCHOR HOLDINGS, LLC**
_____
**("Landlord")**

**And**

**Anotta Holdings**
_____
**("Tenant")**

**Dated _____10/24/2024_____**

_____

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| 1.1 | Basic Lease Terms. | 1 |
| 1.2 | Lease of Premises. | 2 |
| 1.3 | Delivery of Possession and Commencement. | 2 |
| 2.1 | Rent Payment. | 3 |
| 2.2 | Prepaid Rent. | 3 |
| 3.1 | Security Deposit. | 3 |
| 4.1 | Use. | 4 |
| 4.2 | Equipment. | 4 |
| 4.3 | Signs and Other Installations. | 4 |
| 4.4 | Parking. | 4 |
| 5.1 | Utilities and Services. | 4 |



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*

* Users of this lease form are encouraged to show changes using a redlining or blacklining function. Users who receive this form completed by others are encouraged to compare the form received to the form published by BOMA Oregon to ensure the acceptability of any changes or variations from the published form.
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of Industrial Lease (Net Lease)*
**© 2018 BOMA OREGON**

| 5.2 | Extra Usage. | 5 |
| 5.3 | Security. | 5 |
| 6.1 | Maintenance and Repair. | 5 |
| 6.2 | Alterations. | 6 |
| 7.1 | Indemnity. | 6 |
| 7.2 | Insurance. | 6 |
| 8.1 | Fire or Casualty. | 7 |
| 8.2 | Waiver of Subrogation. | 7 |
| 9.1 | Eminent Domain. | 7 |
| 10.1 | Assignment and Subletting. | 7 |
| 11.1 | Default. | 8 |
| 11.2 | Remedies for Default. | 8 |
| 11.3 | Right to Cure. | 9 |
| 12.1 | Surrender; Holdover. | 9 |
| 13.1 | Regulations. | 9 |
| 14.1 | Access. | 9 |
| 14.2 | Furniture and Bulky Articles. | 10 |
| 15.1 | Notices. | 10 |
| 16.1 | Subordination and Attornment. | 10 |
| 16.2 | Transfer of Building. | 10 |
| 16.3 | Estoppels. | 10 |
| 17.1 | Attorney Fees. | 10 |
| 18.1 | Quiet Enjoyment. | 11 |
| 18.2 | Limitation on Liability. | 11 |
| 19.1 | Additional Rent:  Tax Adjustment. | 11 |
| 19.2 | Additional Rent: Cost-of-Living Adjustment. | 11 |
| 19.3 | Additional Rent:  Operating Expense Adjustment. | 12 |
| 19.4 | Operating Expense Disputes. | 12 |
| 20.1 | Hazardous Materials. | 12 |
| 20.2 | Mold. | 13 |
| 21.1 | Complete Agreement; No Implied Covenants. | 13 |
| 21.2 | Space Leased AS IS. | 13 |
| 21.3 | Captions. | 13 |
| 21.4 | Nonwaiver. | 13 |
| 21.5 | Consent. | 13 |



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*

\* Users of this lease form are encouraged to show changes using a redlining or blacklining function. Users who receive this form completed by others are encouraged to compare the form received to the form published by BOMA Oregon to ensure the acceptability of any changes or variations from the published form.
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of Industrial Lease (Net Lease)*
**© 2018 BOMA OREGON**

| 21.6 | Force Majeure. | 13 |
| 21.7 | Commissions. | 13 |
| 21.8 | Successors. | 14 |
| 21.9 | Financial Reports | 14 |
| 21.10 | Waiver of Jury Trial. | 14 |
| 21.11 | OFAC Compliance. | 14 |
| 21.12 | Representation; Preparation. | 14 |
| 21.13 | Exhibits. | 15 |



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*

* Users of this lease form are encouraged to show changes using a redlining or blacklining function. Users who receive this form completed by others are encouraged to compare the form received to the form published by BOMA Oregon to ensure the acceptability of any changes or variations from the published form.
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**1.1   Basic Lease Terms.**

A.   **REFERENCE DATE OF LEASE**   10/24/2024_____

B.   **TENANT:**   **MOYATA ANOTTA**_____
  Trade Name:   NW Metals, INC._____
  Address (Leased Premises):   8140 N Commercial Ave, Portland, OR 97227_____

  Address (For Notices):   3744 NW Devoto Ln_____
  Portland, OR 97229_____

  E-mail address:   anottam@gmail.com_____

  Primary Tenant Contact:   Moyata Anotta_____
  Telephone:   503-367-6955_____
  E-mail address:   _____

C.   **LANDLORD:**   Ankor Holdings, LLC_____
  Address (For Notices):   3877 NE Bryant st_____
  _____

  E-mail address:   _____

  Landlord Primary Contact:   Jesce Horton
  Telephone:   5037896654_____
  E-mail address:   Jescejh@gmail.com_____
  Address for Rent Payments:   3877 NE Bryant St_____

D.   **PREMISES**:  8140 N Commercial Street___ in _____Portland_____, Oregon, as generally shown on Exhibit A hereto.  The land upon which the Building is located, including all parking areas, walkways, landscape areas, together with the Building, is referred to in this Lease as the "Property."

E.   **PREMISES AREA:**  Approximately ___23,980____ Rentable Square Feet (See Exhibit "A"). The parties acknowledge that the calculation of square footage of the Premises is an approximation.  No recalculation of square footage of the Premises shall affect the obligations of Tenant under this Lease, including, without limitation, the amount of Base Rent payable by Tenant.

F.   **BUILDING AREA:**  Approximately _____23,980_____ Rentable Square Feet on 3.03 acres.

G.   **TENANT'S PROPORTIONATE SHARE:**  ___100____%.  The percentage is obtained by dividing the rentable square feet of the Premises by the total number of rentable square feet of the Building.  Landlord may modify Tenant's Proportionate Share if the Building size is increased or decreased, as the case may be.

H.   **TENANT'S PERMITTED USE OF PREMISES:**

  Scrap metal_____

  _____.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 1
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

I. **TERM OF LEASE:** Commencement Date: November 1, 2024 _____

        Expiration Date: Month to Month term. Landlord or Tenant may terminate this lease with 30-day written notice.

        Number of Full Calendar Months: _____

J. **INITIAL MONTHLY BASE RENT:** $18,000 _____

K. **BASE RENT ADJUSTMENT: <u>N/A</u>**

| Effective Date of Rent Increase | New Monthly Base Rent |
|---|---|
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |
| _____, 20____ | $_____ |

L. **PARKING:** ___NA_____ Spaces [Insert "NA" if not applicable]

M. **PREPAID RENT:** Upon execution of this Lease, Tenant shall deposit with Landlord ___$0____ (the "Prepaid Rent"), which shall be Base Rent due for the first month of the Lease Term for which Base Rent is payable.

N. **SECURITY DEPOSIT:** Upon execution of this Lease, Tenant shall deposit with Landlord _____$18,000 (the "Security Deposit"). Due on December 1st, 2024

O. **BROKER(S):** _____Steve Bowers of Kidder Mathews_____

P. **GUARANTORS:** __N/A_____

If Guarantor(s) is/are listed, Tenant shall cause Guarantor(s) to return to Landlord an executed Guaranty of this Lease in the form attached as Exhibit E at the same time as Lease execution.

For valuable consideration, Landlord and Tenant covenant and agree as follows:

**1.2 Lease of Premises.**
Landlord leases to Tenant the premises described in the Basic Lease Terms and shown on Exhibit A (the "Premises"), located in the Building, subject to the terms and conditions of this Lease.

**1.3 Delivery of Possession and Commencement.**
The "Lease Term" or "Term" shall be the number of full calendar months stated in the Basic Lease Terms plus the remaining portion of the calendar month in which the Commencement Date occurs if the Commencement Date does not occur on the first day of a calendar month. Should Landlord be unable to deliver possession of the Premises on the Commencement Date stated in the Basic Lease Terms, and no delay is caused by a "Tenant Delay" as defined in Exhibit B of this Lease, the Commencement Date will be deferred

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 2
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

and Tenant shall owe no rent until notice from Landlord tendering possession to Tenant.  If possession is not so tendered within ninety (90) days following the Commencement Date set forth in the Basic Lease Terms, and no delay is caused by a Tenant Delay, then Tenant may elect to terminate this Lease by notice to Landlord within ten (10) days following expiration of the ninety (90)-day period.  Landlord shall have no liability to Tenant for delay in delivering possession.  The expiration date of this Lease shall be the date stated in the Basic Lease Terms or, if later, the last day of the calendar month that is the number of full calendar months stated in the Basic Lease Terms from the month in which the Commencement Date occurs.  The Premises shall be improved in accordance with Exhibit B.  The existence of any "punch list"-type items shall not postpone the Commencement Date of this Lease.  Tenant's occupancy of the Premises shall constitute conclusive acceptance of the amount of square footage stated herein, and of the condition of the Premises.  Upon determination of the Commencement Date, Landlord and Tenant will complete the Commencement Date Lease Certificate in the form attached as Exhibit C.

**2.1    Rent Payment.**
Tenant shall pay to Landlord the Base Rent for the Premises and any "Additional Rent" provided herein, without deduction or offset.  "Additional Rent" means amounts determined under Section 19 of this Lease and any other sums payable by Tenant to Landlord under this Lease.  For the purposes of this Lease, Base Rent and Additional Rent are herein referred to collectively as "Rent."  Rent is payable in advance on the first day of each month commencing on the Commencement Date of this Lease.  Rent for any partial month during the Lease Term shall be prorated to reflect the number of days during the month that the Lease Term is in effect and shall be due on the first day of any such partial month in which the Lease Term is in effect.  Rent not paid when due shall bear interest at the rate of one and one-half percent (1 ½%) per month, or if less, the maximum applicable rate of interest permitted by law, until paid.  For Rent payments made more than ten (10) days late, Landlord may at its option impose a late charge of the greater of five percent (5%) of the Rent past due or One Hundred dollars ($100) in lieu of interest for the first month of delinquency.  Tenant acknowledges that late payment by Tenant to Landlord of any Rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impracticable to ascertain, and that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of any such late payment and is not a penalty.  Neither imposition nor collection nor failure to impose or collect such late charge shall be considered a waiver of any other remedies available for default.  In addition to such late charge, an additional charge of Seventy-five dollars ($75) shall be recoverable by Landlord for any returned checks.

**2.2    Prepaid Rent.**
Upon the execution of this Lease, Tenant shall pay to Landlord the Prepaid Rent set forth in the Basic Lease Terms.  Landlord's obligations with respect to the Prepaid Rent are those of a debtor and not of a trustee, and Landlord shall be entitled to commingle the Prepaid Rent with Landlord's general funds.  Landlord shall not be required to pay Tenant interest on the Prepaid Rent.  Landlord shall be entitled to immediately endorse and cash Tenant's Prepaid Rent; however, such endorsement and cashing shall not constitute Landlord's acceptance of this Lease.  In the event Landlord does not accept this Lease, Landlord shall promptly return the Prepaid Rent to Tenant.

**3.1    Security Deposit.**
At the same time as execution of the Lease by Tenant, Tenant shall pay to Landlord the amount stated in the Basic Lease Terms as a Security Deposit.  Landlord may apply the Security Deposit to pay the cost of



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 3
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

performing any obligation Tenant fails to perform within the time required by this Lease, but such application by Landlord shall not waive Landlord's other remedies nor be the exclusive remedy for Tenant's default. If the Security Deposit is applied by Landlord, Tenant shall on demand pay the sum necessary to replenish the Security Deposit to its original amount. In no event will Tenant have the right to apply any part of the Security Deposit to any Rent or other sums due under this Lease. If Tenant is not in default at the expiration or termination of this Lease, Landlord shall return the entire Security Deposit to Tenant, except for any portion retained by Landlord pursuant to the provisions of this Section 3.1, Section 12.1, or any other provision of this Lease. Landlord's obligations with respect to the Security Deposit are those of a debtor and not of a trustee, and Landlord shall be entitled to commingle the Security Deposit with Landlord's general funds. Landlord shall not be required to pay Tenant interest on the Security Deposit. Landlord shall be entitled to immediately endorse and cash Tenant's Security Deposit; however, such endorsement and cashing shall not constitute Landlord's acceptance of this Lease. In the event Landlord does not accept this Lease, Landlord shall return said Security Deposit. If Landlord sells its interest in the Premises during the term hereof and deposits with or credits to the purchaser the unapplied portion of the Security Deposit, thereupon Landlord shall be discharged from any further liability or responsibility with respect to the Security Deposit.

4.1    **Use.**
Tenant shall use the Premises as a business for the Tenant's Permitted Use stated in the Basic Lease Terms and for no other purpose without Landlord's written consent. In connection with its use, Tenant shall at its expense promptly comply and cause the Premises to comply with all applicable laws, ordinances, rules and regulations of any public authority ("Laws") and shall not annoy, obstruct, or interfere with the rights of other tenants of the Building. Tenant shall create no nuisance or allow any objectionable fumes, noise, light, vibration, radiation, or electromagnetic waves to be emitted from the Premises. If any sound or vibration produced by Tenant's activities is detectable outside the Premises, Tenant shall provide such insulation as is required to muffle such sound or vibration and render it undetectable at Tenant's cost. Tenant shall not conduct any activities that will increase Landlord's insurance rates for any portion of the Building or that will in any manner degrade or damage the reputation of the Building. Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operations as well as upon all trade fixtures, leasehold improvements, merchandise, and other personal property in or about the Premises.

4.2    **Equipment.**
Tenant shall install in the Premises only such equipment as is customary for Tenant's Permitted Use and shall not overload the floors or electrical circuits of the Premises or Building or alter the plumbing or wiring of the Premises or Building. Landlord must approve in advance the location of and manner of installing any wiring or electrical, heat generating, climate sensitive or communication equipment or exceptionally heavy articles. All telecommunications equipment, conduit, cables and wiring, additional dedicated circuits and any additional air conditioning required because of heat generating equipment or special lighting installed by Tenant shall be installed and operated at Tenant's expense and, at Landlord's written request, shall be removed by Tenant at Tenant's sole cost and expense. Landlord shall have no obligation to permit the installation of equipment by any telecommunications provider whose equipment is not then servicing the Building. Tenant shall have no right to install any equipment on or through the roof of the Building, or use or install or store any equipment or other items outside the interior boundary of the Premises.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 4
**Error! Unknown document property name.**

EXHIBIT F
Page 15 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**4.3** **Signs and Other Installations.**
No signs, awnings, or other apparatus shall be painted on or attached to the Building or anything placed on any glass or woodwork of the Premises or positioned so as to be visible from outside the Premises, including any window covering (shades, blinds, curtains, drapes, screens, or tinting materials) without Landlord's written consent, and Landlord's approval as to design, size, location, and color. All signs installed by Tenant shall comply with Landlord's standards for signs and all applicable codes and all signs and sign hardware shall be removed upon termination of this Lease with the sign location restored to its former state unless Landlord elects to retain all or any portion thereof. Tenant may not install any alarm boxes, foil protection tape or other security equipment on the Premises without Landlord's prior written consent. Any material violating this provision may be removed and disposed of by Landlord without compensation to Tenant, and Tenant shall reimburse Landlord for the cost of the same upon request.

**4.4** **Parking.**
If a number of parking spaces is designated in the Basic Lease Terms, then during the term of this Lease, Landlord shall make available to Tenant's employees such number of parking space(s) at the parking lot servicing the Building, on a non-exclusive first come, first served basis. Landlord's obligation pursuant to this Section shall be limited to making such spaces available in whatever manner Landlord deems appropriate (attended, unattended, marked stalls, or other means), so long as the number of spaces referred to are made available to Tenant. Tenant shall be required to pay as rental for the spaces made available to, and used by, Tenant the established parking rates for the Building or lot (as the case may be), as adjusted from time to time, and such sum shall be Additional Rent payable under this Lease.

**5.1** **Utilities and Services.**
Landlord will arrange with the applicable utility providers to furnish water and electricity to the Building at all times. Tenant shall comply with all government laws or regulations regarding the use or reduction of use of utilities on the Premises. Interruption of services or utilities shall not be deemed an eviction or disturbance of Tenant's use and possession of the Premises, render Landlord liable to Tenant for damages, or relieve Tenant from performance of Tenant's obligations under this Lease. Landlord shall take all reasonable steps to correct any interruptions in service caused by defects in utility systems within Landlord's reasonable control. Tenant shall provide its own surge protection for power furnished to the Premises. Landlord shall have the exclusive right to choose the utility service providers to the Premises and may change providers at its discretion. Tenant shall cooperate with Landlord and the utility service providers at all times as reasonably necessary, and shall allow Landlord and utility service providers reasonable access to the pipes, lines, feeders, risers, wiring, and any other machinery within the Premises.

**5.2** **Extra Usage.**
If Tenant uses excessive amounts of utilities or services of any kind because of operation outside of normal Building hours, high demands from office machinery and equipment, nonstandard lighting, or any other cause, Landlord may impose a reasonable charge for supplying such extra utilities or services, which charge shall be payable monthly by Tenant in conjunction with monthly Base Rent payments or, at Landlord's option, within ten (10) days of Landlord's billing therefor. In case of dispute over any extra charge under this Section, Landlord shall designate a qualified independent engineer whose decision shall be conclusive on both parties. Landlord and Tenant shall each pay one-half (1/2) of the cost of such determination. Landlord reserves the right to install separate meters for any such utility and to charge Tenant for the cost of such installation.


{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 5
**Error! Unknown document property name.**

EXHIBIT F
Page 16 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

5.3    **Security.**
Landlord may but shall have no obligation to provide security service or to adopt security measures regarding the Premises, and Tenant shall cooperate with all reasonable security measures adopted by Landlord. Tenant may install a security system within the Premises with Landlord's written consent, which consent will not be unreasonably withheld. Landlord will be provided with an access code to any security system and shall not have any liability for accidentally setting off Tenant's security system. Landlord may modify the type or amount of security measures or services provided to the Building or the Premises at any time without notice.

6.1    **Maintenance and Repair.**
6.1.1    Tenant shall maintain and repair the Premises in clean and good condition, including, without limitation, maintaining and repairing all walls, floors, and ceilings, all interior doors, partitions and windows, and all Premises systems, fixtures, and equipment that are not the maintenance responsibility of Landlord, as well as damage caused by Tenant, its agents, employees, contractors or invitees.

6.1.2    Landlord shall have no liability for failure to perform required maintenance and repair unless written notice of such maintenance or repair is given by Tenant and Landlord fails to commence efforts to remedy the problem in a reasonable time and manner. Landlord shall have the right to erect scaffolding and other apparatus necessary for the purpose of making repairs or alterations to the Building, and Landlord shall have no liability for interference with Tenant's use because of such work. Work may be done during normal business hours. Tenant shall have no claim against Landlord for any interruption or reduction of services or interference with Tenant's occupancy caused by Landlord's maintenance and repair, and no such interruption or reduction shall be construed as a constructive or other eviction of Tenant.

6.1.3    Landlord's cost of repair and maintenance shall be considered "operating expenses" for purposes of Section 19.3, except that repair of damage caused by negligent or intentional acts or breach of this Lease by Tenant, its agents, employees, contractors, or invitees shall be at Tenant's expense.

6.2    **Alterations.**
6.2.1    Tenant shall not make any alterations, additions, or improvements to the Premises, change the color of the interior, or install any wall or floor covering without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Should Landlord consent in writing to Tenant's alteration of the Premises, Tenant shall contract with a contractor approved by Landlord for the construction of such alterations, shall secure all appropriate governmental approvals and permits, and shall complete such alterations with due diligence in compliance with the plans and specifications approved by Landlord. All such construction shall be performed in a manner that will not interfere with the quiet enjoyment of other tenants of the Building. Any such improvements, alterations, wiring, cables, or conduit installed by Tenant shall at once become part of the Premises and belong to Landlord, except for removable machinery and unattached movable trade fixtures. Landlord may at its option require that Tenant remove any improvements, alterations, wiring, cables, or conduit installed by or for Tenant and restore the Premises to the original condition upon termination of this Lease. Landlord shall have the right to approve the contractor used by Tenant for any work in the Premises, and to post notices of nonresponsibility in connection with work being performed by Tenant in the Premises. Work by Tenant shall comply with all laws then applicable to the Premises. Tenant shall not allow any liens to attach to the Building or Tenant's interest in the Premises as a result of its activities or any alterations.


{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 6
**Error! Unknown document property name.**

EXHIBIT F
Page 17 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

6.2.2     Landlord may require Tenant's general contractor performing any work at the Premises to post a payment and performance bond equal to one hundred twenty-five percent (125%) of the estimated cost of the contractor's work, including work performed by any subcontractor thereunder.  Tenant shall provide, or shall cause Tenant's general contractor to provide, evidence of the following insurance coverages prior to commencing work and upon demand during the course of the work: a) worker's compensation for statutory limits in compliance with applicable state and federal laws; b) commercial general liability with limits of not less than Five Million Dollars ($5,000,000) combined single limit per occurrence for bodily injury and property damage, naming Landlord and its building manager as additional insureds; and c) builder's risk coverage in the coverage amount not less than the projected cost of the improvements contemplated.  Each certificate of insurance must contain a provision confirming that no cancellation or material change in policies will be effective except upon thirty (30) days written notice to Landlord, if available.

6.2.3     Landlord may perform alterations to or change the configuration of the Building, the parking area, and other areas on the Property, in Landlord's sole discretion.

**7.1     Indemnity.**
Tenant shall indemnify, defend, and hold harmless Landlord and its managing agents, and employees from any claim, liability, damage, or loss occurring on the Premises, or any cost or expense in connection therewith (including attorney fees), arising out of (a) any damage to any person or property occurring in, on or about the Premises, (b) use by Tenant or its agents, invitees, or contractors of the Premises and/or the Building, and/or (c) Tenant's breach or violation of any term of this Lease.

**7.2     Insurance.**
Tenant shall carry (a) liability insurance with general aggregate limits of not less than One Million Dollars ($1,000,000) with no less than One Million Dollars ($1,000,000) per occurrence for bodily injury and no less than One Million Dollars ($1,000,000) per occurrence for property damage**,** and (b) Business Auto Liability insurance covering owned, non-owned, and hired vehicles with a limit of not less than One Million Dollars ($1,000,000) per occurrence, which insurance shall have an endorsement naming Landlord**,** Landlord's lender, if any, and Landlord's managing agent, if any, as an additional insured, cover the liability insured under Section 7.1 of this Lease and be in a form and with companies reasonably acceptable to Landlord. Prior to occupancy, Tenant shall furnish a certificate evidencing such insurance that, if reasonably available, shall state that the coverage shall not be canceled or materially changed without thirty (30) days' advance written notice to Landlord, Landlord's lender, if any, and Landlord's managing agent, if any.  In any event, Tenant shall notify Landlord promptly upon learning of any proposed or pending change in any coverage required under this Lease; Tenant shall furnish to Landlord a renewal certificate at least thirty (30) days prior to expiration of any policy.  All insurance required to be procured by Tenant under this Lease shall be issued by a carrier reasonably acceptable to Landlord and authorized to issue policies in the state in which the Property is located.  All insurance providers shall have an AM Best rating of AV or better and shall be licensed to issue insurance in the State of Oregon.

**8.1     Fire or Casualty.**
"Major Damage" means damage by fire or other casualty to the Building or the Premises that causes the Premises or any substantial portion of the Building to be unusable, or that will cost more than twenty-five percent (25%) of the pre-damage value of the Building to repair, or that is not covered by insurance.  In case of Major Damage, Landlord may elect to terminate this Lease by notice in writing to the Tenant within

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 7
**Error! Unknown document property name.**



EXHIBIT F
Page 18 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

thirty (30) days after such date.  If this Lease is not terminated following Major Damage, or if damage occurs that is not Major Damage, Landlord shall promptly restore the Premises to the condition existing just prior to the damage.  Tenant shall promptly restore all damage to tenant improvements or alterations installed or paid for by Tenant or pay the cost of such restoration to Landlord if Landlord elects to do the restoration of such improvements.  Unless the casualty was caused by Tenant, Rent shall be reduced from the date of damage until the date restoration work being performed by Landlord is substantially complete, with the reduction to be in proportion to the area of the Premises not usable by Tenant.

8.2     **Waiver of Subrogation.**
Tenant shall be responsible for insuring its personal property and trade fixtures located on the Premises and any alterations or tenant improvements it has made to the Premises.  Neither Landlord, its managing agent, nor Tenant shall be liable to the other for any loss or damage caused by water damage, sprinkler leakage, or any of the risks that are covered by property insurance or could be covered by a customary broad form of property insurance policy, or for any business interruption, and there shall be no subrogated claim by one party's insurance carrier against the other party arising out of any such loss.

9.1     **Eminent Domain.**
If a condemning authority takes title by eminent domain or by agreement in lieu thereof to the entire Building or a portion sufficient to render the Premises unsuitable for Tenant's use, then either party may elect to terminate this Lease effective on the date that possession is taken by the condemning authority.  If this Lease is not terminated, then Base Rent shall be reduced for the remainder of the term in an amount proportionate to the reduction in area of the Premises caused by the taking.  All condemnation proceeds shall belong to Landlord, and Tenant shall have no claim against Landlord or the condemnation award because of the taking.

10.1    **Assignment and Subletting.**
Tenant shall not assign or encumber its interest under this Lease or sublet all or any portion of the Premises without first obtaining Landlord's consent in writing.  This provision shall apply to all transfers by operation of law, and to all mergers and changes in control of Tenant, all of which shall be deemed assignments for the purposes of this Section.  No assignment shall relieve Tenant of its obligation to pay Rent or perform other obligations required by this Lease, and no consent to one assignment or subletting shall be a consent to any further assignment or subletting.  If Tenant proposes a subletting or assignment for which Landlord's consent is required, Landlord shall have the option of terminating this Lease and dealing directly with the proposed subtenant or assignee, or any third party.  If Landlord does not terminate this Lease, Landlord shall not unreasonably withhold its consent to any assignment or subletting provided the effective rental paid by the subtenant or assignee is not less than the current scheduled rental rate of the Building for comparable space and the proposed Tenant is compatible with Landlord's normal standards for the Building.  If an assignment or subletting is permitted, fifty percent (50%) of any net profit, or the net value of any other consideration received by Tenant as a result of such transaction, shall be paid to Landlord promptly following its receipt by Tenant.  Tenant shall pay a nonrefundable fee in the amount of Seven Hundred Fifty Dollars ($750) to Landlord at the time of any request for assignment or subletting, regardless of whether Landlord's consent is granted, and shall also pay reasonable attorneys', accountants' and other professional fees incurred in connection with any such request, regardless of whether Landlord's consent is granted.  It shall not be unreasonable for Landlord to withhold consent to a proposed sublease or an assignment (a) if the character, reputation, experience, credit, financial strength or business of the proposed sublessee or assignee is unacceptable to Landlord, or (b) if the proposed use of the Premises by the proposed sublessee or assignee is



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 8
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

not a permitted use of the Premises authorized by this Lease, or (c) if in the Landlord's business judgment, the Premises will be adversely impacted by the proposed sublessee or assignee, or (d) if the proposed sublessee or assignee is a former tenant of the Property within the last twelve (12) months prior to the request, or (e) if the proposed sublessee or assignee does not expressly assume and agree in writing to be bound by all of Tenant's obligations under this Lease and, in the event of an assignment, be directly responsible for all of Tenant's obligations under this Lease, or (f) if Tenant is in breach or default under this Lease, or has been within breach or default within the past six (6) months prior to the request of any of terms, covenants, or conditions of this Lease.

**11.1    Default.**
Any of the following shall constitute an Event of Default by Tenant under this Lease (time of performance being of the essence of this Lease):

11.1.1    Tenant's failure to pay Rent or any other charge under this Lease within ten (10) days after it is due.

11.1.2    Tenant's failure to comply with any other term or condition within twenty (20) days following written notice from Landlord specifying the noncompliance.  If such noncompliance cannot be cured within the twenty (20)-day period, this provision shall be satisfied if Tenant commences correction within such period and thereafter proceeds in good faith and with reasonable diligence to complete correction as soon as possible but not later than ninety (90) days after the date of Landlord's notice.

11.1.3    Failure of Tenant to execute the documents described in Section 16.1 or 16.3 within the time required under such Sections; failure of Tenant to provide or maintain the insurance required of Tenant pursuant hereto; or failure of Tenant to comply with any Laws as required pursuant hereto within twenty-four (24) hours after written demand by Landlord.

11.1.4    Tenant's insolvency, business failure or assignment for the benefit of its creditors.  Tenant's commencement of proceedings under any provision of any bankruptcy or insolvency law or failure to obtain dismissal of any petition filed against it under such laws within the time required to answer; or the appointment of a receiver for all or any portion of Tenant's properties or financial records.

11.1.5    Assignment or subletting by Tenant in violation of Section 10.1.

11.1.6    Vacation or abandonment of the Premises without the written consent of Landlord or failure to occupy the Premises within twenty (20) days after notice from Landlord tendering possession.

**11.2    Remedies for Default.**
Upon occurrence of an Event of Default as described in Section 11.1, Landlord shall have the right to the following remedies, which are intended to be cumulative and in addition to any other remedies provided under applicable law or under this Lease:

11.2.1    Landlord may at its option terminate this Lease, without prejudice to its right to damages for Tenant's breach.  With or without termination, Landlord may retake possession of the Premises (with or without use of legal process) and may use or relet the Premises without accepting a surrender or waiving the right to damages.  Following such retaking of possession, efforts by Landlord to relet the Premises shall be sufficient



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 9
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

if Landlord follows its usual procedures for finding tenants for the space at rates not less than the current rates for other comparable space in the Building.  If Landlord has other vacant space in the Building, prospective tenants may be placed in such other space without prejudice to Landlord's claim to damages or loss of rentals from Tenant.

11.2.2   Landlord may recover all damages caused by Tenant's default that shall include an amount equal to (a) all Rent lost through the date that, with commercially reasonable efforts, Landlord should be able to relet the Premises to one or more suitable replacement tenants and such replacement tenants shall begin paying Rent, including monthly Base Rent, plus (b) the difference between the Rent provided under this Lease for the remainder of the Term less the amount that can reasonably be expected to be earned in Rent from replacement tenants, discounted at the federal discount rate published by the Federal Bank, San Francisco office, at the time of the Event of Default.  In addition, Landlord shall be entitled to recover all costs of reletting including, but not limited to, the cost of removing any tenant improvements, personal property, rubbish and debris left on the Premises by Tenant, the cost of preparing the space for reletting, and the cost of all leasing commissions, tenant improvements, free rent periods, and all other tenant concessions reasonably incurred by Landlord in reletting the Premises to one or more replacement tenants.  Landlord may sue periodically to recover damages as they occur throughout the Lease term, and no action for accrued damages shall bar a later action for damages subsequently accruing, or Landlord may elect in any one action to recover accrued damages, plus damages attributable to the remaining term of the Lease.

**11.3**    **Right to Cure.**
Landlord may, but shall not be obligated to, make any payment or perform any obligation that Tenant has failed to perform when required under this Lease.  All of Landlord's expenditures incurred to correct the failure to perform shall be reimbursed by Tenant upon demand with interest from the date of expenditure at the rate of one and one-half percent (1 ½%) per month.  Landlord's right to correct Tenant's failure to perform is for the sole protection of Landlord and the existence of this right shall not release Tenant from the obligation to perform all the covenants herein required to be performed by Tenant, or deprive Landlord of any other right Landlord may have by reason of default of this Lease by Tenant, whether or not Landlord exercises its right under this Section.

**12.1**    **Surrender; Holdover.**
On expiration or early termination of this Lease, Tenant shall deliver all keys to Landlord and surrender the Premises vacuumed, swept, and free of debris and in the same condition as at the commencement of the term subject only to reasonable wear from ordinary use.  Tenant shall remove all its furnishings and trade fixtures that remain its property and any alterations, cables or conduits if required by Section 6.2, and shall repair all damage resulting from such removal.  Failure to remove shall be an abandonment of the property, and, following ten (10) days' written notice, Landlord may remove or dispose of it in any manner without liability, and recover the cost of removal and other damages from Tenant.  If Tenant fails to vacate the Premises when required, including failure to remove all its personal property, Landlord may elect either:  (i) to treat Tenant as a tenant from month to month, subject to the provisions of this Lease except that Rent shall be two (2) times the total Rent being charged when the Lease term expired, and any option or other rights regarding extension of the term or expansion of the Premises shall no longer apply; or (ii) to eject Tenant from the Premises (using self-help or otherwise) and recover damages caused by wrongful holdover.



Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

13.1    **Regulations.**

Landlord shall have the right but shall not be obligated to make, revise, and enforce rules and regulations or policies consistent with this Lease for the purpose of promoting safety, health, order, economy, cleanliness, and good service to all tenants of the Building, including, but not limited to, moving, use of common areas, and prohibition of smoking.  All such regulations and policies including those, if any, attached to this Lease as Exhibit D, shall be complied with as if part of this Lease and failure to comply shall be a default.

14.1    **Access.**

During times other than normal Building hours, Tenant's officers and employees or those having business with Tenant may be required to identify themselves or show passes in order to gain access to the Building. Landlord shall have no liability for permitting or refusing to permit access by anyone.  Landlord may regulate access to any Building elevators outside of normal Building hours.  Landlord shall have the right to enter upon the Premises at any time by passkey or otherwise to determine Tenant's compliance with this Lease, to perform necessary services, maintenance, and repairs or alterations to the Building or the Premises, to post notices of nonresponsibility, or to show the Premises to any prospective tenant or purchaser.  Except in case of emergency, such entry shall be at such times and in such manner as to minimize interference with the reasonable business use of the Premises by Tenant.

14.2    **Furniture and Bulky Articles.**

Tenant shall move furniture and bulky articles in and out of the Building or make independent use of any elevators only at times approved by Landlord following at least 24 hours' written notice to Landlord of the intended move.

15.1    **Notices.**

Notices between the parties relating to this Lease shall be in writing, effective when delivered during business hours by facsimile transmission, email, hand delivery, private courier, nationally-recognized overnight courier or regular or certified U.S. mail.  Notices shall be delivered postage prepaid, to the address, email address, or facsimile number for the party stated in the Basic Lease Terms or to such other address as either party may specify by notice to the other.  Notice to Tenant may always be delivered to the Premises.  Rent shall be payable to Landlord at the same address stated in the Basic Lease Terms (or at such other address as Landlord may specify by notice to Tenant) and in the same manner, but shall be considered paid only when received.  Notwithstanding the foregoing, notice by email or facsimile shall be effective on the date transmitted only with proof of transmission, and only if a copy of such notice is also sent on the same business day by one of the other notice methods permitted under this Section 15.1.

16.1    **Subordination and Attornment.**

This Lease shall be subject to and subordinate to any mortgage, deed of trust, ground lease, master lease or land sale contract (hereafter collectively referred to as encumbrances) now existing against the Building.  At Landlord's option, this Lease shall be subject and subordinate to any future encumbrance, ground lease or master lease hereafter placed against the Building (including the underlying land) or any modifications of existing encumbrances, and Tenant shall execute such documents as may reasonably be requested by Landlord or the holder of the encumbrance to evidence this subordination.  If any encumbrance is foreclosed, then if the purchaser at foreclosure sale gives to Tenant a written agreement to recognize Tenant's Lease, Tenant shall attorn to such purchaser and this Lease shall continue.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 11
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

**16.2    Transfer of Building.**

If the Building is sold or otherwise transferred by Landlord or any successor, Tenant shall attorn to the purchaser or transferee and recognize it as the landlord under this Lease, and, provided the purchaser or transferee assumes all obligations under this Lease thereafter accruing, the transferor shall have no further liability hereunder.

**16.3    Estoppels.**

Either party will within ten (10) days after notice from the other execute, acknowledge, and deliver to the other party a certificate certifying whether or not this Lease has been modified and is in full force and effect; whether there are any modifications or alleged breaches by the other party; the dates to which Rent has been paid in advance, and the amount of any security deposit or prepaid Rent; and any other facts that may reasonably be requested.  Failure to deliver the certificate within the specified time shall be conclusive upon the party of whom the certificate was requested that the Lease is in full force and effect and has not been modified except as may be represented by the party requesting the certificate.  If requested by the holder of any encumbrance, or any underlying lessor, Tenant will agree to give such holder or lessor notice of and an opportunity to cure any default by Landlord under this Lease.

**17.1    Attorney Fees.**

In any litigation, arbitration, or other proceeding arising out of this Lease, including any bankruptcy proceeding, the prevailing party shall be entitled to recover attorney fees at trial, in arbitration, and on any appeal or petition for review for any such proceedings.  If Landlord incurs attorney fees because of a breach or default by Tenant, Tenant shall pay all such legal fees and expenses of Landlord whether or not litigation is filed. If Landlord employs a collection agency to recover delinquent charges, Tenant agrees to pay all collection agency and other fees charged to Landlord in addition to Rent, late charges, interest, and other sums payable under this Lease.

**18.1    Quiet Enjoyment.**

Landlord warrants that as long as Tenant complies with all terms of this Lease it shall be entitled to possession of the Premises free from any eviction or disturbance by Landlord or parties claiming through Landlord.

**18.2    Limitation on Liability.**

Notwithstanding any provision in this Lease to the contrary, neither Landlord nor its managing agent or employees shall have any liability to Tenant for loss or damage to Tenant's property from any cause, nor shall Landlord or its managing agent have any liability arising out of the acts, including criminal acts, of other tenants of the Building or third parties, nor any liability for consequential or punitive damages, nor liability for any reason that exceeds the value of its interest in the Property.

**19.1    Additional Rent:  Property Taxes.**

Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of real property taxes for the Property.  Prior to the Commencement Date, Landlord shall estimate the amount of real property taxes for the then-current calendar year and Tenant shall pay on or before the first day of each calendar month during such calendar year Tenant's Proportionate Share of such real property taxes divided by the number of months remaining in such calendar year.  Thereafter, on or before January 1 of each calendar year during the remainder of the Term, Landlord shall estimate the amount of real property taxes for the ensuing calendar year, and Tenant shall pay on or before the first day of each calendar month during such calendar year one-twelfth (1/12) of Landlord's estimate of Tenant's Proportionate Share of the real property taxes for the year,



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 12
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

provided that Landlord may revise its estimate during any year with reasonable cause and the additional estimate shall be payable as equal additions to Rent for the remainder of the calendar year.  Tenant's Proportionate Share of property taxes shall be prorated like Base Rent for any partial month of the Term. Following the end of each calendar year, or when actual tax year information becomes available, Landlord shall compute the actual real property taxes and bill Tenant for any deficiency or credit Tenant with any excess collected. Tenant shall pay any such deficiency within thirty (30) days after Landlord's billing, whether or not this Lease shall have expired or terminated at the time of such billing. "Real property taxes" as used herein means all taxes and assessments of any public authority against the Property, the cost of contesting any tax, and any form of fee or charge imposed on Landlord as a direct consequence of owning or leasing the Property, including but not limited to Rent taxes, gross receipt taxes, leasing taxes, or any fee or charge wholly or partially in lieu of or in substitution for or to supplement ad valorem real property taxes or assessments, whether now existing or hereafter enacted. If, during the term of this Lease, the voters of the state in which the Premises are located or the state legislature enacts a real property tax limitation, then any substitute taxes, in any name or form, that may be adopted to replace or supplement real property taxes shall be added to taxes for purposes of this Section 19.1.  If any portion of the Building is occupied by a tax-exempt tenant (other than Tenant) that receives a property tax exemption for its premises, so that the Building has a partial tax exemption under ORS 307.112 or a similar statute, then real property taxes shall mean taxes computed as if such partial exemption did not exist.  If Tenant is a nonprofit or tax-exempt organization and wishes to apply for a real property tax exemption as a tax-exempt organization under ORS 307.130, as further described in ORS 307.112, as may be amended from time to time, then Landlord and Tenant shall reasonably cooperate to so apply at no out-of-pocket cost to Landlord.  Any exemption granted as a result of any such application shall accrue for the sole benefit of Tenant.  If a separate assessment or identifiable tax increase arises because of improvements to the Premises, then Tenant shall pay 100 percent (100%) of such increase.

**19.2    Additional Rent: Cost-of-Living Adjustment.**
Effective on each anniversary following the Commencement Date of this Lease, Landlord shall be entitled to recover Additional Rent which shall be a percentage of Base Rent equal to the percentage increase, if any, in the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics. The percentage increase shall be computed by comparing the schedule entitled "West Urban Region, All Items, 1982 - 84 = 100" for the latest available month three (3) months preceding the month in which the Lease term commenced with the same figure for the same month in the years for which the adjustment is computed.  All comparisons shall be made using index figures derived from the same base period and in no event shall this provision operate to decrease the monthly Rent for the Premises below the monthly Base Rent, plus property tax adjustments and operating expense adjustments as provided in this Lease.  If the index cited above is revised or discontinued during the term of this Lease, then the index that is designated by BOMA Oregon to replace it shall be used.

**19.3    Additional Rent:  Operating Expense Adjustment.**
Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of operating expenses for the Property.  Prior to the Commencement Date, Landlord shall estimate the amount of operating expenses for the then-calendar year and Tenant shall pay on or before the first day of each calendar month during such calendar year Tenant's Proportionate Share of such operating expenses divided by the total number of months remaining in such calendar year.  Thereafter, on or before January 1 of each subsequent year of the remainder of the Term, Landlord shall estimate the amount of operating expenses for the ensuing calendar year, and Tenant shall pay to Landlord, on or before the final day of each calendar month during such calendar year,

{00631069;1}
 *Standard Form of INDUSTRIAL LEASE (NET)*
Page 13
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

one-twelfth (1/12) of Tenant's share of the estimated operating expenses, provided that Landlord may revise its estimate during any year with reasonable cause and the additional estimate shall be payable as equal additions to Rent for the remainder of the calendar year. Tenant's Proportionate Share of operating expenses shall be prorated like Base Rent for any partial month of the term. Following the end of each calendar year, Landlord shall compute the actual operating expenses and bill Tenant for any deficiency or credit Tenant with any excess collected. Tenant shall pay any such deficiency within thirty (30) days after Landlord's billing, whether or not this Lease shall have expired or terminated at the time of such billing. Landlord shall also inform Tenant as to any change in Tenant's monthly payment of Tenant's Proportionate Share of operating expenses. As used herein "operating expenses" shall mean all costs of operating, maintaining, and repairing the Property as determined by standard real estate accounting practice, including, but not limited to: all water and sewer charges; the cost of natural gas and electricity provided to the Building; janitorial and cleaning supplies and services; administration costs and management fees; superintendent fees; security services, if any; insurance premiums; licenses; and permits for the operation and maintenance of the Building and all its component elements and mechanical systems; ordinary and emergency repairs and maintenance, and the annual amortized capital improvement cost (amortized over such a period as Landlord may select but not shorter than the period allowed under the Internal Revenue Code and at a current market interest rate) for any capital improvements to the Property required by any governmental authority or those that have a reasonable probability of improving the efficiency of the Building. "Operating expenses" shall also include all assessments under recorded covenants or master plans and/or by owners' associations.

**19.4    Operating Expense Disputes.**
If Tenant disputes any computation of Additional Rent or Rent adjustment under Sections 19.1 through 19.3 of this Lease, Tenant shall give notice to Landlord not later than thirty (30) days after the notice from Landlord describing the computation in question, but in any event not later than (thirty) 30 days after expiration or earlier termination of this Lease. If Tenant fails to give such a notice, the computation by Landlord shall be binding and conclusive between the parties for the period in question. If Tenant gives a timely notice, the dispute shall be resolved by an independent certified public accountant selected by Landlord whose decision shall be conclusive between the parties. Each party shall pay one-half (1/2) of the fee for making such determination, except that if the adjustment in favor of Tenant does not exceed ten percent (10%) of the escalation amounts for the year in question, Tenant shall pay (i) the entire cost of any such third-party determination; and (ii) Landlord's out-of-pocket costs and reasonable expenses for personnel time in responding to the audit. Nothing herein shall reduce Tenant's obligations to make all payments as required by this Lease. In no event shall Landlord have any liability to Tenant based on its calculation of Additional Rent or Rent adjustments, except and only the obligation to cause any correction to be made pursuant to this Section 19.4. Tenant shall maintain as strictly confidential the existence and resolution of any dispute regarding Rent charges hereunder. In no event shall Tenant be entitled to employ or retain any auditor, consultant, or other professional in connection with exercising any right under this Section 19.4 whose fee is based on the results of the dispute.

**20.1    Hazardous Materials.**
Neither Tenant nor Tenant's agents or employees shall cause or permit any Hazardous Material, as hereinafter defined, to be brought upon, stored, used, generated, released into the environment, or disposed of on, in, under, or about the Premises, except reasonable quantities of cleaning supplies and office supplies necessary to or required as part of Tenant's business that are generated, used, kept, stored, or disposed of in a manner that complies with all laws regulating any such Hazardous Materials and with good business practices.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 14
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

Tenant covenants to remove from the Premises (or the Building, if applicable), upon the expiration or sooner termination of this Lease and at Tenant's sole cost and expense, any and all Hazardous Materials brought upon, stored, used, generated, or released into the environment during the term of this Lease. To the fullest extent permitted by law, Tenant hereby agrees to indemnify, defend, protect, and hold harmless Landlord, Landlord's managing agent, and their respective agents and employees, and their respective successors and assigns, from any and all claims, judgments, damages, penalties, fines, costs, liabilities, and losses that arise during or after the term directly or indirectly from the use, storage, disposal, release or presence of Hazardous Materials on, in, or about the Premises that occurs during the term of this Lease. Tenant shall promptly notify Landlord of any release of Hazardous Materials in, on, or about the Premises that Tenant or Tenant's agents or employees become aware of during the Term of this Lease, whether caused by Tenant, Tenant's agents or employees, or any other persons or entities. As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material, or waste that is or becomes regulated by any local governmental authority, the state of Oregon, or the United States government. The term "Hazardous Material" includes, without limitation, any material or substance that is (i) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," "hazardous material," or "waste" under any federal, state, or local law, (ii) petroleum, and (iii) asbestos. The provisions of this Section 20, including, without limitation, the indemnification provisions set forth herein, shall survive any termination of this Lease.

**20.2     Mold.**
Tenant shall not allow or permit any conduct or omission at the Premises, or anywhere on Landlord's property, that will promote or allow the production or growth of mold, spores, fungus, or any other similar organism, and shall indemnify and hold Landlord harmless from any claim, demand, cost and expense (including attorney fees) arising from or caused by Tenant's failure to strictly comply with its obligations under this provision.

**21.1     Complete Agreement; No Implied Covenants.**
This Lease and the attached Exhibits and Schedules, if any, constitute the entire agreement of the parties and supersede all prior written and oral agreements and representations and there are no implied covenants or other agreements between the parties, except as expressly set forth in this Lease. Neither Landlord nor Tenant is relying on any representations other than those expressly set forth herein.

**21.2     Space Leased AS IS.**
Unless otherwise stated in this Lease, the Premises are leased AS IS in the condition now existing with no alterations or other work to be performed by Landlord.

**21.3     Captions.**
The titles to the Sections of this Lease are descriptive only and are not intended to change or influence the meaning of any Section or to be part of this Lease.

**21.4     Nonwaiver.**
Failure by Landlord to promptly enforce any regulation, remedy, or right of any kind under this Lease shall not constitute a waiver of the same and such right or remedy may be asserted at any time after Landlord becomes entitled to the benefit thereof, notwithstanding delay in enforcement.



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 15
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

21.5     **Consent.**
Except where otherwise provided in this Lease, either party may withhold its consent for any reason or for no reason whenever that party's consent is required under this Lease.

21.6     **Force Majeure.**
If performance by Landlord of any portion of this Lease is made impossible or impracticable by any prevention, delay, or stoppage caused by governmental approvals, war, acts of terrorism, strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes for those items, governmental actions, civil commotions, fire or other casualty, or other causes beyond the reasonable control of Landlord, performance by Landlord for a period equal to the period of that prevention, delay, or stoppage is excused.

21.7     **Commissions.**
Each party represents that it has not had dealings with any real estate broker, finder or other person with respect to this Lease in any manner, except for the broker(s) identified in the Basic Lease Terms.  Landlord shall pay a leasing commission of one (1) months rent that shall be paid over the first three months of the lease term. If the property was to close on a sale before February 1st, 2025, the Broker shall credit the Landlord for the full amount of the lease commission. The credit shall be applied through escrow.

21.8     **Successors.**
This Lease shall bind and inure to the benefit of the parties, their respective heirs, successors, and permitted assigns.

21.9     **Financial Reports**
Within fifteen (15) days after Landlord's request, Tenant will furnish Tenant's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's internally prepared financial statements.  Tenant will discuss its financial statements with Landlord and will give Landlord access to Tenant's books and records in order to enable Landlord to verify the financial statements.  Landlord will not disclose any aspect of Tenant's financial statements except (a) to Landlord's property manager and internal personnel, and (b) to Landlord's lenders or prospective purchasers of the Building, and (c) in litigation between Landlord and Tenant, and (d) if required by law or court order.

21.10    **Waiver of Jury Trial.**
To the maximum extent permitted by law, Landlord and Tenant each waive right to trial by jury in any litigation arising out of or with respect to this Lease.

21.11    **OFAC Compliance.**
Tenant represents and warrants that Tenant is in compliance with all laws, statutes, rules and regulations or any federal, state or local governmental authority in the United States of America applicable to Tenant and all beneficial owners of Tenant, including, without limitation, the requirements of Executive Order No. 133224, 66 Fed Reg. 49079 (September 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control of the Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders").  Tenant agrees to make its policies, procedures and practices regarding compliance with the Orders available to Landlord for its review and

{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 16
**Error! Unknown document property name.**



EXHIBIT F
Page 27 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

inspection during normal business hours and upon reasonable prior notice. Tenant further represents and warrants that neither Tenant nor any beneficial owner of Tenant: (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists"); (b) has been determined by competent authority to be subject to the prohibitions contained in the Orders; (c) is owned or controlled by, nor acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or (d) shall transfer or permit the transfer of any interest in Tenant or any beneficial owner in Tenant to any person who is or whose beneficial owners are listed on the Lists.

**21.12    Representation; Preparation.**

**THIS LEASE, ATTACHMENTS AND AMENDMENTS WERE PREPARED AT THE DIRECTION OF LANDLORD AND TENANT AND BOTH HAVE BEEN ADVISED AND HAD AN OPPORTUNITY TO SEEK INDEPENDENT COUNSEL TO REVIEW THIS LEASE, ATTACHMENTS, AND AMENDMENTS. THE RULE OF CONSTRUCTION THAT A WRITTEN AGREEMENT IS CONSTRUED AGAINST THE PARTY PREPARING OR DRAFTING SUCH AGREEMENT SHALL SPECIFICALLY NOT BE APPLICABLE TO THE INTERPRETATION OR ENFORCEMENT OF THIS LEASE, ATTACHMENTS, AND AMENDMENTS. NO REPRESENTATION OR RECOMMENDATION IS MADE BY BOMA PORTLAND OR THE REAL ESTATE BROKERS INVOLVED IN THIS TRANSACTION CONCERNING THE LEGAL SUFFICIENCY OR TAX OR LEGAL CONSEQUENCES ARISING FROM THIS LEASE.**

**21.13    Exhibits.**

The following Exhibits are attached hereto and incorporated as a part of this Lease:

| Exhibit A | Premises |
| Exhibit B | Optional Rider Work Agreement |
| Exhibit C | Commencement Date Lease Certificate |
| Exhibit D | Rules and Regulations |
| Exhibit E | Guaranty |



{00631069;1}
*Standard Form of INDUSTRIAL LEASE (NET)*
Page 17
**Error! Unknown document property name.**

EXHIBIT F
Page 28 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of INDUSTRIAL LEASE (Net Lease)
**© 2018 BOMA OREGON**

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Lease as of the day and year first written above.

LANDLORD:          Ankor _____

By: _____
DocuSigned by: Jesce Horton
C0422DB80BFD4DE...
Printed Name: Jesce Horton _____

Title: Partner _____


TENANT:          Anotta Holdings _____

By: _____
DocuSigned by: Moyata
15D962DD76B5455...
Printed Name: Moyata Anotta _____

Title: President _____

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of OFFICE LEASE (Net Lease)
**© 2018 BOMA OREGON**
**Exhibit A**





{00631069;1}
*Standard Form of OFFICE LEASE (NET)*
Exhibit B
**Error! Unknown document property name.**

EXHIBIT F
Page 30 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of OFFICE LEASE (Net Lease)
**© 2018 BOMA OREGON**

{00631069;1}
*Standard Form of OFFICE LEASE (NET)*
Exhibit B
**Error! Unknown document property name.**

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

Standard Form of OFFICE LEASE (Net Lease)
**© 2018 BOMA OREGON**

{00631069;1}
*Standard Form of OFFICE LEASE (NET)*
Exhibit C
**Error! Unknown document property name.**

EXHIBIT F
Page 32 of 64

Docusign Envelope ID: D54742C2-A152-42D5-8046-534788B77FC1

EXHIBIT F
Page 33 of 64



**Oregon**

Tina Kotek, Governor

Department of Environmental Quality
Office of Compliance and Enforcement
700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100
(503) 229-5696
FAX (503) 229-5100
TTY 711

November 4, 2025

CERTIFIED MAIL: 9589 0710 5270 3236 6720 86

NW Metals Inc
c/o Moyata Anotta, Registered Agent
8140 N Commercial Ave
Portland OR 97217

Re:  Notice of Civil Penalty Assessment and Order
      Case No. LQ-SW-NWR-2025-535

This letter is to inform you that the Oregon Department of Environmental Quality (DEQ) has issued you a civil penalty of $357,461 for operating your business at 8140 North Commercial Avenue in Portland without a solid waste permit, air quality permit, and stormwater permit, and also for disposing of solid waste at 9537 North Columbia Boulevard in Portland without a solid waste permit.

DEQ issued this penalty because your unpermitted metal recycling operations at both properties have created risk to the environment and public health. Specifically, you operated a metal shredder and processed waste automobiles, fluids, and tires without the pollution controls required in solid waste, air quality and stormwater permits. DEQ and the City of Portland have repeatedly notified you of these violations and requested you take action to address them. DEQ is especially concerned about ongoing violations at the Commercial Avenue location, and because you have committed environmental violations at multiple properties in Portland over the past several years.

In addition to issuing you a civil penalty, included in Section IV of the enclosed Notice of Civil Penalty Assessment and Order (Notice) is an order requiring you to:

- Immediately cease operating Shredder 3 without an Air Contaminant Discharge Permit;
- Submit a written notification to DEQ that Shredder 3 is no longer operating, along with a current dated photograph of the Shredder 3 hour meter;
- Submit a complete 2024 annual report under the Columbia Boulevard facility Air Contaminant Discharge Permit;
- Properly dispose of the solid waste and waste tires at the Commercial Avenue facility or submit a complete application for a solid waste permit; and
- Work with the property owner at the Columbia Boulevard facility to properly dispose of the solid waste and waste tires at that site.

The above is a summary, and you should consult Section IV of the Notice for the deadlines and the order's detailed requirements. $179,061 of the civil penalty represents the economic benefit you gained by avoiding costs of compliance. If you complete these requirements, DEQ will consider recalculating the applicable costs as delayed rather than avoided and may reduce the civil penalty accordingly.

NW Metals Inc.
Case No. LQ-SW-NWR-2025-535
Page 2


You may pay the civil penalty as follows:

Pay online with e-check (ACH) or Credit Card. Go to Your DEQ Online here: https://ydo.oregon.gov. Select Register Account or Login, then select Pay Invoices/Fees on your account dashboard. Enter the Invoice number and Account ID included on the attached payment slip. Note: US Bank charges a 2.3% convenience charge for credit card transactions. ACH payments have no additional charges, or

Pay by check or money order: Make checks payable to "Department of Environmental Quality" and mail to the address on the enclosed payment slip. Please make sure to include the payment slip with your check or money order.

If you wish to appeal this matter, DEQ must receive a request for a hearing within 20 calendar days from your receipt of this letter. The hearing request must be in writing. Send your request to DEQ Office of Compliance and Enforcement:

    Via mail – 700 NE Multnomah Street, Suite 600, Portland, Oregon 97232
    Via email – DEQappeals@deq.oregon.gov
    Via fax – 503-229-6762

Once DEQ receives your request, we will arrange to meet with you to discuss this matter. If DEQ does not receive a timely written hearing request, the penalty will become due.

The attached Notice further details DEQ's reasons for issuing the penalty and provides further instructions for appealing the penalty. Please review and refer to it when discussing this case with DEQ.

DEQ may allow you to resolve part of your penalty through the completion of a Supplemental Environmental Project (SEP). SEPs are environmental improvement projects that you sponsor instead of paying a portion of your penalty. Further information is available by calling the number below or at http://www.oregon.gov/deq/Regulations/Pages/SEP.aspx.

DEQ's rules are available at https://www.oregon.gov/deq/Regulations/Pages/Administrative-Rules.aspx or by calling the number below.

If you have any questions, please contact Sarah Wheeler at 971-301-0622.

Sincerely,

Erin Saylor, Interim Manager
Office of Compliance and Enforcement

Enclosures

cc:     Steven Chang, DEQ
        David Graiver, DEQ
        Angelica Greene, City of Portland BES, angelica.greene@portlandoregon.gov
        Moyata Anotta, NW Metals, Inc., anottam@gmail.com

BEFORE THE ENVIRONMENTAL QUALITY COMMISSION

OF THE STATE OF OREGON

IN THE MATTER OF:            )    NOTICE OF CIVIL PENALTY
                                   )    ASSESSMENT AND ORDER
NW METALS, INC.,              )
                                     )    CASE NO. LQ/SW-NWR-2025-535
                    Respondent.    )

## I. AUTHORITY

The Department of Environmental Quality (DEQ) issues this Notice of Civil Penalty Assessment and Order (Notice) pursuant to Oregon Revised Statutes (ORS) 468.100, ORS 468.126 through 468.140, ORS 459.995, ORS Chapters 468A, 468B and 183, and Oregon Administrative Rules (OAR) Chapter 340, Divisions 011, 012, 045, 093, 216, and 245, as more specifically described below.

## II. FINDINGS OF FACT

Solid waste violations

1. From approximately March 2021 through November 2024, Respondent operated a business receiving, storing, and handling discarded vehicles, miscellaneous scrap metal, and tires at 9537 North Columbia Boulevard, Portland, Oregon (Columbia Facility).

2. On January 9, 2025, DEQ staff inspected the Columbia Facility. At that time, and continuing as of the date of this Notice, Respondent had abandoned the following at the Columbia Facility from its prior operations: three piles (approximately 15 feet high) of residue from shredding solid waste including automobiles, as well as several inoperable automobiles and recreational vehicles, containers of waste automotive fluids, scrap metal, hundreds of waste tires, automobile parts, and miscellaneous garbage.

3. At no time did Respondent have a solid waste disposal site permit for the Columbia Facility.

4. From approximately November 2024 through the date of this Notice, Respondent has operated and continues to operate a business receiving, storing, and handling discarded vehicles, miscellaneous scrap metal, and waste tires at 8410 North Commercial Avenue, Portland, Oregon (Commercial Facility).

NOTICE OF CIVIL PENALTY ASSESSMENT AND ORDER              CASE NO. LQ/SW-NWR-2025-535

5.    On January 9 and February 6, 2025, DEQ staff observed the Commercial Facility. There were two Arjes Shredders, a conveyer, separator, and excavator at the Commercial Facility. The separator was sorting material and the conveyor was operational. A pile of shredded material was at the end of the shredder itself and on the ground in front of the shredder. Additionally, there were numerous inoperable vehicles, vehicle parts, residue from shredding solid waste, waste tires, and miscellaneous scrap metal and garbage at the Commercial Facility.

6.    Respondent does not have an automobile dismantler certificate from the Oregon Department of Transportation Division of Motor Vehicles issued pursuant to ORS 822.110 for the Commercial Facility.

7.    Respondent does not have a solid waste disposal site permit for the Commercial Facility.

Water quality violation

8.    Since on or about November 2024, Respondent has operated its business at the Commercial Facility under Standard Industrial Classification (SIC) codes 5015 (Motor Vehicle Parts, Used) and 5093 (Scrap and Waste Materials).

9.    During precipitation events, the industrial activities at the Commercial Facility are exposed to stormwater. From on or about November 2024 to at least August 18, 2025, that industrial stormwater had the potential to discharge to the Columbia Slough. More specifically, at all material times until August 18, 2025, one manhole and two catch basins located in areas at the Commercial Facility where Respondent was operating were connected to the City of Portland's stormwater system, which drains to the Columbia Slough.

10.    On November 13, 2024, April 25, 2025, and August 5, 2025, the City of Portland's Bureau of Environmental Services (BES) notified Respondent in writing that Respondent was required to apply for coverage under a National Pollutant Discharge Elimination System (NPDES) 1200-Z stormwater discharge permit for operations at the Commercial Facility.

11.    On April 7, 2025, and July 30, 2025, BES staff inspected the Commercial Facility. At those times, Respondent stored industrial equipment (including vehicles, shredders, a conveyer, and a separator), as well as piles of shredded waste, waste tires, discarded vehicles and vehicle parts, vehicle

fluids, miscellaneous scrap metal, and other waste.

12.    At no time has Respondent had coverage for the Commercial Facility under the NPDES 1200-Z permit or any other water quality permit.

Air quality violations

13.    On March 24, 2021, DEQ issued Simple Air Contaminant Discharge Permit no. 26-0315-SI-01 to Respondent, authorizing Respondent's metal shredding operations at the Columbia Facility (the Columbia ACDP).

14.    On or about November 7, 2024, Respondent relocated two metal shredders from the Columbia Facility to the Commercial Facility. The first shredder is an Arjes VS 950 Titan Shredder, Device ID 7600-Shredder2 (Shredder 2). The second shredder is also an Arjes VS 950 Titan Shredder, Device ID 7600-Shredder3 (Shredder 3).

15.    Between November 13, 2024, and the end of November 2024, Respondent operated Shredder 3 for a total of 4.8 hours at the Commercial Facility.

16.    During the month of December 2024, Respondent operated Shredder 3 for 15.4 hours at the Commercial Facility.

17.    Between January 1, 2025, and February 15, 2025, Respondent operated Shredder 3 for 32.8 hours at the Commercial Facility.

18.    The Commercial Facility has a capacity to emit 10 or more tons per year of Volatile Organic Compounds (VOCs).

19.    The Commercial Facility has a capacity to emit 10 or more tons per year of Particulate Matter (PM).

20.    On January 9, 2025, DEQ inspected the Commercial Facility. DEQ observed two shredders, a conveyor, a separator, and an excavator on site at the Commercial Facility.

21.    On February 6, 2025, DEQ observed the Commercial Facility from a nearby overpass. On February 6, 2025, there were pieces of metal on the conveyor, and there was a pile of shredded material on the ground at the Commercial Facility.

22.    On July 25, 2025, DEQ issued Pre-Enforcement Notice No. 2025-PEN-9906 to

Respondent (Air Quality PEN). The Air Quality PEN cited Respondent for operating Shredder 3 at the Commercial Facility without an ACDP, requested that Respondent immediately cease operating Shredder 3 without an ACDP, and requested that Respondent submit a written notification to DEQ that Shredder 3 is no longer operating, along with a corresponding dated photograph of the Shredder 3 hour meter.

23.     As of the date of this Notice, Respondent has not notified DEQ that it has ceased operating Shredder 3 at the Commercial Facility nor has Respondent provided the requested written notification and photograph described in Section II, Paragraph 22, above.

24.     As of the date of this Notice, DEQ has not issued Respondent an ACDP for the Commercial Facility.

25.     Condition 9.4 of the Columbia ACDP required Respondent to submit to DEQ, by February 15, 2025, an annual report for calendar year 2024. Specifically, Condition 9.4.c required Respondent to submit a dated photograph of the current hour meter reading for the Shredder 2 engine.

26.     According to Condition 1.2 of the Columbia ACDP, Respondent is prohibited from operating Shredder 2 at the Columbia Facility.

27.     On March 11, 2025, Respondent submitted a 2024 annual report to DEQ under the Columbia ACDP; however, that annual report did not include a dated photograph of the current hour meter reading for the Shredder 2 engine.

28.     As of the date of this Notice, Respondent has not submitted the missing information described in Section II, Paragraph 27, above, to DEQ.

2021 Injunction

29.     On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order in Multnomah County Circuit Court (2021 Injunction). Respondent stipulated in the Injunction that Respondent "shall not operate its metal or automobile shredder(s) without valid air permit coverage from DEQ," "shall comply with ORS Chapter 468A and related regulations (collectively the 'Air Quality Rules')," "shall comply with ORS Chapter 459 and related regulations (collectively the 'Solid ////

Waste Rules'),” and “shall comply with ORS Chapters 468B and related regulations (collectively the 'Water Quality Rules').”

III. CONCLUSIONS

Solid waste violations

1.      Respondent violated OAR 340-093-0040(1) by disposing of solid waste at a location not permitted by DEQ to receive solid waste, as described in Paragraphs 1-3 of Section II above. The materials at the Columbia Facility are “solid waste” as defined in OAR 340-093-0030(99) because they are useless and discarded materials, including garbage, inoperable vehicles and vehicle parts, miscellaneous scrap metal, waste tires, and residue from shredding solid waste. This is a Class I violation, according to OAR 340-012-0065(1)(c). DEQ hereby assesses a $138,566 civil penalty for this violation.

2.      Respondent violated OAR 340-093-0050(1) by establishing, operating, or maintaining a solid waste disposal site at the Commercial Facility without a solid waste disposal site permit issued by DEQ, as described in Paragraphs 4-7 of Section II above. The materials at the Commercial Facility are “solid waste” as defined in OAR 340-093-0030(99) because they are useless and discarded materials, including garbage, non-operational vehicles and vehicle parts, scrap metal, and waste tires. The Commercial Facility is a “disposal site” as defined in OAR 340-093-0030(41) because it was and is used for disposal, handling, transfer, material recovery and recycling from solid wastes. This is a Class I violation, according to OAR 340-012-0065(1)(a). DEQ hereby assesses a $81,557 civil penalty for this violation.

Water quality violation

3.      Respondent violated ORS 468B.050(1)(d) and OAR 340-045-0033(6) by operating a commercial establishment or activity which would cause an increase in the discharge of wastes into waters of the state or which would otherwise alter the physical, chemical or biological properties of any waters of the state in any manner not already lawfully authorized, without a permit issued by DEQ, as described in Paragraphs 4-5 and 8-12 of Section II above. From approximately November of 2024 through August 18, 2025, Respondent allowed stormwater discharge contaminated by Respondent's operations at the

Commercial Facility to enter a manhole and two catch basins that convey stormwater to the City of Portland's stormwater collection system, which connects to the Columbia Slough, waters of the state as defined in ORS 468B.005(10). The stormwater discharge from the Commercial Facility is waste as defined in ORS 468B.005(9) because it will or tends to cause pollution, as defined in ORS 468B.005(5), of waters of the state. This is a Class I violation, according to OAR 340-012-0055(1)(d). DEQ hereby assesses an $11,480 civil penalty for this violation.

Air quality violations

4.      Respondent violated ORS 468A.045(1)(b) and OAR 340-216-0020(3) by establishing, installing and operating Shredder 3 at the Commercial Facility without first obtaining an ACDP from DEQ, as described in Paragraphs 13-24 of Section II, above. Specifically, on or about November 7, 2024, Respondent moved Shredder 3 from the Columbia Facility to the Commercial Facility. On November 13, 2024, Respondent began operating Shredder 3 at the Commercial Facility. Shredder 3 has a capacity[1] to emit 10 or more tons per year of VOCs and 10 or more tons per year of PM, making the Commercial Facility a source listed in OAR 340-216-8010, Table 1, Part B, Category 85[2], and triggering the requirement in OAR 340-216-0020(2) to obtain an ACDP from DEQ. As of the date of this Notice, DEQ has not issued Respondent an ACDP for the Commercial Facility. This is a Class I violation according to OAR 340-012-0054(1)(b). DEQ hereby asseses a $125,858 civil penalty for this violation.

5.      Respondent violated Condition 9.4 of the Columbia ACDP by failing to timely submit a complete 2024 annual report for the Columbia Facility, as described in Paragraphs 13 and 25-28 of Section II, above. This is a Class II violation according to OAR 340-012-0054(2)(f). DEQ has not assessed a civil penalty for this violation.

IV.  ORDER TO PAY CIVIL PENALTY AND TO COMPLY

Based upon the foregoing FINDINGS OF FACTS AND CONCLUSIONS, Respondent is hereby ORDERED TO:

---

[1] Capacity is defined in OAR 340-200-0020(20) as "the maximum regulated pollutant emissions from a satationary source under its physical and operational design."

[2] OAR 340-216-8010, Table 1, Part B, Category 85 applies to "All other sources, both stationary and portable, not listed herein which would have the capacity of 5 or more tons per year of direct PM2.5 or PM10 if located in a PM2.5 or PM10 nonattainment or maintenance area, or 10 or more tons per year of any single criteria pollutant." VOCs and PM are included within the definition of "criteria pollutant" in OAR 340-200-0020(36).

NOTICE OF CIVIL PENALTY ASSESSMENT AND ORDER                      CASE NO. LQ/SW-NWR-2025-535
Page 6 of 9

EXHIBIT F
Page 41 of 64

1. Pay a total civil penalty of $357,461. The determination of the civil penalty is attached as Exhibits 1-4 and is incorporated as part of this Notice.

If you do not file a request for hearing as set forth in Section V below, please pay the penalty as follows:

Pay online with e-check (ACH) or Credit Card. Go to Your DEQ Online here: https://ydo.oregon.gov. Select Register Account or Login, then select Pay Invoices/Fees on your account dashboard. Enter the Reference Number and FIMS Account ID included on the attached payment slip. Note: US Bank charges a 2.3% convenience charge for credit card transactions. ACH payments have no additional charges.

Pay by check or money order: Make checks payable to "Department of Environmental Quality" and mail to the address on the enclosed payment slip. Please make sure to include the payment slip with your check or money order.

2. Immediately cease operating Shredder 3, or any other shredder, at the Commercial Facility without an Air Contaminant Discharge Permit.

3. By November 7, 2025, submit written notification to DEQ that Shredder 3 is no longer operating, along with a current dated photograph of the Shredder 3 hour meter.

4. By November 14, 2025, submit an updated 2024 annual report that complies with the requirements of Condition 9.4 of the Columbia ACDP. The updated report must be submitted through Your DEQ Online and must include a dated photograph of the current hour meter reading for the Shredder 2 engine.

5. By November 14, 2025, provide documentation of your efforts to work with the current property owner to contribute to cleaning up and legally disposing of all solid waste and waste tires disposed at the Columbia Facility, to Steven Chang, DEQ, steven.chang@deq.oregon.gov, or 700 NE Multnomah St, Ste 600, Portland OR 97232.

6. By November 28, 2025, either, 1) dispose of all solid waste and waste tires from the Commercial Facility at a location permitted to accept them and submit documentation that you have completed such disposal, including receipts and photographs, to Steven Chang, DEQ,

steven.chang@deq.oregon.gov, or 700 NE Multnomah St, Ste 600, Portland OR 97232; or 2) submit a complete application for a solid waste disposal site permit for the Commercial Facility to DEQ.

V.  NOTICE OF RIGHT TO REQUEST A CONTESTED CASE HEARING

You have a right to a contested case hearing on this Notice, if you request one in writing. DEQ must receive your request for hearing **within 20 calendar days** from the date you receive this Notice. If you have any affirmative defenses or wish to dispute any allegations of fact in this Notice or attached exhibits, you must do so in your request for hearing, as factual matters not denied will be considered admitted, and failure to raise a defense will be a waiver of the defense. (See OAR 340-011-0530 for further information about requests for hearing.) You must send your request to:  **DEQ, Office of Compliance and Enforcement, 700 NE Multnomah Street, Suite 600, Portland, Oregon 97232**, fax it to **503-229-6762** or email it to **DEQappeals@deq.oregon.gov**. An administrative law judge employed by the Office of Administrative Hearings will conduct the hearing, according to ORS Chapter 183, OAR Chapter 340, Division 011 and OAR 137-003-0501 to 0700. You have a right to be represented by an attorney at the hearing, however you are not required to be. If you request a hearing, you will be notified of the time and place of the hearing and you will be given information on the procedures, and other rights of parties relating to the conduct of the hearing before commencement of the hearing.  If you are an individual, you may represent yourself. If you are a corporation, partnership, limited liability company, unincorporated association, trust or government body, you must be represented by an attorney or a duly authorized representative, as set forth in OAR 137-003-0555.

Active duty Service members have a right to stay proceedings under the federal Service Members Civil Relief Act. For more information contact the Oregon State Bar at 1-800-452-8260, the Oregon Military Department at 503-584-3571, or the nearest United States Armed Forces Legal Assistance Office through http://legalassistance.law.af.mil. The Oregon Military Department does not have a toll free telephone number.

If you fail to file a timely request for hearing, the Notice will become a final order by default without further action by DEQ, as per OAR 340-011-0535(1). If you do request a hearing but later withdraw your request, fail to attend the hearing or notify DEQ that you will not be attending the

hearing, DEQ will issue a final order by default pursuant to OAR 340-011-0535(3). DEQ designates the relevant portions of its files, including information submitted by you, as the record for purposes of proving a prima facie case.

11/4/2025
Date

Erin Saylor, Interim Manager
Office of Compliance and Enforcement

EXHIBIT 1

FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY
PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

VIOLATION 1:               Disposing of solid waste at a location not permitted by DEQ to
                           receive solid waste, in violation of OAR 340-093-0040(1).

CLASSIFICATION:            This is a Class I violation pursuant to OAR 340-012-0065(1)(c).

MAGNITUDE:                 The magnitude of the violation is major pursuant to OAR 340-012-
                           0135(3)(a)(A) because the volume of solid waste disposed at the
                           unpermitted Columbia Facility exceeded 400 cubic yards.

CIVIL PENALTY FORMULA:     The formula for determining the amount of penalty of each
                           violation is:  $BP + [(0.1 \times BP) \times (P + H + O + M + C)] + EB$

"BP"    is the base penalty, which is $12,000 for a Class I, major magnitude violation in the matrix
        listed in OAR 340-012-0140(2)(b)(A)(i) and applicable pursuant to OAR 340-012-
        0140(2)(a)(Q)(i) because Respondent should have had a solid waste disposal permit to
        dispose of waste at the Columbia Facility.

"P"     is whether Respondent has any prior significant actions (PSAs), as defined in OAR 340-
        012-0030(19), in the same media as the violation at issue that occurred at a facility owned
        or operated by the same Respondent and receives an initial value of 5 according to OAR
        340-012-0145(2)(a)(C) and (D), and OAR 340-012-0030(2). On December 3, 2018, DEQ
        issued Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063 to
        Respondent, which included three Class I land quality violations and two Class II land
        quality violations. Pursuant to OAR 340-012-0145(2)(e) and OAR 340-012-
        0145(2)(d)(A)(ii), because all the formal enforcement actions in which PSAs were cited
        were issued more than five years before the current violation occurred, the value of P is
        reduced to 0.

"H"     is Respondent's history of correcting prior significant actions and receives an initial value of
        0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which
        to base a finding under paragraphs (3)(a) or (b). However, pursuant to OAR 340-012-
        0145(3)(d), the sum of values for "P" and "H" may not be less than one because Respondent
        did not take extraordinary efforts to address the PSAs, so the final value of H is 1.

"O"     is whether the violation was repeated or ongoing and receives a value of 4 according to
        OAR 340-012-0145(4)(d) because there were more than 28 occurrences of the violation.
        Each day of violation constitutes a separate occurrence. The violation has been ongoing
        since at least November of 2024.

"M"     is the mental state of the Respondent and receives a value of 4 according to OAR 340-012-
        0145(5)(c) because Respondent's conduct was negligent. Respondent is aware of solid

Case No. LQ-SW-NWR-2025-535
Exhibit 1                              Page 1

waste permitting and disposal regulations. On or about August 24, 2020, Respondent submitted an incomplete application for a solid waste permit at the Columbia Facility, which was put on hold. On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order (the 2021 Injunction) where Respondent agreed to comply with ORS Chapter 459 and related solid waste rules. In November of 2024, Respondent abandoned solid waste at the Columbia Facility. On February 20, 2025, DEQ notified Respondent in writing of the violation at the Columbia Facility. As of the date of this Notice, Respondent has not legally disposed of the solid waste Respondent abandoned at the Columbia Facility. By disposing of Respondent's solid waste at an unpermitted location, Respondent failed to take reasonable care to avoid a foreseeable risk of conduct constituting or resulting in a violation.

"C"    is Respondent's efforts to correct or mitigate the violation and receives a value of 2 according to OAR 340-012-0145(6)(g) because Respondent did not address the violation as described in paragraphs (6)(a) through (6)(e) and the facts do not support a finding under paragraph (6)(f). As of the date of this Notice, Respondent has not addressed the violation at the Columbia Facility.

"EB"   is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance. In this case, "EB" receives a value of $113,366. This is the amount Respondent gained by avoiding, since at least November 30, 2024, spending an estimated $145,314 to dispose of the solid waste disposed at the unpermitted Columbia Facility. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

PENALTY CALCULATION:  Penalty = BP + [(0.1 x BP) x (P + H + O + M + C)] + EB
        = $12,000 + [(0.1 x $12,000) x (0 + 1 + 4 + 4 + 2)] + $113,366
        = $12,000 + ($1,200 x 11) + $113,366
        = $12,000 + $13,200 + $113,366
        = $138,566

Case No. LQ-SW-NWR-2025-535
Exhibit 1                          Page 2

EXHIBIT 2

FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY
PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

VIOLATION 2:            Establishing, operating, and maintaining an unpermitted solid
                        waste disposal site at the Commercial Facility, in violation of ORS
                        459.205(1) and OAR 340-093-0050(1).

CLASSIFICATION:        This is a Class I violation pursuant to OAR 340-012-0065(1)(a).

MAGNITUDE:             The magnitude of the violation is major pursuant to OAR 340-012-
                       0135(3)(a)(A) because the volume of unpermitted solid waste at the
                       Commercial Facility exceeds 400 cubic yards.

CIVIL PENALTY FORMULA:    The formula for determining the amount of penalty of each
                          violation is:  $BP + [(0.1 \times BP) \times (P + H + O + M + C)] + EB$

"BP"   is the base penalty, which is $12,000 for a Class I, major magnitude violation in the matrix
       listed in OAR 340-012-0140(2)(b)(A)(i) and applicable pursuant to OAR 340-012-
       0140(2)(a)(Q)(i) because Respondent should have had a solid waste disposal permit.

"P"    is whether Respondent has any prior significant actions (PSAs), as defined in OAR 340-
       012-0030(19), in the same media as the violation at issue that occurred at a facility owned
       or operated by the same Respondent and receives an initial value of 5 according to OAR
       340-012-0145(2)(a)(C) and (D), and OAR 340-012-0030(2). On December 3, 2018, DEQ
       issued Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063 to
       Respondent, which included three Class I land quality violations and two Class II land
       quality violations. Pursuant to OAR 340-012-0145(2)(e) and OAR 340-012-
       0145(2)(d)(A)(ii), because all the formal enforcement actions in which PSAs were cited
       were issued more than five years before the current violation occurred, the value of P is
       reduced to 0.

"H"    is Respondent's history of correcting prior significant actions and receives an initial value of
       0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which
       to base a finding under paragraphs (3)(a) or (b). However, pursuant to OAR 340-012-
       0145(3)(d), the sum of values for "P" and "H" may not be less than one because Respondent
       did not take extraordinary efforts to address the PSAs, so the final value of H is 1.

"O"    is whether the violation was repeated or ongoing and receives a value of 4 according to
       OAR 340-012-0145(4)(d) because there were more than 28 occurrences of the violation.
       Each day of violation constitutes a separate occurrence. DEQ first notified Respondent in
       writing that a solid waste permit was required on February 20, 2025, and as of the date of
       this Notice, Respondent has not corrected the violation.

"M"   is the mental state of the Respondent and receives a value of 4 according to OAR 340-012-0145(5)(c) because Respondent's conduct was negligent. Respondent is aware of solid waste permitting and disposal regulations. In 2020, Respondent submitted an incomplete application for a solid waste permit at the Columbia Facility, which was put on hold. On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order where Respondent agreed to comply with ORS Chapter 459 and related solid waste rules. DEQ first notified Respondent in writing that a solid waste permit was required for the Commercial Facility on February 20, 2025, and DEQ has repeatedly reiterated the requirement and attempted to assist Respondent since that date. As of the date of this Notice, Respondent has not applied for a permit. By operating a business accepting solid waste without applying for a permit, despite Respondent's awareness of the requirement and the multiple notices and requests from DEQ, Respondent failed to take reasonable care to avoid a foreseeable risk of conduct constituting or resulting in a violation.

"C"   is Respondent's efforts to correct or mitigate the violation and receives a value of 2 according to OAR 340-012-0145(6)(g) because Respondent did not address the violation as described in paragraphs (6)(a) through (6)(e) and the facts do not support a finding under paragraph (6)(f). As of the date of this Notice, Respondent has not addressed the violation at the Commercial Facility.

"EB"   is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance.  In this case, "EB" receives a value of $56,357. This is the amount Respondent gained by avoiding, since at least January 9, 2025, spending an estimated $72,657 to legally dispose of the solid waste Respondent disposed at the unpermitted Commercial Facility. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

PENALTY CALCULATION:  Penalty = BP + [(0.1 x BP) x (P + H + O + M + C)] + EB
= $12,000 + [(0.1 x $12,000) x (0 + 1 + 4 + 4 + 2)] + $56,357
= $12,000 + ($1,200 x 11) + $56,357
= $12,000 + $13,200 + $56,357
= $81,557

EXHIBIT 3

FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY
PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

VIOLATION 3:                    Operating a commercial activity which would cause an increase in
                               the discharge of wastes into waters of the state or which would
                               otherwise alter the physical, chemical, or biological properties of
                               waters of the state in a manner not already lawfully authorized, in
                               violation of ORS 468B.050(1)(d) and OAR 340-045-0033(6).

CLASSIFICATION:                This is a Class I violation pursuant to OAR 340-012-0055(1)(d).

MAGNITUDE:                     The magnitude of the violation is moderate pursuant to OAR 340-
                               012-0130(1), as there is no selected magnitude specified in OAR
                               340-012-0135 applicable to this violation, and the information
                               reasonably available to DEQ does not indicate a minor or major
                               magnitude.

CIVIL PENALTY FORMULA:         The formula for determining the amount of penalty of each
                               violation is:  $BP + [(0.1 \times BP) \times (P + H + O + M + C)] + EB$

"BP"   is the base penalty, which is $4,000 for a Class I, moderate magnitude violation in the
       matrix listed in OAR 340-012-0140(3)(b)(A)(ii) and applicable pursuant to OAR 340-012-
       0140(3)(a)(E)(iii) because Respondent violated a water quality statute and should have
       applied for coverage under an NPDES General Permit.

"P"    is whether Respondent has any prior significant actions (PSAs), as defined in OAR 340-
       012-0030(19), in the same media as the violation at issue that occurred at a facility owned
       or operated by the same Respondent and receives an initial value of 2 according to OAR
       340-012-0145(2)(a)(C). On December 3, 2018, DEQ issued Amended Notice of Civil
       Penalty Assessment and Order WQ/SW-NWR-2018-063 to Respondent, which included
       two Class I water quality violations and one Class II water quality violation. Because all the
       formal enforcement actions in which PSAs were cited were issued more than five years
       before the current violation occurred, the value of P is reduced to 0, pursuant to OAR 340-
       012-0145(2)(e) and OAR 340-012-0145(2)(d)(A)(ii).

"H"    is Respondent's history of correcting prior significant actions and receives an initial value of
       0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which
       to base a finding under paragraphs (3)(a) or (b). However, the sum of values for "P" and
       "H" may not be less than one because Respondent did not take extraordinary efforts to
       address the PSAs, so the final value of H is 1, pursuant to OAR 340-012-0145(3)(d).

"O"    is whether the violation was repeated or ongoing and receives a value of 4 according to
       OAR 340-012-0145(4)(d) because the violation was ongoing from at least April 11, 2025,
       the date of the City of Portland's first inspection of the Commercial Facility, until August

Case No. LQ-SW-NWR-2025-535
Exhibit 3                                    Page 1

18, 2025, when Respondent covered the manhole and catch basins at the Commercial Facility with concrete.

"M"   is the mental state of the Respondent and receives a value of 8 according to OAR 340-012-0145(5)(d) because Respondent's conduct was reckless, as defined in OAR 340-012-0030(20). Since at least 2020, Respondent has operated this business at multiple properties, all of which have been evaluated for coverage under the 1200-Z permit. On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order where Respondent agreed to comply with ORS Chapters 468B and related water quality rules. The City of Portland notified Respondent as early as November 14, 2024, that the Commercial Facility required coverage under the 1200-Z permit, and the City notified Respondent of the requirement again during inspections in April and July of 2025. Under these circumstances, by operating prior to applying for stormwater permit coverage and continuing to operate for nine months without applying for a permit, Respondent consciously disregarded a substantial and unjustifiable risk that the result would occur. Given Respondent's experience with stormwater permitting generally, and Respondent's specific knowledge with respect to the Commercial Facility, Respondent's disregard of this risk constituted a gross deviation from the standard of care a reasonable person would observe in this situation.

"C"   is Respondent's efforts to correct or mitigate the violation and receives a value of 0 according to OAR 340-012-0145(6)(f) because there is insufficient information to make a finding under paragraphs (6)(a) through (6)(e), or (6)(g) or if the violation or the effects of the violation could not be corrected or minimized.

"EB"  is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance.  In this case, "EB" receives a value of $2,280. This is the amount Respondent gained by avoiding spending $2,984 by at least April 11, 2025, for the permit application and first year of annual fees. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

PENALTY CALCULATION:  Penalty = BP + [(0.1 x BP) x (P + H + O + M + C)] + EB
        = $4,000 + [(0.1 x $4,000) x (0 + 1 + 4 + 8 + 0)] + $2,280
        = $4,000 + ($400 x 13) + $2,280
        = $4,000 + $5,200 + $2,280
        = $11,480

EXHIBIT 4

FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY
PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

VIOLATION NO. 4 — Establishing, installing and operating Shredder 3 at the Commercial Facility without first obtaining an ACDP from DEQ, in violation of ORS 468A.045(1)(b) and OAR 340-216-0020(3).

CLASSIFICATION: — This is a Class I violation pursuant to OAR 340-012-0054(1)(b) because Respondent constructed a new source, as defined in OAR 340-245-0020, without first obtaining a required Air Contaminant Discharge Permit that includes permit conditions required under OAR 340-245-0005 through 340-245-8050 or without complying with Cleaner Air Oregon rules under OAR 340-245-0005 through 340-245-8050. The Commercial Facility is a new source as defined in OAR 340-245-0020(33)(a) because it is not an existing source. The Commercial Facility is not an existing source according to OAR 340-245-0020(20) because Respondent did not begin construction or obtain any Clean Air Act approvals, nor did Respondent submit any applications to DEQ for the Commercial Facility before November 16, 2018, the effective date of the Cleaner Air Oregon program. As of the date of this Notice, Respondent has not obtained an ACDP from DEQ for the Commercial Facility, and has not submitted a Cleaner Air Oregon risk assessment for the Commercial Facility according to OAR 340-245-0500(2) or demonstrated to DEQ that the Commercial Facility is an exempt source under OAR 340-245-0500(6).

MAGNITUDE: — The magnitude of the violation is moderate pursuant to OAR 340-012-0130(1), as there is no selected magnitude specified in OAR 340-012-0135 applicable to this violation, and the information reasonably available to DEQ does not indicate a minor or major magnitude.

CIVIL PENALTY FORMULA: — The formula for determining the amount of penalty of each violation is: $BP + [(0.1 \times BP) \times (P + H + O + M + C)] + EB$

"BP" is the base penalty, which is $4,000 for a Class I, moderate magnitude violation in the matrix listed in OAR 340-012-0140(3)(b)(A)(ii) and applicable pursuant to OAR 340-012-0140(3)(a)(A) because Respondent should have an ACDP to operate the shredder at the Commercial Facility.

"P" is whether Respondent has any prior significant actions, as defined in OAR 340-012-0030(19), in the same media as the violation at issue that occurred at a facility owned or operated by the same Respondent, and receives an initial value of 2 according to OAR 340-

Case No. LQ-SW-NWR-2025-535
Exhibit 4                          Page 1

012-0145(2)(a)(C), and OAR 340-012-0030(2). On December 3, 2018, DEQ issued Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063 to Respondent, which included two Class II air quality violations. Pursuant to OAR 340-012-0145(2)(e) and OAR 340-012-0145(2)(d)(A)(ii), because all the formal enforcement actions in which PSAs were cited were issued more than five years before the current violation occurred, the value of P is reduced to 0.

"H"     is Respondent's history of correcting prior significant actions and receives a value of is Respondent's history of correcting prior significant actions and receives an initial value of 0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which to base a finding under paragraphs (3)(a) or (b). However, pursuant to OAR 340-012-0145(3)(d), the sum of values for "P" and "H" may not be less than one because Respondent did not take extraordinary efforts to address the PSAs, so the final value of H is 1.

"O"     is whether the violation was repeated or ongoing and receives a value of 4 according to OAR 340-012-0145(4)(d) because there were more than 28 occurrences of the violation. Each day is a separate occurrence of the violation. On or about November 7, 2024, Respondent moved Shredder 3 from the Columbia Facility to the Commercial Facility. On November 13, 2024, Respondent began operating Shredder 3 at the Commercial Facility. As of the date of this Notice, DEQ has not issued Respondent an ACDP for the Commercial Facility. Therefore, the violation has been ongoing from November 7, 2024, to the date of this Notice, and there are more than 334 occurrences of the violation. As described below, DEQ is assessing 11 separate penalties for each calendar month since Respondent established and installed the Shredder 3 at the Commercial Facility without an ACDP. Therefore, there are more than 28 occurrences of the violation represented in each separate penalty.

"M"     is the mental state of the Respondent and receives a value of 10 according to OAR 340-012-0145(5)(e) because Respondent acted flagrantly. According to OAR 340-012-0030(11), flagrant means the respondent had actual knowledge that the conduct was unlawful and consciously set out to commit the violation. Respondent has previously been cited by DEQ in Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063, issued by DEQ on December 3, 2018, for operating a metal shredder at a former facility (7600 NE Killingsworth Street) without an ACDP. In addition, the 2021 Injunction provides that Respondent "shall not operate its metal or automobile shredder(s) without valid air permit coverage from DEQ," "shall comply with ORS Chapter 468A and regulated regulations (collectively the "Air Quality Rules"). In addition, since Respondent relocated Shredder 3 from the Columbia Facility to the Commercial Facility in November 2024, DEQ has notified Respondent on multiple occasions that the operation of Shredder 3 at the Commercial Facility is unpermitted and unlawful. These notifications include an email on December 17, 2024, a letter dated December 30, 2024, an email dated February 25, 2025, and the Air Quality PEN issued on July 25, 2025. Thus, Respondent had actual knowledge that the conduct was unlawful and consciously set out to commit the violation by operating Shredder 3 at the Commercial Facility.

"C"   is Respondent's efforts to correct or mitigate the violation, and receives a value of 2 according to OAR 340-012-0145(6)(g) because Respondent did not address the violation as described in paragraphs (6)(a) through (6)(e) and the facts do not support a finding under paragraph (6)(f). As of the date of this Notice, Respondent has not addressed the violation at the Commercial Facility.

GRAVITY-BASED PENALTY CALCULATION:

$$\text{Penalty} = BP + [(0.1 \times BP) \times (P + H + O + M + C)]$$
$$= \$4,000 + [(0.1 \times \$4,000) \times (0 + 1 + 4 + 10 + 2)]$$
$$= \$4,000 + (\$400 \times 17)$$
$$= \$4,000 + \$6,800$$
$$= \$10,800$$

According to ORS 468.140(2), each day of violation constitutes a separate offense and is subject to a civil penalty up to $25,000 per day. According to OAR 340-012-00145(4)(e), DEQ is exercising its enforcement discretion to assess 11 separate penalties.

Gravity based penalty: $10,800 x 11 = $118,800

ECONOMIC BENEFIT

"EB"   is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance. In this case, "EB" receives a value of $7,058. This is the amount Respondent gained by avoiding spending $9,000 to apply for an ACDP for the Commercial Facility. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

TOTAL PENALTY

According to OAR 340-012-0045, the total penalty is the gravity-based penalty (BP + [(0.1 x BP) x (P + H + O + M + C)]) plus the Economic Benefit.

Total penalty: $118,800 + $7,058 = $125,858

Oregon Department of Environmental Quality
700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100



**State of Oregon**
**DEQ Department of Environmental Quality**

Phone: 503-229-5437
Fax: 503-229-5850

MOYATA ANOTTA
NORTHWEST METALS
8140 N COMMERCIAL AVE
PORTLAND, OR 97217-1040

## CIVIL PENALTY - ORS 468.135(2)

| DATE: | November 4, 2025 |
|---|---|
| RESPONSE DATE*: | January 13, 2026 |
| TOTAL PENALTY: | $357,461.00 |

| Account Name: | NORTHWEST METALS | | |
|---|---|---|---|
| Account Type: | Vendor/Organization/Company | Reference Number: | CPGFD2600040 |
| SubSystem ID: | 1523 | FIMS Acct. ID: | 29139 |

## Penalty Summary

| Penalty Amount | Interest | Adjustment | Amount Paid | Total Penalty |
|---|---|---|---|---|
| $ 357,461.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 357,461.00 |

*This is the date the penalty is due if you do not exercise your right to appeal the attached order. Payment of this penalty is subject to the exercise of your options or right to appeal as described in the enclosed enforcement documents.

To Pay Online with ACH or Credit Card Visit https://ydo.oregon.gov and select 'Register Account'

------------------------------------------------------------------------✂
PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

**DEQ**
MOYATA ANOTTA
NORTHWEST METALS
8140 N COMMERCIAL AVE
PORTLAND, OR 97217-1040

☐ Check this box if updated address information has
been provided on the back of the form.

| REFERENCE NO. | CPGFD2600040 | | |
|---|---|---|---|
| PAYCODE: | 00401 7400 10040 74001 0500 000000 00 | | |
| FEE PROGRAM ID: | 950 | RESPONSE DATE: | January 13, 2026 |
| FIMS ACCT. ID: | 29139 | TOTAL PENALTY DUE: | $357461.00 |

AMOUNT ENCLOSED: [                    ]

MAKE CHECK PAYABLE TO: Department of Environmental Quality

DEQ FINANCIAL SERVICES - LBX4244
PO BOX 4244
PORTLAND OR  97208-4244

00401 7400 10040 74001 0500 000000 0095000291393CPGFD2600040000357461007

EXHIBIT F
Page 54 of 64



**State of Oregon**
**Department of**
**Environmental**
**Quality**

# State of Oregon Department of Environmental Quality

## CIVIL PENALTY - ORS 468.135(2)

700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100
Phone: 503-229-5437
Fax: 503-229-5850

## Penalty Detail

| Transaction Date | Description | Amount |
|---|---|---|
| 11/3/2025 | 2025-535 LQ-SW-NWR-2025-535 | $357,461.00 |

### SFMS Agencies Use:

| Trans Code | Treasury Fund | SFMS | Index | PCA (5) | Agency Object | Project # | Phase |
|---|---|---|---|---|---|---|---|
| 723 | 00401 | 7400 | 10040 | 74001 | 0500 | 00000 | 00 |

## Address Changes

Please visit https://ydo.oregon.gov to update your mailing address online or provide the following information:

Name _____

Address _____

City, State, Zip _____

# CERTIFICATE OF MAILING

I hereby certify that I served DEQ Case No. LQ-SW-NWR-2025-535 _____ upon:

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____      Postmark
☐ Certified Mail Restricted Delivery  $ _____        Here
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____
Postage

NW Metals Inc
c/o Moyata Anotta, Registered Agent
8140 N Commercial Ave.
Portland, OR 97217

PS Form 3800, January 2023 PSN 7530-02-000-9047   See Reverse for Instructions

By mailing a true copy of the above by placing it in a sealed envelope, with postage prepaid at the DEQ/DAS mail services in Portland, Oregon on November 4, 2025 _____

Isaac Griffith, Case Coordinator
Office of Compliance & Enforcement
Department of Environmental Quality

December 22, 2025

**VIA OVERNIGHT COURIER**

Moyata Anotta
3744 NW Devoto Lane
Portland, OR 97229

RE:    Lease of Property located at 8140 N. Commercial Ave, Portland, OR
       NOTICE OF DEFAULT

Dear Mr. Anotta,

This notice is given pursuant to the Lease Agreement dated October 24, 2024 ("Lease") between Ankor Holdings, LLC as landlord ("Landlord"), and Moyata Anotta, DBA NW Metals, Inc. as tenant ("Tenant"), for the premises at 8140 N Commercial Ave in Portland Oregon, as more particularly described on Exhibit A to the Lease ("Premises").  Tenant is in default of the Lease as follows:

Landlord recently became aware that Tenant is the subject of an investigation and enforcement action brought by the Oregon Department of Environmental Quality ("DEQ") for multiple violations of Oregon law, including:

- Disposing of solid waste at the Premises, a location not permitted by DEQ to receive solid waste.
- Establishing, operating, or maintaining a solid waste disposal site at the Premises without a solid waste disposal permit.
- Operating a commercial establishment or activity which would cause an increase in the discharge of wastes into waters of the state, or which would otherwise alter the physical, chemical, or biological properties of any waters of the state without a permit issued by DEQ.
- Establishing, installing, and operating a shredder at the Premises without first obtaining an air contaminant discharge permit ("ACDP") from DEQ.

Tenant was issued a Pre-Enforcement Notice by DEQ in July 2025, which Tenant failed to comply with.  As such, Tenant was then issued a Notice of Civil Penalty Assessment and Order (Attached as Exhibit A), requiring the Tenant to pay a penalty to DEQ in the amount of $357,461 and to:

- Immediately cease operating Shredder 3 without an ACDP;
- Submit a written notification to DEQ that Shredder 3 is no longer operating, along with a current dated photograph of the Shredder 3 hour meter;
- Properly dispose of the solid waste and waste tires at the Premises or submit a complete application for a solid waste permit; and
- Work with the Landlord to properly dispose of the solid waste and waste tires at the site.

Tenant is in violation of Section H of the Basic Lease Terms. Tenant's Permitted Use of Premises is defined only as "scrap metal."  This does not permit Tenant to operate a shredder, dispose of, or store solid waste at the Premises.

Moyata Anotta
December __, 2025
Page 2

Tenant is in violation of Section 4.1 of the Lease which requires tenant to "promptly comply and cause the Premises to comply with all applicable laws, ordinances, rules and regulations of any public authority. Tenant is also in violation of the portion of Section 4.1 of the Lease which prohibits Tenant from conducting "any activities that will increase Landlord's insurance rates for any portion of the Building or that will in any manner degrade or damage the reputation of the Building."

Tenant is in violation of Section 6.1 of the Lease which requires Tenant to "maintain and repair the Premises in clean and good condition." The photographs taken by DEQ demonstrate that the Premises is not being maintained in clean and good condition.

Tenant is in violation of Section 6.2.1 of the Lease which prohibits Tenant from making any alterations, additions, or improvements to the Premises without Landlord's prior written consent. Operating a shredder at the Premises constitutes an alteration or addition, for which Landlord's consent was not obtained.

Tenant is in violation of Section 20.1 of the Lease, which prohibits Tenant and Tenant's agents from causing or permitting any Hazardous Material to be brought upon, stored, used, generated, released into the environment, or disposed of on, in, under or about the Premises. Hazardous Material is defined to include the "waste" that is the subject of DEQ's enforcement action. The only permitted use of Hazardous Materials is that which "complies with all laws regulating any such Hazardous Materials and with good business practices."

Tenant is also in violation of Section 20.1 of the Lease for failing to notify Landlord of releases of hazardous materials when it became aware of such after DEQ's issuance of the pre-enforcement notice.

This letter constitutes Landlord's notice to Tenant under Section 11.1.3 of the Lease, which provides that "failure of Tenant to comply with any Laws as required pursuant hereto **within twenty-four (24) hours** after written demand of Landlord" shall constitute an Event of Default.

This letter also constitutes Landlord's notice to Tenant under Section 11.1.2 of the Lease, which provides that Tenant's failure to comply with any other term or condition **within twenty (20) days** following written notice from Landlord specifying the noncompliance constitutes an Event of Default. If Tenant has not cured the breaches stated in this letter within 20 days after the date of this letter, then Tenant shall be in default of the Lease and Landlord will seek its available remedies, which includes lease termination, retaking possession of the Premises, and an action for damages and/or recovery under Landlord's indemnification rights in Sections 7.1, 11.2.2 and 20.1.

Landlord also hereby notifies the Tenant that it may exercise its right to perform any obligation that Tenant has failed to perform when required under Lease, including, but not limited to, all actions required by DEQ, and that pursuant to Section 11.3, all of Landlord's expenditures incurred to correct the failure to perform shall be reimbursed by Tenant upon demand with interest from the rate of expenditure at the rate of 1.5% per month.

Finally, Tenant's actions have caused DEQ to bring an enforcement action against the Landlord, including the assessment of a penalty in the amount of $78,798. Landlord hereby notifies Tenant of its intent to bring an action for damages and recovery under the applicable Lease provisions, which includes attorney fees pursuant to Section 17.1 of the Lease.

Moyata Anotta
December 23, 2025
Page 3

If Landlord wishes to discuss this issue further, please have your legal counsel contact our attorney, Maureen Bayer of Tonkon Torp LLP, at maureen.bayer@tonkon.com or (503) 802-2115.

Thank you for your prompt attention to this matter.

Very truly yours,

*Jesce Horton*

Jesce Horton, Partner
Anchor Holdings, LLC

007459\00077\19044996v2
044805\00002\19085447v1



**TONKON TORP**

Maureen S. Bayer
maureen.bayer@tonkon.com

503.802.2115   direct
503.221.1440   main

February 4, 2026

**VIA EMAIL (anottam@gmail.com)**
**AND CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Moyata Anotta DBA NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

Re:    NOTICE OF LEASE TERMINATION
        8140 N. Commercial Avenue, Portland Oregon

Dear Mr. Anotta:

Tonkon Torp LLP represents Anchor Holdings LLC, an Oregon limited liability company ("Landlord") in connection with that certain Lease Agreement dated October 24, 2024, between Landlord and Moyata Anotta / NW Metals, Inc. ("Tenant") (the "Lease").

Pursuant to Section 11.2.1 of the Lease, this letter constitutes Landlord's written notice that Landlord elects to terminate the Lease. Landlord issued Tenant a Notice of Default pursuant to Section 11.1.2 of the Lease on or about December 12, 2025. Tenant acknowledged receipt of the Notice of Default effective December 22, 2025 and therefore Tenant had until no later than January 11, 2026 to cure the noncompliance identified in the Notice of Default. Tenant's response dated December 23, 2025 identified that NW Metals was "evaluating" the steps evaluated in DEQ's enforcement correspondence and "assessing operational adjustments." As Tenant has not cured its noncompliance, **Landlord hereby declares Tenant in default and terminates the Lease, effective at 11:59 p.m. on February 28, 2026**.

As required by Section 12.1 of the Lease, Tenant must deliver all keys to Landlord and surrender the Premises vacuumed, swept, and free of debris and in the same condition as at commencement of the Lease, save for reasonable wear from ordinary use. Tenant must remove all furnishings, trade fixtures, alterations, cables and conduits, and repair all damage resulting from such removal.

Landlord expressly reserves all rights and remedies under the Lease and Oregon law.

Sincerely,

Maureen S. Bayer

MSB/cp
044805\00003\19164906v2

Timothy J. Conway, OSB No. 851752
    Email:  tim.conway@tonkon.com
    Direct:  503.802.2027
Eric M. Levine, OSB No. 224393
    Email:  Eric.Levine@tonkon.com
    Direct:  503.802.2072
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Main:  503.221.1440
Facsimile:  503.274.8779
    *Attorneys for Ankor Holdings, LLC*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| In re | Case No. 26-31412-7 |
|---|---|
| Moyata Alaka Anotta, dba Anotta Holdings, | **ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING** |
| Debtor. | |
| | **(EXPEDITED HEARING REQUESTED)** |

Ankor Holdings, LLC ("**Ankor Holdings**") moves for entry of an order, substantially similar to the proposed form of order attached hereto as **Exhibit A**, granting emergency relief ("**Motion**") to secure and protect the real property commonly known as 8140 N. Commercial Avenue in Portland, Multnomah County, Oregon 97217 ("**Premises**").  Specifically, Ankor Holdings seeks permission to: (1) secure access to the Premises at its sole cost and expense, including, without limitation, the installation, repair, and maintenance of perimeter fencing and to undertake such additional measures as may be reasonably necessary or appropriate to protect and secure the Premises; (2) restrict Debtor Moyata Alaka Anotta ("**Anotta**") and any other party not authorized by Mr. Ken Eiler, the Chapter 7 trustee ("**Chapter 7 Trustee**") from entering or

**Page 1 of 7** – ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

conducting business on the Premises; (3) take any other security measures the Chapter 7 Trustee may authorize; and (4) allow Ankor Holdings' environmental experts and relevant authorities from the Oregon Department of Environmental Quality ("**DEQ**") to enter the Premises and evaluate the myriad environmental hazards that Anotta has accrued on the Premises.  Ankor Holdings has conferred with the Chapter 7 Trustee who consents to this relief.

This matter is urgent and requires an expedited hearing (and a shortening of the response period) because Anotta is causing ongoing environmental harm at the Premises and incurring corresponding administrative civil fines, interest, and penalties from DEQ, some of which Ankor Holdings (as owner of the Premises and Anotta's landlord) may be liable for.  The fines accrue daily. *Moreover, Governor Tina Kotek and the Oregon Department of Justice have decried the serious consequences of Anotta's pollution*.[1]  Granting the Motion will allow Ankor Holdings to work with the Chapter 7 Trustee to gain access to, secure, and ultimately begin the cleanup process of the Premises.

In support hereof, Ankor Holdings represents as follows:

**I.      JURISDICTION**

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157.  Venue is proper in this Court under 28 U.S.C. § 1409.  This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(G).

**II.     PRELIMINARY STATEMENT**

Ankor Holdings needs Anotta's mess cleaned up.  Anotta rented commercial real estate from Ankor Holdings beginning in the fall of 2024.  Attached as **Exhibit B** is a true and correct copy of the commercial lease dated October 24, 2024 ("**Lease**").  Anotta represented that he

---

[1]    *See* Oregon Department of Justice, AG Rayfield Asks Court to Schedule Hearing to Hold Portland Scrapyard Owner in Contempt for Repeated Environmental Violations, available at https://www.doj.state.or.us/media-home/news-media-releases/ag-rayfield-asks-court-to-act-on-portland-scrapyards-repeated-violations/ (last visited Apr. 24, 2026).

**Page 2 of 7** –    ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

would run a scrap metal business at the Premises. Instead, Anotta ran an illegal car shredding business in violation of the Lease and Oregon environmental laws.[2] Anotta's pollution includes unpermitted wastewater discharge, hazardous waste storage, air contamination, and more—thereby damaging the Premises and posing serious dangers to surrounding properties and neighbors.

Ankor Holdings tried to stop this. It began eviction proceedings against Anotta in March 2026, which were stayed the morning of the eviction trial when Anotta filed its Chapter 7 petition. Ankor Holdings wishes to work cooperatively with the Chapter 7 Trustee to gain access to, secure, and begin addressing the environmental issues at the Premises. Ankor Holdings will fund such actions at no cost to the Estate, pending the Court's approval of this Motion.

## III.    FACTUAL BACKGROUND

Anotta leased the Premises from Ankor Holdings beginning in the fall of 2024. Anotta signed the Lease as President of "Anotta Holdings," an assumed business name, with the stated tenant as Anotta Moyata, trade name NW Metals, Inc. Under the Lease, Anotta agreed to pay $18,000 per month in Base Rent, plus calculated Additional Rent. Also under the Lease, Anotta was required to maintain the Premises according to certain standards, conduct his operations in compliance with Oregon law, and was prohibited from using the Premises for certain uses.

Anotta is in arrears for unpaid rent under the Lease for nearly $250,000 and is in violation of myriad provisions of the Lease for repeated failure to comply with Oregon environmental laws, destruction of the Premises, failure to notice Ankor Holdings of hazardous waste releases, and more. Based on these Lease violations, Ankor Holdings issued a Notice of Default and opportunity to cure on December 22, 2025. A true and correct copy of the Notice of

---

[2] DEQ has also issued a Notice of Civil Penalty Assessment and Order because Anotta operated the business without proper permitting. The Oregon Department of Justice has also initiated contempt proceedings in *State of Oregon v. NW Metals, Inc. and Moyata Anotta*, Case No. 19CV49704, in the Circuit Court of the State of Oregon for the County of Multnomah, which is pending at the time of filing.

**Page 3 of 7** –    ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

Default is attached hereto as **Exhibit C** and incorporated herein.  The defaults were not cured, and, on February 4, 2026, Ankor Holdings issued a Notice of Lease Termination, accordingly, noticing Anotta that the Lease would terminate on February 28, 2026.  A true and correct copy of the Notice of Lease Termination is attached hereto as **Exhibit D** and incorporated herein.  On February 24, 2026, Ankor Holdings sent Anotta a Supplemental Notice for failure to pay rent and reiterated that the Lease would terminate on February 28, 2026.  A true and correct copy of the Supplemental Notice is attached hereto as **Exhibit E** and incorporated herein.  Pursuant to Ankor Holdings' Notice of Default, Notice of Lease Termination, and Supplemental Notice, the Lease terminated on February 28, 2026, at 11:59 p.m.

Despite the termination of the Lease, Anotta remained in possession of the Premises and unlawfully held the Premises with force.  Accordingly, Ankor Holdings initiated the eviction action captioned as *Ankor Holdings, LLC. vs Moyata Anotta, Doing Business as NW Metals, Inc.* in the Circuit Court of the State of Oregon for the County of Multnomah ("**State Court**"), Case No. 26LT05695 ("**Eviction Case**") in March 2026.  A true and correct copy of the Complaint and Summons filed in the Eviction Case is attached hereto as **Exhibit F** and incorporated herein.

Meanwhile, NW Metals, Inc., an Oregon corporation owned and operated by Anotta and listed as a tenant by and through Anotta in the Lease, is the subject of an investigation and enforcement action brought by DEQ for multiple violations of Oregon law, including improper disposal of solid waste without a permit, operating a commercial establishment that would cause an increase of discharge of waste into waters, and operating a shredder at the Premises without obtaining an air containment discharge permit.  A true and correct copy of the Notice of Civil Penalty Assessment and Order issued by DEQ dated November 4, 2025, is attached hereto as **Exhibit G** and incorporated herein.

On April 6, 2026, Governor Tina Kotek described Anotta and NW Metals as "repeatedly violat[ing] our environmental safety and air quality standards" and thereby "put[ting] Oregon communities at risk[.]"  Similarly, Attorney General Dan Rayfield described the business

**Page 4 of 7** –  ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

practices of Anotta and NW Metals as "send[ing] toxic smoke over a residential neighborhood" during a 2018 incident that caused 145 people to evacuate their homes. And, at the Premises in particular, the Attorney General also alleged that Anotta and NW Metals continue to illegally dispose of solid waste, among other environmental violations.

The State Court scheduled a trial in the Eviction Case on Thursday, April 23, 2026, at 1:30 p.m. Anotta filed the above-captioned bankruptcy case on April 23, 2026 ("**Petition Date**"). Notice of the bankruptcy filing was provided to Ankor Holdings at 12:27 p.m. on April 23, 2026, just one hour before the eviction trial, causing it to be automatically stayed. As of the Petition Date, any of Anotta's possessory rights to the Premises have vested in the Bankruptcy Estate and are controlled by the Chapter 7 Trustee. *See* 11 U.S.C. §§ 323, 541(a), 542(a), 363(b)(1), and 704(a).

Ankor Holdings, through counsel, reached out to the Chapter 7 Trustee regarding the environmental issues at the Premises. The Chapter 7 Trustee subsequently informed Anotta that Anotta is not authorized to conduct any business on the Premises, nor remove any equipment or vehicles from it. With respect to the Premises, Anotta responded that "my possessory and operational interests, as well as related disputes with the landlord, are subject to ongoing legal proceedings. Any restriction on access or control over the premises should be addressed through appropriate court authorization." A true and correct copy of the email correspondence between the Chapter 7 Trustee and Anotta is attached hereto as **Exhibit H**. This Court is the proper forum to seek direction regarding protection of the Premises and property of the Bankruptcy Estate.

IV.    **ARGUMENT**

A.    **Ankor Holdings Seeks an Order Permitting it to Help Secure and Protect the Premises.**

Ordinarily, the Chapter 7 Trustee would incur the expenses necessary to protect the Premises and potential assets of the estate. However, in this instance, it is uncertain whether any

**Page 5 of 7** –    ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440

assets will be available to satisfy such expenses, and the Premises require immediate protection and action. Accordingly, and because the Premises are owned by Ankor Holdings, Ankor Holdings is willing to pay the expenses associated with securing and protecting the Premises. Anotta is currently damaging the Premises through his illegal, unfettered pollution. He is causing hazardous chemicals to seep into the ground and contaminate water streams, particulates to contaminate the air from his car shredder, and piling incredible amounts of vehicular waste across the Premises. Both the Governor and the Attorney General have publicly called out Anotta, by name, and demanded that he stop his harmful conduct at the Premises. Ankor Holdings has also tried to stop Anotta by evicting him from the Premises, but such efforts were stayed by the filing of this Chapter 7 petition.

Not only is it in the public's interest to stop Anotta's illegal activities at the Premises, Ankor Holdings—as the owner and landlord of the Premises—also has an interest in stopping the continuous damage to the Premises. Moreover, Anotta's continued illegal activity potentially exposes Ankor Holdings to DEQ fines because it owns the Premises.

Accordingly, Ankor Holdings is willing to pay the costs to secure the Premises—instead of such costs being borne by the Estate. That includes the costs to install and maintain fencing around the perimeter of the Premises and whatever other actions are deemed necessary or appropriate to protect the Premises, and the costs of having environmental experts evaluate the Premises and determine a process to remediate Anotta's illegal conduct. Allowing Ankor Holdings to pay the costs of securing and protecting the Premises is in the best interest of the public and the Estate.

**B.     The Order Should Prohibit Unauthorized Access to the Premises.**

The bankruptcy estate is currently in possession of the Premises. The Chapter 7 Trustee is the person with authority over property of the estate and the right to control access to the Premises. *See* 11 U.S.C. §§ 323, 541(a), 542(a), 363(b)(1), and 704(a). The Chapter 7 Trustee has notified Anotta of the Chapter 7 Trustee's authority over property of the estate. However,

**Page 6 of 7** –    ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

Anotta has responded that his access to the Premises "should be addressed through appropriate court authorization." *See* **Exhibit H**.  Based on Anotta's response, an order of this Court is needed that expressly states that the Chapter 7 Trustee has possession and control over all property of the estate and all access to the Premises shall be limited only to such persons and entities as authorized by the Chapter 7 Trustee pending further order of this Court.

**V.     CONCLUSION**

For the foregoing reasons, Ankor Holdings hereby respectfully requests that this Court enter an order, substantially similar to the proposed form of order attached hereto as **Exhibit A**, permitting Ankor Holdings to secure and protect the property, shortening the time for a response to the Motion, expediting a hearing on the Motion, and such other relief as the Court deems fit.

DATED:  April 27, 2026.

TONKON TORP LLP


By:     */s/ Eric M. Levine*
          Timothy J. Conway, OSB No. 851752
          Eric M. Levine, OSB No. 224393
          *Attorneys for Ankor Holdings, LLC*

**Page 7 of 7** –   ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING

TONKON TORP LLP
1300 SW FIFTH AVE., SUITE 2400
PORTLAND, OR 97201
503.221.1440



Maureen S. Bayer
maureen.bayer@tonkon.com

503.802.2115   direct
503.221.1440   main

February 24, 2026

**VIA EMAIL**
**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

Moyata Anotta
DBA NW Metals, Inc.
3744 NW Devoto Lane
Portland, OR 97229

Re:    SUPPLEMENTAL NOTICE OF LEASE TERMINATION
       8140 N. Commercial Avenue, Portland, Oregon

Dear Mr. Anotta:

Pursuant to Section 11.2.1 of the Lease, this letter constitutes Landlord's supplemental written notice that Landlord elects to terminate the Lease. Landlord issued Tenant a Notice of Default pursuant to Section 11.1.2 of the Lease on or about December 12, 2025. Tenant acknowledged receipt of the Notice of Default effective December 22, 2025 and therefore Tenant had until no later than January 11, 2026 to cure the noncompliance identified in the Notice of Default. Tenant's response dated December 23, 2025 identified that NW Metals was "evaluating" the steps evaluated in DEQ's enforcement correspondence and "assessing operational adjustments." This does not cure Tenant's noncompliance.

In addition, pursuant to Section 11.1.1, Tenant is also in default for failure to pay rent under the Lease within ten days after it was due. Specifically, Tenant has not paid amounts due and owing for the months October 2025, November 2025, December 2025, January 2026, and February 2026. The rent payment made in December 2025 in the amount of $12,000 was applied to rent due for the month of September 2025. The amount of rent currently outstanding is $90,000.

As Tenant has not cured its noncompliance, and as Tenant's nonpayment of rent within ten days of the due date constitutes an Event of Default under the Lease, **Landlord hereby declares Tenant in supplemental default and terminates the Lease on that additional basis, effective at 11:59 p.m. on February 28, 2026**. Tenant must vacate and surrender the Premises by that date, as required by Section 12.1 of the Lease and detailed in Landlord's prior termination notice.

EXHIBIT F
Page 61 of 64

Moyata Anotta
February 24, 2026
Page 2

In response to your undated letter received on February 14, 2026, the grounds upon which Ankor Holdings ("Landlord") is pursuing eviction are based on independent violations of the Lease, as set forth in the Notice of Default and this letter. While certain violations of the Lease are also the subject of Oregon Department of Environmental Quality ("DEQ") enforcement action against you, the outcome of the enforcement action does not bear on the Lease violations. For example, Section 4.1 of the Lease requires Tenant to "promptly comply and cause the Premises to comply with all applicable laws, ordinances, rules and regulations of any public authority." You allege that "the lease does not permit termination based solely on disputed allegations that remain under administrative review." First, termination is not based solely on disputed allegations, but includes violations that constitute events of default which are unrelated to Tenant's compliance with law, including:

- Nonpayment of rent – violation of Section 2.1;
- Use of the Premises for activities outside of the allowed use – violation of Basic Lease Term H;
- Conducting activities that will increase Landlord's insurance rates for any portion of the Building or that will in any manner degrade or damage the reputation of the Building – violation of Section 4.1;
- Failure to maintain and repair the Premises in clean and good condition – violation of Section 6.1.1;
- Making alterations, additions, or improvements to the Premises without Landlord's prior written consent – violation of Section 6.1.2;
- Failing to notify Landlord of releases of hazardous materials – violation of Section 20.1; and
- Causing or permitting any Hazardous Material to be brought upon, stored, used, generated, released into the environment, or disposed of on, in, under or about the Premises - violation of Section 20.1.

Second, there is nothing in the Lease or in law that prohibits Landlord from terminating the Lease for violations where Tenant has challenged the basis of regulatory enforcement. As such, the Lease remains terminated, **effective at 11:59 p.m. on February 28, 2026**.

Sincerely,

Maureen S. Bayer

MSB/cp

044805\00003\19289527v1

# Capitol
# Electric Co., Inc.

**Invoice:** 93474
**Invoice Date:** 2/12/2025
**PO Number:**
**Due Date:** 2/12/2025
**Project:** 250248

11401 NE Marx St
Portland OR 97220-1041
503-255-9488

**To:**
Ankor Holdings LLC
dave@lowd.com
3877 NE Bryan Street
Portland OR

**Project:**
Restore Power
8140 N Commerical Ave
Portland OR

Electrical invoice for the electrical work at 8140 N Commercial Ave, Portland, Oregon. Change pricing is per phone call with David for the required upgrades/ changes that Pacific Power told us was required to reconnect. Per Capitol Electric Bid AB3721

| Code - Description | Current Contract | Previous Completed | Prev % Compl | % Compl | Retainage To Date | Current Completed | Current Retainage | Current Due |
|---|---|---|---|---|---|---|---|---|
| 01 - Contract | 4,480.00 | 0.00 | 0.00 | 100.00 | 0.00 | 4,480.00 | 0.00 | 4,480.00 |
| CO01 - Pacific Power required repairs | 513.00 | 0.00 | 0.00 | 100.00 | 0.00 | 513.00 | 0.00 | 513.00 |
| **Invoice Totals:** | 4,993.00 | 0.00 | 0.00 | 100.00 | 0.00 | **4,993.00** | **0.00** | 4,993.00 |
| | | | | | | | **Net Due:** | **4,993.00** |

*Payment due upon receipt. Interest at the rate of 1.5% shall be charged on all amounts more than thirty days past due. In any action or suit relating to the amounts due hereunder, the prevailing party shall be entitled to an award of its reasonably incurred attorney fees in addition to all other remedies. Add 3.5% for Credit Card*

EXHIBIT F
Page 63 of 64

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing **AMENDED COMPLAINT (FORCIBLE ENTRY AND UNLAWFUL DETAINER – COMMERCIAL PROPERTY)** on:

Moyata Anotta DBA NW Metals, Inc.
8140 N. Commercial Ave
Portland, Oregon 97217
Email: anottam@gmail.com

☐      by electronic means through the Court's File & Serve system (if registered) on the date set forth below;

☒      by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to the party listed above and depositing in the U.S. mail at Portland, Oregon on the date set forth below;

☒      by causing a copy thereof to be emailed to the party listed above on the date set forth below;

DATED:  March 6, 2026.

TONKON TORP LLP


By:      *s/ Maureen S. Bayer*
        Will Gent, OSB No. 165254
        Maureen S. Bayer, OSB No. 214905
        Carlisle S. Pearson, OSB No. 204221
    Attorneys for Plaintiff

PAGE 1 –   CERTIFICATE OF SERVICE

006030\00054\13111723v1

BEFORE THE ENVIRONMENTAL QUALITY COMMISSION

OF THE STATE OF OREGON

IN THE MATTER OF:              )      NOTICE OF CIVIL PENALTY
                                   )      ASSESSMENT AND ORDER

NW METALS, INC.,               )
                                   )      CASE NO.  LQ/SW-NWR-2025-535
                    Respondent.   )

## I.  AUTHORITY

The Department of Environmental Quality (DEQ) issues this Notice of Civil Penalty Assessment and Order (Notice) pursuant to Oregon Revised Statutes (ORS) 468.100, ORS 468.126 through 468.140, ORS 459.995, ORS Chapters 468A, 468B and 183, and Oregon Administrative Rules (OAR) Chapter 340, Divisions 011, 012, 045, 093, 216, and 245, as more specifically described below.

## II.  FINDINGS OF FACT

### Solid waste violations

1.      From approximately March 2021 through November 2024, Respondent operated a business receiving, storing, and handling discarded vehicles, miscellaneous scrap metal, and tires at 9537 North Columbia Boulevard, Portland, Oregon (Columbia Facility).

2.      On January 9, 2025, DEQ staff inspected the Columbia Facility. At that time, and continuing as of the date of this Notice, Respondent had abandoned the following at the Columbia Facility from its prior operations: three piles (approximately 15 feet high) of residue from shredding solid waste including automobiles, as well as several inoperable automobiles and recreational vehicles, containers of waste automotive fluids, scrap metal, hundreds of waste tires, automobile parts, and miscellaneous garbage.

3.      At no time did Respondent have a solid waste disposal site permit for the Columbia Facility.

4.      From approximately November 2024 through the date of this Notice, Respondent has operated and continues to operate a business receiving, storing, and handling discarded vehicles, miscellaneous scrap metal, and waste tires at 8410 North Commercial Avenue, Portland, Oregon (Commercial Facility).

5.    On January 9 and February 6, 2025, DEQ staff observed the Commercial Facility. There were two Arjes Shredders, a conveyer, separator, and excavator at the Commercial Facility. The separator was sorting material and the conveyor was operational. A pile of shredded material was at the end of the shredder itself and on the ground in front of the shredder. Additionally, there were numerous inoperable vehicles, vehicle parts, residue from shredding solid waste, waste tires, and miscellaneous scrap metal and garbage at the Commercial Facility.

6.    Respondent does not have an automobile dismantler certificate from the Oregon Department of Transportation Division of Motor Vehicles issued pursuant to ORS 822.110 for the Commercial Facility.

7.    Respondent does not have a solid waste disposal site permit for the Commercial Facility.

Water quality violation

8.    Since on or about November 2024, Respondent has operated its business at the Commercial Facility under Standard Industrial Classification (SIC) codes 5015 (Motor Vehicle Parts, Used) and 5093 (Scrap and Waste Materials).

9.    During precipitation events, the industrial activities at the Commercial Facility are exposed to stormwater. From on or about November 2024 to at least August 18, 2025, that industrial stormwater had the potential to discharge to the Columbia Slough. More specifically, at all material times until August 18, 2025, one manhole and two catch basins located in areas at the Commercial Facility where Respondent was operating were connected to the City of Portland's stormwater system, which drains to the Columbia Slough.

10.    On November 13, 2024, April 25, 2025, and August 5, 2025, the City of Portland's Bureau of Environmental Services (BES) notified Respondent in writing that Respondent was required to apply for coverage under a National Pollutant Discharge Elimination System (NPDES) 1200-Z stormwater discharge permit for operations at the Commercial Facility.

11.    On April 7, 2025, and July 30, 2025, BES staff inspected the Commercial Facility. At those times, Respondent stored industrial equipment (including vehicles, shredders, a conveyer, and a separator), as well as piles of shredded waste, waste tires, discarded vehicles and vehicle parts, vehicle

fluids, miscellaneous scrap metal, and other waste.

12.     At no time has Respondent had coverage for the Commercial Facility under the NPDES 1200-Z permit or any other water quality permit.

Air quality violations

13.     On March 24, 2021, DEQ issued Simple Air Contaminant Discharge Permit no. 26-0315-SI-01 to Respondent, authorizing Respondent's metal shredding operations at the Columbia Facility (the Columbia ACDP).

14.     On or about November 7, 2024, Respondent relocated two metal shredders from the Columbia Facility to the Commercial Facility. The first shredder is an Arjes VS 950 Titan Shredder, Device ID 7600-Shredder2 (Shredder 2). The second shredder is also an Arjes VS 950 Titan Shredder, Device ID 7600-Shredder3 (Shredder 3).

15.     Between November 13, 2024, and the end of November 2024, Respondent operated Shredder 3 for a total of 4.8 hours at the Commercial Facility.

16.     During the month of December 2024, Respondent operated Shredder 3 for 15.4 hours at the Commercial Facility.

17.     Between January 1, 2025, and February 15, 2025, Respondent operated Shredder 3 for 32.8 hours at the Commercial Facility.

18.     The Commercial Facility has a capacity to emit 10 or more tons per year of Volatile Organic Compounds (VOCs).

19.     The Commercial Facility has a capacity to emit 10 or more tons per year of Particulate Matter (PM).

20.     On January 9, 2025, DEQ inspected the Commercial Facility. DEQ observed two shredders, a conveyor, a separator, and an excavator on site at the Commercial Facility.

21.     On February 6, 2025, DEQ observed the Commercial Facility from a nearby overpass. On February 6, 2025, there were pieces of metal on the conveyor, and there was a pile of shredded material on the ground at the Commercial Facility.

22.     On July 25, 2025, DEQ issued Pre-Enforcement Notice No. 2025-PEN-9906 to

Respondent (Air Quality PEN). The Air Quality PEN cited Respondent for operating Shredder 3 at the Commercial Facility without an ACDP, requested that Respondent immediately cease operating Shredder 3 without an ACDP, and requested that Respondent submit a written notification to DEQ that Shredder 3 is no longer operating, along with a corresponding dated photograph of the Shredder 3 hour meter.

23.    As of the date of this Notice, Respondent has not notified DEQ that it has ceased operating Shredder 3 at the Commercial Facility nor has Respondent provided the requested written notification and photograph described in Section II, Paragraph 22, above.

24.    As of the date of this Notice, DEQ has not issued Respondent an ACDP for the Commercial Facility.

25.    Condition 9.4 of the Columbia ACDP required Respondent to submit to DEQ, by February 15, 2025, an annual report for calendar year 2024. Specifically, Condition 9.4.c required Respondent to submit a dated photograph of the current hour meter reading for the Shredder 2 engine.

26.    According to Condition 1.2 of the Columbia ACDP, Respondent is prohibited from operating Shredder 2 at the Columbia Facility.

27.    On March 11, 2025, Respondent submitted a 2024 annual report to DEQ under the Columbia ACDP; however, that annual report did not include a dated photograph of the current hour meter reading for the Shredder 2 engine.

28.    As of the date of this Notice, Respondent has not submitted the missing information described in Section II, Paragraph 27, above, to DEQ.

2021 Injunction

29.    On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order in Multnomah County Circuit Court (2021 Injunction). Respondent stipulated in the Injunction that Respondent "shall not operate its metal or automobile shredder(s) without valid air permit coverage from DEQ," "shall comply with ORS Chapter 468A and related regulations (collectively the 'Air Quality Rules')," "shall comply with ORS Chapter 459 and related regulations (collectively the 'Solid

////

NOTICE OF CIVIL PENALTY ASSESSMENT AND ORDER

Waste Rules')," and "shall comply with ORS Chapters 468B and related regulations (collectively the 'Water Quality Rules')."

III. CONCLUSIONS

Solid waste violations

1.    Respondent violated OAR 340-093-0040(1) by disposing of solid waste at a location not permitted by DEQ to receive solid waste, as described in Paragraphs 1-3 of Section II above. The materials at the Columbia Facility are "solid waste" as defined in OAR 340-093-0030(99) because they are useless and discarded materials, including garbage, inoperable vehicles and vehicle parts, miscellaneous scrap metal, waste tires, and residue from shredding solid waste. This is a Class I violation, according to OAR 340-012-0065(1)(c). DEQ hereby assesses a $138,566 civil penalty for this violation.

2.    Respondent violated OAR 340-093-0050(1) by establishing, operating, or maintaining a solid waste disposal site at the Commercial Facility without a solid waste disposal site permit issued by DEQ, as described in Paragraphs 4-7 of Section II above. The materials at the Commercial Facility are "solid waste" as defined in OAR 340-093-0030(99) because they are useless and discarded materials, including garbage, non-operational vehicles and vehicle parts, scrap metal, and waste tires. The Commercial Facility is a "disposal site" as defined in OAR 340-093-0030(41) because it was and is used for disposal, handling, transfer, material recovery and recycling from solid wastes. This is a Class I violation, according to OAR 340-012-0065(1)(a). DEQ hereby assesses a $81,557 civil penalty for this violation.

Water quality violation

3.    Respondent violated ORS 468B.050(1)(d) and OAR 340-045-0033(6) by operating a commercial establishment or activity which would cause an increase in the discharge of wastes into waters of the state or which would otherwise alter the physical, chemical or biological properties of any waters of the state in any manner not already lawfully authorized, without a permit issued by DEQ, as described in Paragraphs 4-5 and 8-12 of Section II above. From approximately November of 2024 through August 18, 2025, Respondent allowed stormwater discharge contaminated by Respondent's operations at the

Commercial Facility to enter a manhole and two catch basins that convey stormwater to the City of Portland's stormwater collection system, which connects to the Columbia Slough, waters of the state as defined in ORS 468B.005(10). The stormwater discharge from the Commercial Facility is waste as defined in ORS 468B.005(9) because it will or tends to cause pollution, as defined in ORS 468B.005(5), of waters of the state. This is a Class I violation, according to OAR 340-012-0055(1)(d). DEQ hereby assesses an $11,480 civil penalty for this violation.

Air quality violations

4.      Respondent violated ORS 468A.045(1)(b) and OAR 340-216-0020(3) by establishing, installing and operating Shredder 3 at the Commercial Facility without first obtaining an ACDP from DEQ, as described in Paragraphs 13-24 of Section II, above. Specifically, on or about November 7, 2024, Respondent moved Shredder 3 from the Columbia Facility to the Commercial Facility. On November 13, 2024, Respondent began operating Shredder 3 at the Commercial Facility. Shredder 3 has a capacity[1] to emit 10 or more tons per year of VOCs and 10 or more tons per year of PM, making the Commercial Facility a source listed in OAR 340-216-8010, Table 1, Part B, Category 85[2], and triggering the requirement in OAR 340-216-0020(2) to obtain an ACDP from DEQ. As of the date of this Notice, DEQ has not issued Respondent an ACDP for the Commercial Facility. This is a Class I violation according to OAR 340-012-0054(1)(b). DEQ hereby asseses a $125,858 civil penalty for this violation.

5.      Respondent violated Condition 9.4 of the Columbia ACDP by failing to timely submit a complete 2024 annual report for the Columbia Facility, as described in Paragraphs 13 and 25-28 of Section II, above. This is a Class II violation according to OAR 340-012-0054(2)(f). DEQ has not assessed a civil penalty for this violation.

IV.  ORDER TO PAY CIVIL PENALTY AND TO COMPLY

Based upon the foregoing FINDINGS OF FACTS AND CONCLUSIONS, Respondent is hereby ORDERED TO:

---

[1] Capacity is defined in OAR 340-200-0020(20) as "the maximum regulated pollutant emissions from a satationary source under its physical and operational design."

[2] OAR 340-216-8010, Table 1, Part B, Category 85 applies to "All other sources, both stationary and portable, not listed herein which would have the capacity of 5 or more tons per year of direct PM2.5 or PM10 if located in a PM2.5 or PM10 nonattainment or maintenance area, or 10 or more tons per year of any single criteria pollutant." VOCs and PM are included within the definition of "criteria pollutant" in OAR 340-200-0020(36).

NOTICE OF CIVIL PENALTY ASSESSMENT AND ORDER                    CASE NO. LQ/SW-NWR-2025-535

1.      Pay a total civil penalty of $357,461. The determination of the civil penalty is attached as Exhibits 1-4 and is incorporated as part of this Notice.

If you do not file a request for hearing as set forth in Section V below, please pay the penalty as follows:

Pay online with e-check (ACH) or Credit Card. Go to Your DEQ Online here: https://ydo.oregon.gov. Select Register Account or Login, then select Pay Invoices/Fees on your account dashboard. Enter the Reference Number and FIMS Account ID included on the attached payment slip. Note: US Bank charges a 2.3% convenience charge for credit card transactions. ACH payments have no additional charges.

Pay by check or money order: Make checks payable to "Department of Environmental Quality" and mail to the address on the enclosed payment slip. Please make sure to include the payment slip with your check or money order.

2.      Immediately cease operating Shredder 3, or any other shredder, at the Commercial Facility without an Air Contaminant Discharge Permit.

3.      By November 7, 2025, submit written notification to DEQ that Shredder 3 is no longer operating, along with a current dated photograph of the Shredder 3 hour meter.

4.      By November 14, 2025, submit an updated 2024 annual report that complies with the requirements of Condition 9.4 of the Columbia ACDP. The updated report must be submitted through Your DEQ Online and must include a dated photograph of the current hour meter reading for the Shredder 2 engine.

5.      By November 14, 2025, provide documentation of your efforts to work with the current property owner to contribute to cleaning up and legally disposing of all solid waste and waste tires disposed at the Columbia Facility, to Steven Chang, DEQ, steven.chang@deq.oregon.gov, or 700 NE Multnomah St, Ste 600, Portland OR 97232.

6.      By November 28, 2025, either, 1) dispose of all solid waste and waste tires from the Commercial Facility at a location permitted to accept them and submit documentation that you have completed such disposal, including receipts and photographs, to Steven Chang, DEQ,

steven.chang@deq.oregon.gov, or 700 NE Multnomah St, Ste 600, Portland OR 97232; or 2) submit a complete application for a solid waste disposal site permit for the Commercial Facility to DEQ.

## V. NOTICE OF RIGHT TO REQUEST A CONTESTED CASE HEARING

You have a right to a contested case hearing on this Notice, if you request one in writing. DEQ must receive your request for hearing **within 20 calendar days** from the date you receive this Notice. If you have any affirmative defenses or wish to dispute any allegations of fact in this Notice or attached exhibits, you must do so in your request for hearing, as factual matters not denied will be considered admitted, and failure to raise a defense will be a waiver of the defense. (See OAR 340-011-0530 for further information about requests for hearing.) You must send your request to: **DEQ, Office of Compliance and Enforcement, 700 NE Multnomah Street, Suite 600, Portland, Oregon 97232**, fax it to **503-229-6762** or email it to **DEQappeals@deq.oregon.gov**. An administrative law judge employed by the Office of Administrative Hearings will conduct the hearing, according to ORS Chapter 183, OAR Chapter 340, Division 011 and OAR 137-003-0501 to 0700. You have a right to be represented by an attorney at the hearing, however you are not required to be. If you request a hearing, you will be notified of the time and place of the hearing and you will be given information on the procedures, and other rights of parties relating to the conduct of the hearing before commencement of the hearing. If you are an individual, you may represent yourself. If you are a corporation, partnership, limited liability company, unincorporated association, trust or government body, you must be represented by an attorney or a duly authorized representative, as set forth in OAR 137-003-0555.

Active duty Service members have a right to stay proceedings under the federal Service Members Civil Relief Act. For more information contact the Oregon State Bar at 1-800-452-8260, the Oregon Military Department at 503-584-3571, or the nearest United States Armed Forces Legal Assistance Office through http://legalassistance.law.af.mil. The Oregon Military Department does not have a toll free telephone number.

If you fail to file a timely request for hearing, the Notice will become a final order by default without further action by DEQ, as per OAR 340-011-0535(1). If you do request a hearing but later withdraw your request, fail to attend the hearing or notify DEQ that you will not be attending the

hearing, DEQ will issue a final order by default pursuant to OAR 340-011-0535(3). DEQ designates the relevant portions of its files, including information submitted by you, as the record for purposes of proving a prima facie case.

_11/4/2025_
Date

_U. Saylor_
Erin Saylor, Interim Manager
Office of Compliance and Enforcement

EXHIBIT 1

FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY
PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

VIOLATION 1:         Disposing of solid waste at a location not permitted by DEQ to
                     receive solid waste, in violation of OAR 340-093-0040(1).

CLASSIFICATION:      This is a Class I violation pursuant to OAR 340-012-0065(1)(c).

MAGNITUDE:           The magnitude of the violation is major pursuant to OAR 340-012-
                     0135(3)(a)(A) because the volume of solid waste disposed at the
                     unpermitted Columbia Facility exceeded 400 cubic yards.

CIVIL PENALTY FORMULA:   The formula for determining the amount of penalty of each
                         violation is:  $BP + [(0.1 \times BP) \times (P + H + O + M + C)] + EB$

"BP"   is the base penalty, which is $12,000 for a Class I, major magnitude violation in the matrix
       listed in OAR 340-012-0140(2)(b)(A)(i) and applicable pursuant to OAR 340-012-
       0140(2)(a)(Q)(i) because Respondent should have had a solid waste disposal permit to
       dispose of waste at the Columbia Facility.

"P"    is whether Respondent has any prior significant actions (PSAs), as defined in OAR 340-
       012-0030(19), in the same media as the violation at issue that occurred at a facility owned
       or operated by the same Respondent and receives an initial value of 5 according to OAR
       340-012-0145(2)(a)(C) and (D), and OAR 340-012-0030(2). On December 3, 2018, DEQ
       issued Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063 to
       Respondent, which included three Class I land quality violations and two Class II land
       quality violations. Pursuant to OAR 340-012-0145(2)(e) and OAR 340-012-
       0145(2)(d)(A)(ii), because all the formal enforcement actions in which PSAs were cited
       were issued more than five years before the current violation occurred, the value of P is
       reduced to 0.

"H"    is Respondent's history of correcting prior significant actions and receives an initial value of
       0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which
       to base a finding under paragraphs (3)(a) or (b). However, pursuant to OAR 340-012-
       0145(3)(d), the sum of values for "P" and "H" may not be less than one because Respondent
       did not take extraordinary efforts to address the PSAs, so the final value of H is 1.

"O"    is whether the violation was repeated or ongoing and receives a value of 4 according to
       OAR 340-012-0145(4)(d) because there were more than 28 occurrences of the violation.
       Each day of violation constitutes a separate occurrence. The violation has been ongoing
       since at least November of 2024.

"M"    is the mental state of the Respondent and receives a value of 4 according to OAR 340-012-
       0145(5)(c) because Respondent's conduct was negligent. Respondent is aware of solid

waste permitting and disposal regulations. On or about August 24, 2020, Respondent submitted an incomplete application for a solid waste permit at the Columbia Facility, which was put on hold. On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order (the 2021 Injunction) where Respondent agreed to comply with ORS Chapter 459 and related solid waste rules. In November of 2024, Respondent abandoned solid waste at the Columbia Facility. On February 20, 2025, DEQ notified Respondent in writing of the violation at the Columbia Facility. As of the date of this Notice, Respondent has not legally disposed of the solid waste Respondent abandoned at the Columbia Facility. By disposing of Respondent's solid waste at an unpermitted location, Respondent failed to take reasonable care to avoid a foreseeable risk of conduct constituting or resulting in a violation.

"C"    is Respondent's efforts to correct or mitigate the violation and receives a value of 2 according to OAR 340-012-0145(6)(g) because Respondent did not address the violation as described in paragraphs (6)(a) through (6)(e) and the facts do not support a finding under paragraph (6)(f). As of the date of this Notice, Respondent has not addressed the violation at the Columbia Facility.

"EB"    is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance. In this case, "EB" receives a value of $113,366. This is the amount Respondent gained by avoiding, since at least November 30, 2024, spending an estimated $145,314 to dispose of the solid waste disposed at the unpermitted Columbia Facility. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

PENALTY CALCULATION:  Penalty = BP + [(0.1 x BP) x (P + H + O + M + C)] + EB
        = $12,000 + [(0.1 x $12,000) x (0 + 1 + 4 + 4 + 2)] + $113,366
        = $12,000 + ($1,200 x 11) + $113,366
        = $12,000 + $13,200 + $113,366
        = $138,566

Case No. LQ-SW-NWR-2025-535
Exhibit 1                                    Page 2

EXHIBIT 2

## FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

VIOLATION 2:                   Establishing, operating, and maintaining an unpermitted solid waste disposal site at the Commercial Facility, in violation of ORS 459.205(1) and OAR 340-093-0050(1).

CLASSIFICATION:              This is a Class I violation pursuant to OAR 340-012-0065(1)(a).

MAGNITUDE:                   The magnitude of the violation is major pursuant to OAR 340-012-0135(3)(a)(A) because the volume of unpermitted solid waste at the Commercial Facility exceeds 400 cubic yards.

CIVIL PENALTY FORMULA:       The formula for determining the amount of penalty of each violation is:  $BP + [(0.1 \times BP) \times (P + H + O + M + C)] + EB$

"BP"   is the base penalty, which is $12,000 for a Class I, major magnitude violation in the matrix listed in OAR 340-012-0140(2)(b)(A)(i) and applicable pursuant to OAR 340-012-0140(2)(a)(Q)(i) because Respondent should have had a solid waste disposal permit.

"P"   is whether Respondent has any prior significant actions (PSAs), as defined in OAR 340-012-0030(19), in the same media as the violation at issue that occurred at a facility owned or operated by the same Respondent and receives an initial value of 5 according to OAR 340-012-0145(2)(a)(C) and (D), and OAR 340-012-0030(2). On December 3, 2018, DEQ issued Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063 to Respondent, which included three Class I land quality violations and two Class II land quality violations. Pursuant to OAR 340-012-0145(2)(e) and OAR 340-012-0145(2)(d)(A)(ii), because all the formal enforcement actions in which PSAs were cited were issued more than five years before the current violation occurred, the value of P is reduced to 0.

"H"   is Respondent's history of correcting prior significant actions and receives an initial value of 0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which to base a finding under paragraphs (3)(a) or (b). However, pursuant to OAR 340-012-0145(3)(d), the sum of values for "P" and "H" may not be less than one because Respondent did not take extraordinary efforts to address the PSAs, so the final value of H is 1.

"O"   is whether the violation was repeated or ongoing and receives a value of 4 according to OAR 340-012-0145(4)(d) because there were more than 28 occurrences of the violation. Each day of violation constitutes a separate occurrence. DEQ first notified Respondent in writing that a solid waste permit was required on February 20, 2025, and as of the date of this Notice, Respondent has not corrected the violation.

Case No. LQ-SW-NWR-2025-535
Exhibit 2                                        Page 1

"M"     is the mental state of the Respondent and receives a value of 4 according to OAR 340-012-0145(5)(c) because Respondent's conduct was negligent. Respondent is aware of solid waste permitting and disposal regulations. In 2020, Respondent submitted an incomplete application for a solid waste permit at the Columbia Facility, which was put on hold. On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order where Respondent agreed to comply with ORS Chapter 459 and related solid waste rules. DEQ first notified Respondent in writing that a solid waste permit was required for the Commercial Facility on February 20, 2025, and DEQ has repeatedly reiterated the requirement and attempted to assist Respondent since that date. As of the date of this Notice, Respondent has not applied for a permit. By operating a business accepting solid waste without applying for a permit, despite Respondent's awareness of the requirement and the multiple notices and requests from DEQ, Respondent failed to take reasonable care to avoid a foreseeable risk of conduct constituting or resulting in a violation.

"C"     is Respondent's efforts to correct or mitigate the violation and receives a value of 2 according to OAR 340-012-0145(6)(g) because Respondent did not address the violation as described in paragraphs (6)(a) through (6)(e) and the facts do not support a finding under paragraph (6)(f). As of the date of this Notice, Respondent has not addressed the violation at the Commercial Facility.

"EB"    is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance. In this case, "EB" receives a value of $56,357. This is the amount Respondent gained by avoiding, since at least January 9, 2025, spending an estimated $72,657 to legally dispose of the solid waste Respondent disposed at the unpermitted Commercial Facility. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

PENALTY CALCULATION:  Penalty = BP + [(0.1 x BP) x (P + H + O + M + C)] + EB
        = $12,000 + [(0.1 x $12,000) x (0 + 1 + 4 + 4 + 2)] + $56,357
        = $12,000 + ($1,200 x 11) + $56,357
        = $12,000 + $13,200 + $56,357
        = $81,557

EXHIBIT 3

FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY
PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

VIOLATION 3:   Operating a commercial activity which would cause an increase in the discharge of wastes into waters of the state or which would otherwise alter the physical, chemical, or biological properties of waters of the state in a manner not already lawfully authorized, in violation of ORS 468B.050(1)(d) and OAR 340-045-0033(6).

CLASSIFICATION:   This is a Class I violation pursuant to OAR 340-012-0055(1)(d).

MAGNITUDE:   The magnitude of the violation is moderate pursuant to OAR 340-012-0130(1), as there is no selected magnitude specified in OAR 340-012-0135 applicable to this violation, and the information reasonably available to DEQ does not indicate a minor or major magnitude.

CIVIL PENALTY FORMULA:   The formula for determining the amount of penalty of each violation is:  $BP + [(0.1 \times BP) \times (P + H + O + M + C)] + EB$

"BP"   is the base penalty, which is $4,000 for a Class I, moderate magnitude violation in the matrix listed in OAR 340-012-0140(3)(b)(A)(ii) and applicable pursuant to OAR 340-012-0140(3)(a)(E)(iii) because Respondent violated a water quality statute and should have applied for coverage under an NPDES General Permit.

"P"   is whether Respondent has any prior significant actions (PSAs), as defined in OAR 340-012-0030(19), in the same media as the violation at issue that occurred at a facility owned or operated by the same Respondent and receives an initial value of 2 according to OAR 340-012-0145(2)(a)(C). On December 3, 2018, DEQ issued Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063 to Respondent, which included two Class I water quality violations and one Class II water quality violation. Because all the formal enforcement actions in which PSAs were cited were issued more than five years before the current violation occurred, the value of P is reduced to 0, pursuant to OAR 340-012-0145(2)(e) and OAR 340-012-0145(2)(d)(A)(ii).

"H"   is Respondent's history of correcting prior significant actions and receives an initial value of 0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which to base a finding under paragraphs (3)(a) or (b). However, the sum of values for "P" and "H" may not be less than one because Respondent did not take extraordinary efforts to address the PSAs, so the final value of H is 1, pursuant to OAR 340-012-0145(3)(d).

"O"   is whether the violation was repeated or ongoing and receives a value of 4 according to OAR 340-012-0145(4)(d) because the violation was ongoing from at least April 11, 2025, the date of the City of Portland's first inspection of the Commercial Facility, until August

Case No. LQ-SW-NWR-2025-535
Exhibit 3                                          Page 1

18, 2025, when Respondent covered the manhole and catch basins at the Commercial Facility with concrete.

"M"    is the mental state of the Respondent and receives a value of 8 according to OAR 340-012-0145(5)(d) because Respondent's conduct was reckless, as defined in OAR 340-012-0030(20). Since at least 2020, Respondent has operated this business at multiple properties, all of which have been evaluated for coverage under the 1200-Z permit. On June 21, 2021, Respondent and DEQ entered into a Stipulated Permanent Injunction Order where Respondent agreed to comply with ORS Chapters 468B and related water quality rules. The City of Portland notified Respondent as early as November 14, 2024, that the Commercial Facility required coverage under the 1200-Z permit, and the City notified Respondent of the requirement again during inspections in April and July of 2025. Under these circumstances, by operating prior to applying for stormwater permit coverage and continuing to operate for nine months without applying for a permit, Respondent consciously disregarded a substantial and unjustifiable risk that the result would occur. Given Respondent's experience with stormwater permitting generally, and Respondent's specific knowledge with respect to the Commercial Facility, Respondent's disregard of this risk constituted a gross deviation from the standard of care a reasonable person would observe in this situation.

"C"    is Respondent's efforts to correct or mitigate the violation and receives a value of 0 according to OAR 340-012-0145(6)(f) because there is insufficient information to make a finding under paragraphs (6)(a) through (6)(e), or (6)(g) or if the violation or the effects of the violation could not be corrected or minimized.

"EB"    is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance. In this case, "EB" receives a value of $2,280. This is the amount Respondent gained by avoiding spending $2,984 by at least April 11, 2025, for the permit application and first year of annual fees. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

PENALTY CALCULATION:  Penalty = BP + [(0.1 x BP) x (P + H + O + M + C)] + EB

$$= \$4,000 + [(0.1 \times \$4,000) \times (0 + 1 + 4 + 8 + 0)] + \$2,280$$
$$= \$4,000 + (\$400 \times 13) + \$2,280$$
$$= \$4,000 + \$5,200 + \$2,280$$
$$= \$11,480$$

Case No. LQ-SW-NWR-2025-535
Exhibit 3                    Page 2

EXHIBIT 4

FINDINGS AND DETERMINATION OF RESPONDENT'S CIVIL PENALTY
PURSUANT TO OREGON ADMINISTRATIVE RULE (OAR) 340-012-0045

| | |
|---|---|
| <u>VIOLATION NO. 4</u> | Establishing, installing and operating Shredder 3 at the Commercial Facility without first obtaining an ACDP from DEQ, in violation of ORS 468A.045(1)(b) and OAR 340-216-0020(3). |
| <u>CLASSIFICATION</u>: | This is a Class I violation pursuant to OAR 340-012-0054(1)(b) because Respondent constructed a new source, as defined in OAR 340-245-0020, without first obtaining a required Air Contaminant Discharge Permit that includes permit conditions required under OAR 340-245-0005 through 340-245-8050 or without complying with Cleaner Air Oregon rules under OAR 340-245-0005 through 340-245-8050. The Commercial Facility is a new source as defined in OAR 340-245-0020(33)(a) because it is not an existing source. The Commercial Facility is not an existing source according to OAR 340-245-0020(20) because Respondent did not begin construction or obtain any Clean Air Act approvals, nor did Respondent submit any applications to DEQ for the Commercial Facility before November 16, 2018, the effective date of the Cleaner Air Oregon program. As of the date of this Notice, Respondent has not obtained an ACDP from DEQ for the Commercial Facility, and has not submitted a Cleaner Air Oregon risk assessment for the Commercial Facility according to OAR 340-245-0500(2) or demonstrated to DEQ that the Commercial Facility is an exempt source under OAR 340-245-0500(6). |
| <u>MAGNITUDE</u>: | The magnitude of the violation is moderate pursuant to OAR 340-012-0130(1), as there is no selected magnitude specified in OAR 340-012-0135 applicable to this violation, and the information reasonably available to DEQ does not indicate a minor or major magnitude. |
| <u>CIVIL PENALTY FORMULA</u>: | The formula for determining the amount of penalty of each violation is:  BP + [(0.1 x BP) x (P + H + O + M + C)] + EB |

"BP"   is the base penalty, which is $4,000 for a Class I, moderate magnitude violation in the matrix listed in OAR 340-012-0140(3)(b)(A)(ii) and applicable pursuant to OAR 340-012-0140(3)(a)(A) because Respondent should have an ACDP to operate the shredder at the Commercial Facility.

"P"   is whether Respondent has any prior significant actions, as defined in OAR 340-012-0030(19), in the same media as the violation at issue that occurred at a facility owned or operated by the same Respondent, and receives an initial value of 2 according to OAR 340-

012-0145(2)(a)(C), and OAR 340-012-0030(2). On December 3, 2018, DEQ issued Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063 to Respondent, which included two Class II air quality violations. Pursuant to OAR 340-012-0145(2)(e) and OAR 340-012-0145(2)(d)(A)(ii), because all the formal enforcement actions in which PSAs were cited were issued more than five years before the current violation occurred, the value of P is reduced to 0.

"H"    is Respondent's history of correcting prior significant actions and receives a value of is Respondent's history of correcting prior significant actions and receives an initial value of 0 according to OAR 340-012-0145(3)(c) because there is insufficient information on which to base a finding under paragraphs (3)(a) or (b). However, pursuant to OAR 340-012-0145(3)(d), the sum of values for "P" and "H" may not be less than one because Respondent did not take extraordinary efforts to address the PSAs, so the final value of H is 1.

"O"    is whether the violation was repeated or ongoing and receives a value of 4 according to OAR 340-012-0145(4)(d) because there were more than 28 occurrences of the violation. Each day is a separate occurrence of the violation. On or about November 7, 2024, Respondent moved Shredder 3 from the Columbia Facility to the Commercial Facility. On November 13, 2024, Respondent began operating Shredder 3 at the Commercial Facility. As of the date of this Notice, DEQ has not issued Respondent an ACDP for the Commercial Facility. Therefore, the violation has been ongoing from November 7, 2024, to the date of this Notice, and there are more than 334 occurrences of the violation. As described below, DEQ is assessing 11 separate penalties for each calendar month since Respondent established and installed the Shredder 3 at the Commercial Facility without an ACDP. Therefore, there are more than 28 occurrences of the violation represented in each separate penalty.

"M"    is the mental state of the Respondent and receives a value of 10 according to OAR 340-012-0145(5)(e) because Respondent acted flagrantly. According to OAR 340-012-0030(11), flagrant means the respondent had actual knowledge that the conduct was unlawful and consciously set out to commit the violation. Respondent has previously been cited by DEQ in Amended Notice of Civil Penalty Assessment and Order WQ/SW-NWR-2018-063, issued by DEQ on December 3, 2018, for operating a metal shredder at a former facility (7600 NE Killingsworth Street) without an ACDP. In addition, the 2021 Injunction provides that Respondent "shall not operate its metal or automobile shredder(s) without valid air permit coverage from DEQ," "shall comply with ORS Chapter 468A and regulated regulations (collectively the "Air Quality Rules"). In addition, since Respondent relocated Shredder 3 from the Columbia Facility to the Commercial Facility in November 2024, DEQ has notified Respondent on multiple occasions that the operation of Shredder 3 at the Commercial Facility is unpermitted and unlawful. These notifications include an email on December 17, 2024, a letter dated December 30, 2024, an email dated February 25, 2025, and the Air Quality PEN issued on July 25, 2025. Thus, Respondent had actual knowledge that the conduct was unlawful and consciously set out to commit the violation by operating Shredder 3 at the Commercial Facility.

"C"    is Respondent's efforts to correct or mitigate the violation, and receives a value of 2 according to OAR 340-012-0145(6)(g) because Respondent did not address the violation as described in paragraphs (6)(a) through (6)(e) and the facts do not support a finding under paragraph (6)(f). As of the date of this Notice, Respondent has not addressed the violation at the Commercial Facility.

GRAVITY-BASED PENALTY CALCULATION:

$$\begin{aligned}
\text{Penalty} = BP + [(0.1 \times BP) \times (P + H + O + M + C)] \\
= \$4,000 + [(0.1 \times \$4,000) \times (0 + 1 + 4 + 10 + 2)] \\
= \$4,000 + (\$400 \times 17) \\
= \$4,000 + \$6,800 \\
= \$10,800
\end{aligned}$$

According to ORS 468.140(2), each day of violation constitutes a separate offense and is subject to a civil penalty up to $25,000 per day. According to OAR 340-012-00145(4)(e), DEQ is exercising its enforcement discretion to assess 11 separate penalties.

Gravity based penalty: $10,800 x 11 = $118,800

ECONOMIC BENEFIT

"EB"    is the approximate dollar value of the benefit gained and the costs avoided or delayed as a result of the Respondent's noncompliance. It is designed to "level the playing field" by taking away any economic advantage the entity gained and to deter potential violators from deciding it is cheaper to violate and pay the penalty than to pay the costs of compliance. In this case, "EB" receives a value of $7,058. This is the amount Respondent gained by avoiding spending $9,000 to apply for an ACDP for the Commercial Facility. This "EB" was calculated pursuant to OAR 340-012-0150(1) using the U.S. Environmental Protection Agency's BEN computer model.

TOTAL PENALTY

According to OAR 340-012-0045, the total penalty is the gravity-based penalty (BP + [(0.1 x BP) x (P + H + O + M + C)]) plus the Economic Benefit.

Total penalty: $118,800 + $7,058 = $125,858

Case No. LQ-SW-NWR-2025-535
Exhibit 4                              Page 3

Oregon Department of Environmental Quality
700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100



**State of Oregon**
**DEQ Department of Environmental Quality**

Phone: 503-229-5437
Fax: 503-229-5850

MOYATA ANOTTA
NORTHWEST METALS
8140 N COMMERCIAL AVE
PORTLAND, OR 97217-1040

## CIVIL PENALTY - ORS 468.135(2)

| DATE: | November 4, 2025 |
|---|---|
| **RESPONSE DATE\*:** | January 13, 2026 |
| **TOTAL PENALTY:** | $357,461.00 |

| Account Name: | NORTHWEST METALS | | |
|---|---|---|---|
| Account Type: | Vendor/Organization/Company | Reference Number: | CPGFD2600040 |
| SubSystem ID: | 1523 | FIMS Acct. ID: | 29139 |

## Penalty Summary

| Penalty Amount | Interest | Adjustment | Amount Paid | Total Penalty |
|---|---|---|---|---|
| $ 357,461.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 357,461.00 |

\*This is the date the penalty is due if you do not exercise your right to appeal the attached order. Payment of this penalty is subject to the exercise of your options or right to appeal as described in the enclosed enforcement documents.

To Pay Online with ACH or Credit Card Visit https://ydo.oregon.gov and select 'Register Account'

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂

PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

**DEQ**
MOYATA ANOTTA
NORTHWEST METALS
8140 N COMMERCIAL AVE
PORTLAND, OR 97217-1040

| REFERENCE NO. | CPGFD2600040 | | |
|---|---|---|---|
| PAYCODE: | 00401 7400 10040 74001 0500 000000 00 | | |
| FEE PROGRAM ID: | 950 | RESPONSE DATE: | January 13, 2026 |
| FIMS ACCT. ID: | 29139 | TOTAL PENALTY DUE: | $357461.00 |

☐ Check this box if updated address information has been provided on the back of the form.

AMOUNT ENCLOSED: [          ]

MAKE CHECK PAYABLE TO: Department of Environmental Quality

DEQ FINANCIAL SERVICES - LBX4244
PO BOX 4244
PORTLAND OR 97208-4244

00401 7400 10040 74001 0500 000000 0095000291393CPGFD2600040000357461007



**State of Oregon**
**Department of**
**Environmental**
**Quality**

# State of Oregon Department of Environmental Quality

## CIVIL PENALTY - ORS 468.135(2)

700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100
Phone: 503-229-5437
Fax: 503-229-5850

## Penalty Detail

| Transaction Date | Description | Amount |
|---|---|---|
| 11/3/2025 | 2025-535 LQ-SW-NWR-2025-535 | $357,461.00 |

### SFMS Agencies Use:

| Trans Code | Treasury Fund | SFMS | Index | PCA (5) | Agency Object | Project # | Phase |
|---|---|---|---|---|---|---|---|
| 723 | 00401 | 7400 | 10040 | 74001 | 0500 | 00000 | 00 |

## Address Changes

Please visit https://vdo.oregon.gov to update your mailing address online or provide the following information:

Name _____

Address _____

City, State, Zip _____

# CERTIFICATE OF MAILING

I hereby certify that I served DEQ Case No. **LQ-SW-NWR-2025-535** upon:

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $ _____
☐ Return Receipt (electronic)      $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required          $ _____
☐ Adult Signature Restricted Delivery $ _____
Postage

Postmark
Here

NW Metals Inc
c/o Moyata Anotta, Registered Agent
8140 N Commercial Ave.
Portland, OR 97217

PS Form 3800, January 2023 PSN 7530-02-000-9047   See Reverse for Instructions

By mailing a true copy of the above by placing it in a sealed envelope, with postage prepaid at the DEQ/DAS mail services in Portland, Oregon on _November 4, 2025_

Isaac Griffith, Case Coordinator
Office of Compliance & Enforcement
Department of Environmental Quality

| | |
|---|---|
| **From:** | Kenneth Eiler |
| **To:** | 'Moyata Anotta' |
| **Cc:** | Tim Conway; Eric Levine; Maureen Bayer; |
| **Subject:** | RE: MOYOTA ALAKA ANOTTA 26-31412 |
| **Sent:** | 4/24/2026 4:06:56 PM |

Please provide me with a list of all parties who currently occupy the property including their name, mailing address, email address and sublease agreement.  I want to make sure that they, like you, receive notice of any filings in the bankruptcy court.

I have copied the land owner's attorneys so that they are aware of your concerns.   Thank you.  Ken Eiler

Kenneth S. Eiler
Receiver
Attorney at Law
Bankruptcy Panel Trustee
Sub Chapter V Trustee (Region 18)
515 NW Saltzman Rd.
PMB 810
Portland, OR. 97229

503.292.6020
503.297.9402  (fax)

---

**From:** Moyata Anotta <anottam@gmail.com>
**Sent:** Friday, April 24, 2026 3:46 PM
**To:** Kenneth Eiler <kenneth.eiler7@gmail.com>
**Subject:** Re: MOYOTA ALAKA ANOTTA 26-31412

Mr. Eiler,

I acknowledge receipt of your email and understand your role as Chapter 7 Trustee.

I intend to cooperate in good faith with the administration of the estate. However, I must respectfully clarify and preserve certain rights and factual issues that remain in dispute.

First, the characterizations regarding alleged environmental violations and permitting issues involve matters that are currently being actively litigated and have not been adjudicated. I do not agree with those characterizations and reserve all rights with respect to those proceedings.

Second, with respect to the property located at 8140 N. Commercial St., my possessory and operational interests, as well as related disputes with the landlord, are subject to ongoing legal proceedings. Any restriction on access or control over the premises should be addressed through appropriate court authorization.

Third, the site includes multiple subtenants and independent operators who are not part of this bankruptcy proceeding and whose property and operations are not assets of the bankruptcy estate. Any measures taken at the property must be narrowly tailored to avoid interference with the rights, property, and operations of those non-debtor parties.

Fourth, I do not object in principle to reasonable measures to secure the property and preserve estate assets. However, I cannot consent to any actions that would:
(1) alter or disturb potential evidence,
(2) expand the scope of access beyond what is necessary to secure estate assets,
(3) interfere with non-debtor third-party occupants, or
(4) allow dissemination of information or materials to third parties, including regulatory agencies, without my prior knowledge and appropriate court oversight.

To the extent you intend to file a motion, I request that I be provided with a copy in advance so that I may review and respond as necessary.

I remain willing to cooperate and coordinate in a manner that protects both the estate and my legal rights.

Sincerely,
Moyata Anotta

EXHIBIT H
Page 1 of 2

On Fri, Apr 24, 2026 at 2:56 PM Kenneth Eiler <kenneth.eiler7@gmail.com> wrote:

I am the bankruptcy Trustee in the Chapter 7 proceeding that you have filed.  I have attached a copy of the notice of my appointment.  As a result of your filing, your assets are now property of the bankruptcy estate.

I have been contacted by the attorneys representing the owner of the property at 8140 N. Commercial St. in Portland.  I understand that you leased this property from the owner to operate a car crushing business.  I also understand that the Oregon DEQ has issued a Notice of Civil Penalty Assessment and Order because the business you operated was conducted without proper permits and that you have otherwise allowed for the accumulation of hazardous waste on the property.  I am also aware that the Oregon Department of Justice filed contempt proceedings earlier this month concerning these violations.

Please be advised that as a result of your bankruptcy filing, that you are not authorized to conduct any business on the property.  In addition, you are not authorized to remove any equipment or vehicles from the property.  Finally, you are not authorized to enter the property without my consent. Once the property is secured, I will be sending my auctioneer out to the property to investigate the vehicles and equipment located at the site.

For now, I will be filing an emergency Motion with the court seeking permission to install fencing on the property to prevent unauthorized access,  and to otherwise allow for environmental consultants to go onto the property to investigate the concerns raised by the DEQ.  I assume that you have no objection to these initial measures.

Filing bankruptcy is a complicated process, especially when the debtor owns commercial assets that the bankruptcy Trustee needs to evaluate and ultimately liquidate.  To that end, I would strongly urge you to retain a bankruptcy attorney to assist you with this process.  I cannot represent you or otherwise provide you with legal advice.

Thank you in advance for your cooperation and assistance in this matter.  Ken Eiler

Kenneth S. Eiler
Receiver
Attorney at Law
Bankruptcy Panel Trustee
Sub Chapter V Trustee (Region 18)
515 NW Saltzman Rd.
PMB 810
Portland, OR. 97229

503.292.6020
503.297.9402  (fax)

EXHIBIT H
Page 2 of 2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **ANKOR HOLDINGS, LLC'S EMERGENCY MOTION (I) TO SECURE AND PROTECT PROPERTY, (II) TO SHORTEN TIME FOR RESPONSE, AND (III) FOR EXPEDITED HEARING** was served on Debtor and the parties indicated as "ECF" on the attached List of Interested Parties by electronic means through the Court's Case Management/Electronic Case File system on the date set forth below.

In addition, the parties indicated as "Non-ECF" on the attached List of Interested Parties were served by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to each party's last-known address, and depositing in the U.S. mail at Portland, Oregon on the date set forth below.

DATED:  April 27, 2026.

TONKON TORP LLP

By:   */s/ Eric M. Levine*
     Timothy J. Conway, OSB No. 851752
     Eric M. Levine, OSB No. 224393
     *Attorneys for Ankor Holdings, LLC*

044805\00003\19525999v5

**Page 1 of 1** – CERTIFICATE OF SERVICE